1 | Nathan G. Kanute (CA Bar No. 300946)
SNELL & WILMER L.L.P.
2 | 50 West Liberty Street, Suite 510
Reno, Nevada 89501
3 | Telephone: 775-785-5440
E-Mail: nkanute@swlaw.com
4 |
5 | Don Bivens (*pro hac vice pending*)
(AZ Bar No. 005134)
Donald L. Gaffney (*pro hac vice pending*)
6 | (AZ Bar No. 005717)
SNELL & WILMER L.L.P.
7 | One Arizona Center, Suite 1900
400 East Van Buren Street
8 | Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
9 | Facsimile: (602) 382-6070
Email: dbivens@swlaw.com
10 |          dgaffney@swlaw.com

11 | *Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

SOLARMORE MANAGEMENT
SERVICES, INC., a California corporation,

           Plaintiff,

v.

Bankruptcy Estate of DC SOLAR
SOLUTIONS, INC. dba DC SOLAR
SOLUTIONS MFG, INC. dba DC SOLAR
SOLUTIONS MANUFACTURING, INC., a
California corporation; Bankruptcy Estate of
DC SOLAR DISTRIBUTION, INC., a
California corporation; Bankruptcy Estate of
DC SOLAR FREEDOM, INC., a California
corporation; MATTHEW CARPOFF, an
individual; LAUREN CARPOFF, an
individual; ROBERT V. AMATO and
PRISCILLA AMATO, husband and wife;
ROBERT KARMANN, an individual;
RONALD J. ROACH, an individual;
SEBASTIAN JANO, an individual; STEVE
WILDE, an individual; RYAN GUIDRY, an
individual; PATRICK MOORE, an
individual; HALO MANAGEMENT
SERVICES LLC, a Nevada limited liability
company; SCOTT WENTZ, an individual;
RAINA YEE, an individual; MONTAGE

Case No.

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

1  SERVICES, INC., a California corporation;
   VISTRA INTERNATIONAL EXPANSION
2  (USA) INC., fka RADIUS GGE (USA),
   INC., fka HIGH STREET PARTNERS INC.,
3  a Maryland corporation; JULIE MURACO,
   an individual; Praeditis Group LLC, a
4  Delaware limited liability company; THE
   STRAUSS LAW FIRM, LLC, a South
5  Carolina limited liability company; PETER
   STRAUSS, an individual; DIANA
6  KERSHAW, an individual; HERITAGE
   BANK OF COMMERCE, a California
7  Corporation; CARSON TRAILER, INC., a
   California corporation; DAVID ENDRES, an
8  individual; ALVAREZ & MARSAL
   VALUATION SERVICES, LLC, a Delaware
9  limited liability company; BARRY
   HACKER, an individual; MARSHAL &
10 STEVENS, INC.; MARCELO BERMUDEZ,
   an individual; COHNREZNICK, LLP, a New
11 Jersey limited liability partnership; RADIUS
   GGE (USA), INC., fka HIGH STREET
12 PARTNERS INC., a Maryland corporation;
   PANDA BEAR INTERNATIONAL, LTD., a
13 Hong Kong corporation; PANDA SOLAR
   SOLUTIONS LLC, a Nevada limited liability
14 corporation; DC SOLAR
   INTERNATIONAL, INC., a Nevis
15 corporation; BAYSHORE SELECT
   INSURANCE, a Bahamian Corporation;
16 CHAMPION SELECT INSURANCE, a
   Bahamian Corporation; JPLM DYNASTY
17 TRUST, a Cook Island Trust; BILLIE JEAN
   TRUST, a Cook Island Trust; SOUTHPAC
18 INTERNATIONAL, INC., a Cook Islands
   Corporation, AHERN RENTALS INC., a
19 Nevada corporation,

20                          Defendants.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT .................................................................... 1

II.     PARTIES ................................................................................................... 2

        A.      PLAINTIFF ................................................................................... 2

        B.      DEFENDANTS .............................................................................. 3

                1)      THE CORE DEFENDANTS ................................................ 3

                2)      "SCHEME AIDERS/ ABETTORS" ...................................... 5

                3)      ASSET HIDERS .................................................................. 8

III.    JURISDICTION & VENUE ...................................................................... 10

IV.     FACTUAL ALLEGATIONS ...................................................................... 11

        A.      INTRODUCTION ......................................................................... 11

        B.      THE CREATION OF THE MSGS ................................................ 15

        C.      THE FIRST FUNDS ..................................................................... 16

        D.      THE BEGINNING OF THE FUNDS ............................................ 17

        E.      THE FUNDS' BASIC STRUCTURE ............................................ 17

        F.      GENERAL BACKGROUND - DEFENDANTS CAUSING OR
                CONTRIBUTING TO PLAINTIFF'S INJURIES ............................. 23

        G.      THE FIRST SIGN OF TROUBLE (THE AUDITS) & THE APPRAISALS ...... 25

        H.      THE PHASEOUT OF SOLARMORE ............................................ 27

        I.      THE COLLAPSE OF DC SOLAR .................................................. 28

        J.      THE CARPOFFS' PREPARATIONS FOR ESCAPE .......................... 32

V.      ALLEGATIONS RELATED TO RICO VIOLATIONS ................................. 33

        A.      ENTERPRISE ............................................................................... 33

        B.      OPERATION OF THE RICO ENTERPRISE .................................. 35

        C.      PREDICATE ACTS ...................................................................... 35

        D.      VIOLATIONS OF 18 U.S.C. § 1343 ............................................ 36

        E.      PATTERN OF RACKETEERING ACTIVITY ................................ 39

VI.     DAMAGES .............................................................................................. 40

VII.    CLAIMS FOR RELIEF ............................................................................ 40

        COUNT I (FEDERAL RICO - 18 U.S.C. §1962(C) – CORE DEFENDANTS) ............ 40

        COUNT II (FEDERAL RICO - 18 U.S.C. §1962(D) – CORE DEFENDANTS) .......... 42

        COUNT III (FRAUD: INTENTIONAL MISREPRESENTATION – CORE
                DEFENDANTS) ............................................................................ 43

        COUNT IV (FRAUD: INTENTIONAL CONCEALMENT – CORE
                DEFENDANTS) ............................................................................ 44

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

**TABLE OF CONTENTS**

Page

COUNT V (FRAUD IN THE INDUCEMENT- CORE DEFENDANTS) ...................... 44

COUNT VI (CONVERSION- CORE DEFENDANTS) .................................................... 45

COUNT VII (CIVIL CONSPIRACY – CORE DEFENDANTS AND SCHEME AIDERS/ABETTORS) ..................................................................................... 45

COUNT VIII (UNJUST ENRICHMENT – CORE DEFENDANTS AND HALO)........ 46

COUNT IX (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP OR BUSINESS EXPECTANCY – CORE DEFENDANTS) .................................................................................................. 47

COUNT X (NEGLIGENCE – ALVAREZ & MARSAL) .............................................. 47

COUNT XI (NEGLIGENT MISREPRESENTATION – ALVAREZ & MARSAL) ...... 47

COUNT XII (PROFESSIONAL NEGLIGENCE – ROACH) ......................................... 48

COUNT XIII (BREACH OF FIDUCIARY DUTY – ROACH) ...................................... 49

COUNT XIV (PROFESSIONAL NEGLIGENCE – WENTZ, YEE, MONTAGE, & RADIUS/VISTRA) ........................................................................................ 49

COUNT XV (BREACH OF FIDUCIARY DUTY- WENTZ, YEE, MONTAGE & RADIUS/VISTRA) ........................................................................................ 50

COUNT XVI (NEGLIGENT MISREPRESENTATION – ALL DEFENDANTS)........ 50

VIII.    PRAYER FOR RELIEF.......................................................................................... 51

IX.     DEMAND FOR JURY TRIAL............................................................................... 51

**COMPLAINT**

# I.   **PRELIMINARY STATEMENT**

Plaintiff's claims arise from two parallel fraud schemes that wrested over $910 million from innocent purchasers, who thought they had purchased mobile solar energy generators which qualified for valid and significant tax benefits.

Scheme One: From 2011 to 2018, Defendants named below built and sold mobile solar generators ("**MSGs**") to purchasers. Purchasers bought the MSGs for $150,000, with (a) a down payment of $45,000, which supposedly qualified for alternative energy tax credits; and (b) a promissory note for the balance due over twenty years, during which purchasers could depreciate their MSGs on favorable tax terms. But, in reality, the Defendants' sale of MSGs proved a sham.

Scheme Two: The same purchasers were told that Defendants would generate substantial lease revenues from third parties, which would more than cover the balance purchasers owed on their promissory notes. But in reality, the Defendants' promised lease revenues proved to be a sham.

In reality, there was no true market for the MSGs sold to purchasers. Indeed, some purchasers paid for MSGs that were never manufactured. In reality, there was also no true market for the touted leases. The majority of the promised subleases never materialized. In reality, the Defendants perpetrated a fraud on the purchasers, by pretending to have sublease revenue, when in fact the purported sublease revenue was really cash from later purchasers that was transferred from DC Solar to DC Distribution, either directly or through the use of third parties. Defendants' touted sale and leasing transactions of MSGs were business failures that never made money. As a result, the purchasers grossly overpaid for the MSGs and the transactions may not qualify for the promised tax benefits promised. Further, the transactions never generated the promised lease income.

Defendants tried as long as possible to hide and conceal the true facts from purchasers. Among other things, Defendants lied about and tried to conceal that some MSGs sold to purchasers were never manufactured. The Defendants also lied about and tried to conceal that the MSGs failed to generate lease revenues. Among other things, the

                          **COMPLAINT**

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

Defendants moved money between companies in ways intended to disguise the fact that the MSG transactions were fraudulent failures.

Defendants fall into three main categories: Defendants who were core schemers, Defendants who were scheme aiders/abettors, and Defendants who facilitated hiding money and MSGs (or lack thereof).

Plaintiff, for its complaint against the Defendants, alleges as follows:

## II.   **PARTIES**

### A. **Plaintiff**

1. Solarmore Management Services, Inc. ("**Solarmore**" or "**Plaintiff**") is a California corporation authorized to do and doing business in California. Solarmore is owned and managed by Carl Jansen ("**Jansen**").

2. Until December 12, 2019, Solarmore was the managing member of the following California limited liability companies, which are collectively referred to as the "**Funds**" or the "**Purchasers**."

      a.     Solar Eclipse Investment Fund V, LLC

      b.     Solar Eclipse Investment Fund VI, LLC

      c.     Solar Eclipse Investment Fund VII, LLC

      d.     Solar Eclipse Investment Fund VIII, LLC

      e.     Solar Eclipse Investment Fund X, LLC

      f.     Solar Eclipse Investment Fund XI, LLC

      g.     Solar Eclipse Investment Fund XII, LLC

      h.     Solar Eclipse Investment Fund XIV, LLC

      i.     Solar Eclipse Investment Fund XV, LLC

      j.     Solar Eclipse Investment Fund XVI, LLC

      k.     Solar Eclipse Investment Fund XVII, LLC

      l.     Solar Eclipse Investment Fund XVIII, LLC

      m.     Solar Eclipse Investment Fund XIX, LLC

      n.     Solar Eclipse Investment Fund XXI, LLC

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

o.      Solar Eclipse Investment Fund XXII, LLC

p.      Solar Eclipse Investment Fund XXIII, LLC

q.      Solar Eclipse Investment Fund XXIV, LLC

r.      Solar Eclipse Investment Fund XXVI, LLC

s.      Solar Eclipse Investment Fund XXVIII, LLC

t.      Solar Eclipse Investment Fund XXXI, LLC

3.      Solarmore is currently the 1% owner in each of the Funds except for Fund V and Fund VI, in which Solarmore is the 95% owner.

4.      The Funds are tax-equity investment funds permitted under the Internal Revenue Code (the "**Code**"), created specifically for the purpose of owning MSGs.

5.      Along with the managing member of the Funds, which was Solarmore up to December 12, 2019, each Fund has a purchasing member or members (as further defined below, the "**Purchasing Member**"), which provided the money to purchase the MSGs.

6.      As of December 18, 2019, Solarmore consented to resignation as managing member of the Funds.

**B.  Defendants**

*1)  The Core Defendants*

7.      DC Solar Solutions, Inc. (on information and belief, dba DC Solar Solutions MFG, Inc. dba DC Solar Solutions Manufacturing, Inc.) is a California corporation headquartered in Benicia, California ("**DC Solar Solutions**").

8.      DC Solar Distribution, Inc. is a California corporation headquartered in Benicia, California ("**DC Solar Distribution**").

9.      DC Solar Freedom, Inc. is a California corporation headquartered in Benicia, California ("**DC Solar Freedom**") (together with DC Solar Solutions and DC Solar Distribution, "**DC Solar**"). The DC Solar entities are owned by Jeff Carpoff ("**Carpoff**") and Paulette Carpoff (together, the "**Carpoffs**"), except that Lauer, Muraco, and Roach also owned equity in DC Solar Freedom.

10.     The DC Solar entities are currently debtors in the jointly administered Chapter

7 bankruptcy proceedings pending in the United States Bankruptcy Court, District of Nevada ("**Bankruptcy Court**") under the lead case styled *In re Double Jump, Inc.,* Case No. 19-50102-gs ("**Bankruptcy Case**"). Christine W. Lovato ("**Lovato**" or "**Trustee**") is the duly appointed Chapter 7 Trustee for the DC Solar entities' bankruptcy estates (the "**Estates**").

11.     The Estates are named as Defendants in this Complaint only for purposes of determination of liability, or determination of forms of legal or equitable relief; pursuant to the court-approved stay relief stipulation between the Plaintiff and the Trustee in the Bankruptcy Case filed with the Bankruptcy Court on December 16, 2019. Any enforcement or collection actions against the Estates will occur within the context of the Bankruptcy Case.

12.     Matthew and Lauren Carpoff (the "**Carpoff Children**") are the adult children of Jeff and Paulette Carpoff and, upon information and belief, reside in California.

13.     The Carpoff Children received funds and/or wages from DC Solar.

14.     Upon information and belief, Lauren Carpoff was involved in the process of keeping track of VINs for MSGs that did not exist by assisting in the preparation of a master list of VINs.

15.     Robert V. Amato is Paulette Carpoff's brother. Robert worked for DC Solar. Robert's wife is Priscilla Amato (together, the "**Amatos**"). The Amatos were also on DC Solar's payroll, and, upon information and belief, Priscilla managed some of the real properties that were purchased with funds obtained by DC Solar from the Purchasers. Upon information and belief, the Amatos reside in California.

16.     According to the DOJ Seizure document (*infra*), Robert V. Amato had planted GPS devices that were supposed to be attached to MSGs in locations so that it appeared that the MSGs existed at these locations on the GPS tracking program.

17.     Robert Karmann ("**Karmann**") is an accountant and, upon information and belief, resides in California. Karmann worked for DC Solar as controller or CFO from around 2014 through the companies' closing.

4                                          **COMPLAINT**

18.     On December 12, 2019, Karmann was charged by Information with felony charges of conspiracy to commit an offense against the United States and securities fraud. See Case No. 2:19-cr-00222-JAM. Karmann has pled guilty.

19.     Ronald J. Roach ("**Roach**") is an accountant and, upon information and belief, resides in California. Roach runs a company known as Ronald J. Roach Accountancy Corp., and performed accounting services for, among others, DC Solar and Plaintiff.

20.     On October 21, 2019, Roach was charged by Information with felony charges of conspiracy to commit an offense against the United States and securities fraud. On the same day, Joseph Bayliss was charged by Information with a felony charge of conspiracy to commit an offense against the United States. See Case No. 2:19-cr-00182-JAM. Roach and Bayliss pled guilty to those counts on October 22, 2019 and are set for sentencing on January 28, 2020. The charges and guilty pleas are related to their roles in the DC Solar fraud and enterprise.

21.     Sebastian Jano ("**Jano**") is a former employee of DC Solar, and, upon information and belief, resides in California.

22.     Steve Wilde ("**Wilde**") is an accountant the former controller of DC Solar Solutions and, upon information and belief, resides in California.

23.     The Defendants listed in paragraphs 7 through 22, supra, shall hereinafter be referred to collectively as the "**Core Defendants**."

24.     Additional Defendants may be included as Core Defendants as investigation and discovery proceeds in this or related estates.

### 2)  *"Scheme Aiders/ Abettors"*

25.     Ryan Guidry ("**Guidry**") was involved in operations of DC Solar from at least early 2012, and, upon information and belief, resides in California.

26.     Upon information and belief, Guidry operated and/or administered the DC Solar sublease scheme which involved the misrepresentation of MSGs, and third party rentals.

27.     Patrick Moore ("**Moore**") is or was the 21% minority owner of Solarmore

Investments, Inc. ("**Solarmore Investments**"), which was the managing member of the first funds purchasing MSGs from DC Solar. Upon information and belief, he resides in California.

28.     According to the DOJ Seizure Document (*infra*), an informant tipster contacted the FBI and told the FBI that Moore admitted that he was part of a fraudulent scheme involving MSGs with the Carpoffs.

29.     Halo Management Services LLC ("**Halo**") is a Nevada limited liability company which is or was managed by Peter Roselli ("**Roselli**"). Halo was the managing member of the final funds purchasing MSGs from DC Solar.

30.     Alvarez & Marsal Valuation Services, LLC is a Delaware limited liability company with its principal place of business in New York, NY ("**Alvarez & Marsal**").

31.     Alvarez & Marsal completed appraisals of MSGs for DC Solar validating the alleged value of the MSGs, which were presented to Purchasers.

32.     Barry Hacker ("**Hacker**") was a broker and sometimes senior officer at Marshall & Stevens, Inc. and, upon information and belief, resides in California.

33.     Hacker brokered some MSG purchases, worked directly with Alvarez & Marsal in establishing value for the MSGs, promoted DC Solar as a potential borrower, and assisted in the Carpoffs activities to move assets and and/or operations to Nevis Island.

34.     Upon information and belief, Marcelo Bermudez ("**Bermudez**") is a broker at Shokunin, Inc. and, upon information and belief, resides in California who assisted Hacker and DC Solar.

35.     Upon information and belief, Bermudez brokered some MSG purchases and may have worked directly with Alvarez & Marsal in establishing value representations for the MSGs.

36.     CohnReznick LLP ("**CohnReznick**") is New Jersey limited liability partnership and consulting firm with its principal place of business in New York, NY.

37.     CohnReznick and its employees brokered some MSG purchases and worked directly with Alvarez & Marsal in establishing value for the MSGs.

**COMPLAINT**

38.    Scott Wentz ("**Wentz**") is an accountant and another Defendant who resides in California.

39.    Wentz performed tax work, oversaw or participated in an audit or financial compilation, and acted directly and helped DC Solar create international companies built to keep assets and income outside of the United States.

40.    Raina Yee ("**Yee**") is an accountant and, upon information and belief, resides in California. Yee was in charge of handling many of the various taxing authority audits of DC Solar, the Funds, and/or the Carpoffs individually.

41.    Vistra International Expansion (USA) Inc., fka Radius GGE (USA), Inc., fka High Street Partners Inc., is a Maryland corporation headquartered in Massachusetts ("**Vistra**") that acquired Radius GGE (USA).

42.    Radius GGE (USA), Inc., fka High Street Partners Inc., is a Maryland corporation headquartered in Massachusetts ("**Radius**").

43.    Radius was acquired by Vistra on or about May 2018. Radius and Vistra provided, among other things, tax work and other services to DC Solar, Solarmore, and the Funds.

44.    Montage Services, Inc. is a California corporation based in San Francisco ("**Montage**").

45.    Some of Montage's assets were acquired by Radius on or about June 2016 and entered into contractual agreements with Montage including the cooperative sharing of employees and, facilities, and equipment.

46.    Heritage Bank of Commerce (**"Heritage"**) is a California Corporation primarily operating in California.

47.    Diana Kershaw ("**Kershaw**") is or was an officer or employee or former employee of Heritage Bank and, upon information and belief, resides in California.

48.    Upon information and belief, as an officer or employee Kershaw cooperated with the Carpoffs to conceal or restrict information from Solarmore regarding its bank accounts at Heritage.

**COMPLAINT**

49.     Carson Trailer, Inc. ("**Carson**") is a California corporation with its principal place of business in Gardena, California. Carson produced and sold the physical trailers upon which the MSGs were built.

50.     Ahern Rentals, Inc. is a Nevada corporation headquartered in Las Vegas ("**Ahern**").

51.     David Endres ("**Endres**") is a former employee of Carson and DC Solar and, upon information and belief, resides in California.

52.     Upon information and belief, Endres cooperated with the Carpoffs and DC Solar to provide VINs without corresponding trailers, and began working directly for DC Solar in the summer of 2018.

53.     The Defendants listed in paragraphs 25 through 52, supra, shall hereinafter be referred to collectively as the "**Scheme Aiders/Abettors.**"

54.     Additional Defendants may be included as Scheme Aiders/Abettors as investigation and discovery proceeds in this or related estates.

### 3)  Asset Hiders

55.     Julie Muraco ("**Muraco**") is a financial advisor at Praeditis Group LLC, and, upon information and belief, resides in New York.

56.     Muraco is or was an owner and on the board of directors of DC Solar Freedom and provided investment advice to the Carpoffs and/or DC Solar, as well as the direction of assets to offshore companies.

57.     Praeditis Group LLC ("**Praeditis**") is a Delaware limited liability company that was utilized by Muraco in her activities for DC Solar, some of the DC solar affiliates, and the Carpoffs in concealing and/or of assisting in the movement of assets.

58.     The Strauss Law Firm ("**Strauss Firm**") is a law firm located in Hilton Head, South Carolina. The Strauss Firm helped the Carpoffs and/or DC Solar to conceal or move assets.

59.     Peter Strauss ("**Strauss**") is an attorney and, upon information and belief, resides in South Carolina. Strauss is the principal/owner of the Strauss Firm.

60.     Panda Bear International, Ltd. ("**Panda International**") is an international

Hong Kong corporation. That was utilized in the movement of funds in and out of Hong Kong and the China Bank and Trust.

61. Panda Solar Solutions LLC ("**Panda Solutions**") is a Nevada limited liability company, and entirely owned by the Carpoffs.

62. Upon information and belief, Panda International was formed by DC Solar with assistance from Wentz supposedly for the purpose of purchasing batteries for MSGs, to keep profits out of the United States and avoid U.S. income taxation.

63. Panda Solutions was the sole owner of Panda International.

64. DC Solar International, Inc. ("**DC Solar International**") is an international Nevis corporation. DC Solar International was formed by DC Solar with assistance from Lauer, Strauss and Hacker, among others, to be the seller in certain sale-leaseback deals, designed to move profits out of the United States and tax-free.

65. Bayshore Select Insurance is a Bahamian company, and acts as a captive insurance company for DC Solar.

66. Champion Select Insurance is a Bahamian company, and acts as a captive insurance company for DC Solar.

67. JPLM Dynasty Trust is a Cook Island trust administered in the Cook Islands with Southpac Trust International, Inc. a Cook Island corporation as its Trustee.

68. Billie Jean Trust is a trust administered in the Cook Islands with Southpac Trust International, Inc. a Cook Island corporation as its Trustee

69. The Defendants listed in paragraphs 55 through 68, *supra*, are described collectively as the "**Asset Hiders**."

70. The Core Defendants, Scheme Aiders/Abbetors, and the Asset Hiders shall hereinafter be referred to collectively as the "**Defendants**."

71. Additional Defendants may be added to these categories as further investigation or discovery proceed in this or related cases.

**COMPLAINT**

### III.    JURISDICTION & VENUE

72.    This Court has subject-matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, because the claims arise under the laws of the United States, including the Racketeer Influenced and Corrupt Organization Act ("**RICO**"), 18 U.S.C. § 1961 *et. seq.*

73.    This Court has supplemental jurisdiction over Plaintiff's claims arising out of state law pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as Plaintiff's claims brought under federal law.

74.    Plaintiff also asserts that jurisdiction is also present due to 28 U.S.C.157.

75.    Personal jurisdiction comports with due process under the United States Constitution, the long-arm statutes of California, and the provisions of 18 U.S.C. § 1965(b) and (d).

76.    Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

   a.  Transacted business in California;

   b.  Contracted to supply or obtain services in California;

   c.  Availed themselves intentionally of the benefits of doing business in California;

   d.  Produced, promoted, sold, marketed, and/or distributed their products or services in California and, and thereby, have purposefully profited from their access to markets in California;

   e.  Caused tortious damage by act or omission in California;

   f.  Caused tortious damage in California by acts or omissions committed outside California while (i) regularly doing business or soliciting business in California, and/or (ii) engaging in other persistent courses of conduct within California, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in California;

**COMPLAINT**

g.   Committed acts and omissions which Defendants knew or should have known would cause damage (and, in fact, did cause damage) in California to Plaintiff while (i) regularly doing or soliciting business in California, and/or (ii) engaging in other persistent courses of conduct within California , and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in California;

h.   Engaged in a conspiracy with others doing business in California that caused tortious damage in California; and/or

i.   Otherwise had the requisite minimum contacts with California such that, under the circumstances, it is fair and reasonable to require Defendants to come before this Court to defend this action.

77.   Pursuant to 11 U.S.C. § 362 and to allow and Plaintiff to pursue its claims the Trustee has stipulated to relief from the automatic stay in the Bankruptcy Case to allow Plaintiff to liquidate the nature and amount of its claims against the Estates as a Defendant; however, Plaintiff may not proceed with any collection or other enforcement of any such determination except through the Bankruptcy case.

78.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Benicia, California, which is located in this judicial district.

## IV.   FACTUAL ALLEGATIONS

### A.   Introduction

79.   This case involves two parallel fraud schemes which bilked purchasers out of nearly a billion dollars (together, the "**Schemes**").

80.   The Carpoffs orchestrated the Schemes through companies they controlled (DC Solar), and the Carpoffs used the Schemes to enrich themselves personally at Plaintiff's expense.

81.   The Defendants in this action each played an important role in the Schemes.

82.   In 2011, the Carpoffs began the selling of MSGs through their privately-held

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

alternative energy company, DC Solar Solutions.

83.   Through December 2018, DC Solar raised around $910 million from sales of MSGs. DC Solar described the sales to interested parties as transactions that qualified for alternative energy tax credits.

84.   To that end, Purchasers purchased MSGs from DC Solar Solutions and then immediately leased the MSGs to DC Solar Distribution.

85.   DC Solar Distribution then supposedly sub-leased the MSGs to end-users.

86.   The sale price for east MSG was $150,000.

87.   Purchasers typically made a 30% cash down payment to DC Solar Solutions on the MSGs, which were sold for $150,000 apiece, because the associated tax credits were based upon 30% of the $150,000 sales price.

88.   This down payment was typically made by the Purchasing Member. Purchasers could immediately claim a dollar-for-dollar tax credit for the total they paid in cash to DC Solar Solutions per MSG.

89.   Thereafter, the Purchasers could also claim depreciation for each MSG for five years.

90.   These cumulative tax benefits were significant to Plaintiff and the Purchasers.

91.   To complete the transactions, Purchasers paid the remaining amount owed to DC Solar Solutions for the MSGs by a carryback promissory note with a twenty (20) year term.

92.   The Carpoffs and other Defendants told Purchasers that the cash to pay the note payments was supposed to be generated by lease revenues received by DC Solar Distribution from its supposed subleases of the MSGs to end users.

93.   Additionally, the Purchasers (and the LLC members) were to receive some income from the subleases, over and above amounts needed to pay the carryback notes.

94.   The sublease revenue payable to Purchasers from DC Solar Distribution was a critical component of the transactions, maximizing the tax benefits while minimizing debt

**COMPLAINT**

and expenses.

95.    Without the mechanism, the alleged $150,000 value of the MSGs would be difficult to sustain, thus jeopardizing the maximum value of the tax credits.

96.    When the Funds were created, Solarmore owned 1% of each Fund, with the primary Purchasing Member owning the remaining 99% interest.

97.    After five (5) years, which was the recapture period for the MSG tax credit, the equity ownership in the Funds would flip, with Solarmore owning 95% and the Purchasing Member owning 5%.

98.    After the 5-year period, Solarmore had a call option to acquire the Purchasing Member's equity in the Funds for an amount that is significantly less than the amount of the Purchasing Member's downpayment.

99.    DC Solar touted itself as a major player in its industry, with thousands of MSGs in the field, lucrative contracts with big customers yielding a track record of major revenues, and extensive experience in making and maintaining the MSGs, and finding customers to lease or purchase MSGs.

100.    The sublease program and the major lease revenue promotion were a sham.

101.    DC Solar manufactured and put into service far fewer MSGs than it claimed to Purchasers, and DC Solar made hardly any of its revenue from leasing MSGs.

102.    In fact, DC Solar Solutions did not actually manufacture or receive about two-thirds of the MSGs that it purportedly sold to Purchasers.

103.    Intensive efforts by Plaintiff to locate the MSGs have identified roughly 6,800 of the approximately 18,400 MSGs that DC Solar sold to Purchasers.

104.    Simply put, Purchasers paid over one billion dollars for MSGs that never existed or been delivered.

105.    Further, legitimate lease income from actual end-users of the MSGs represented a tiny fraction -- less than 5% -- of DC Solar Distribution's alleged revenue.

106.    The vast majority of DC Solar Distribution's revenue was actually comprised of money transferred from DC Solar Solutions derived from downpayments from later

13                          **COMPLAINT**

purchasers.

107.   In reality, the vast majority of DC Solar's money was used to manufacture, place into service, or to maintain the thousands of MSGs that the DC Solar "sold" to Purchasers.

108.   Instead the Carpoffs pilfered the money to cover-up losses by DC Distribution, and to support a lavish lifestyle that included buying numerous luxury and collector vehicles, a baseball team, a NASCAR Raceteam, expensive real estate within and without the United States, and the use of private jets.

109.   Generally, the Defendants perpetrated two fraud Schemes, the first relating to the existence of MSGs.

110.   The second relating to the movement of money from DC Solar to DC Distribution to hide the failed sublease program.

111.   A later third fraud scheme developed from the first two in the after-the-fact effort to prop up bogus $150,000 valuation of MSGs sold to Purchasers.

112.   In the first Scheme, the Defendants falsely certified and represented to Purchasers the existence of non-existent or undelivered MSGs.

113.   Plaintiff relied on Defendants' certificates and representations, although the claimed MSGs never existed or were delivered.

114.   In the second Scheme, the Defendants tried to hide the lack of legitimate lease revenue by moving money between and among different Defendants to conceal the failed sublease program.

115.   Defendants made representations to Plaintiff that the subleasing of the MSGs started slowly, but then became robust, resulting in the sublease of most of the MSGs and the generation of significant rental revenue.

116.   Defendants showed Plaintiff a few leases for a large number of MSGs to third parties.

117.   Then, Defendants represented to Plaintiff that Defendants had many other-such leases that produced significant revenue for DC Distribution.

**COMPLAINT**

118.   In reality, the overwhelming majority of DC Distribution's supposed "revenue" consisted of cash transfers from DC Solar Solutions to DC Solar Distribution derived from initial down payments of later Purchasers.

119.   Between March 2011 and December 18, 2019, approximately thirty-four (34) Funds entered into transactions with DC Solar Solutions to purchase MSGs, resulting in the deposit of approximately $759,000,000 by interstate transfer into the Funds' bank accounts by Purchasing Members for Defendants' MSG transactions.

120.   Other Purchasers transferred approximately $136,000,000 to DC Solar Solutions as part of related transactions for the purchase and lease of MSGs.

121.   In total, DC Solar Solutions closed transactions with Funds and others involving approximately 18,400 MSGs at approximately $2.7 billion in purported value.

122.   These deals had face values of more than $2.7 billion because Purchasers financed approximately 70 percent of the amount of the MSGs' purchase price through promissory notes.

123.   DC Solar, directly and indirectly, solicited purchasers through brokers and salespeople using various methods, including email, conference calls and in-person meetings. DC Solar offered and sold Fund Contracts (defined below) through interstate commerce to purchasers across the United States.

124.   The Core Defendants were in the process of attempting to close additional large transactions by the end of 2018 on in early 2019 but were stopped by the federal government's raid and seizures.

## B.  The Creation of the MSGs

125.   Carpoff started DC Solar Solutions in or about 2009, when he began designing and creating the first MSGs.

126.   Carpoff wholly owned the company after the departure of John Messer, a former 21% owner.

127.   A typical MSG consisted of photovoltaic ("**PV**") modules, PV inverters, batteries, a trailer and other miscellaneous ancillary components.

**COMPLAINT**

128.    According to an appraisal of 1,140 MSGs dated August 19, 2015 ("**GEICO Appraisal**") by Alvarez & Marsal, which is nearly identical to the other Appraisals (defined below) provided to all of the Funds, DC Solar Solutions "is a clean energy company that designs, manufactures and deploys solar energy solutions which are eligible for federal, state and local renewable energy incentives."

129.    Alvarez & Marshall initially was requested to produce retroactive appraisals to bolster an earlier appraisal by a less prestigious appraiser.

130.    The GEICO Appraisal describes the MSGs as DC Solar Solutions' "signature product… available in 5, 10, 15, 20 and 25.5 kW power capacities… in use throughout the United States where an MSG is a more desirable alternative than a diesel-powered generator. MSGs are capable of operating anywhere they can be transported…"

131.    The GEICO Appraisal further describes the MSGs as follows: "The MSGs utilize two PV arrays of Talesun Solar USA panels made up of a total of ten PV modules.

132.    The PV modules are framed or attached together by struts in a panel structure. Each panel structure contains five solar modules which are about 16 feet in length.

133.    The PV Arrays are grouped so that the panels can be deployed at multiple angles for maximum exposure to the Sun.

134.    The MSGs also contained a battery backup system, a battery management system and a charge controller.

135.    At the beginning, the cost of production for one MSG was purportedly approximately $78,000, however this "cost" was comprised largely of overhead and labor costs.

## C.   The First Funds

136.    In or about 2010, DC Solar Solutions created the first fund to own MSGs and solicit MSG purchases for tax benefits.

137.    The early funds created by the Carpoffs to own MSGs were managed by Solarmore Investments, an entity controlled by Carpoff and owned by Carpoff and Moore.

138.    Purchasers typically made a 30% down payment to DC Solar Solutions on the

**COMPLAINT**

MSGs, which were sold for $150,000 apiece.

139.    Purchasers could then immediately claim a dollar-for-dollar tax credit based upon 30% of the $150,000 price. Purchasers also claim depreciation for each MSG for five (5) years. These tax benefits were significant and amounted in hundreds of millions of dollars.

### D.   The Beginning of the Funds

140.    Solarmore was formed in 2013 by Lauer and was initially owned 79% by Carpoff and 21% by Jansen.

141.    Currently, Jansen owns 100% of Solarmore.

142.    Solarmore was formed to manage certain of the Funds who purchased MSGs.

143.    As compensation for Solarmore's management of certain Funds, Defendants promised a payment equal to 1% of the tax credits for the Funds, and the later ability to indirectly own through Solarmore entity 95% of the MSGs after the ownership of the Funds "flip" after 5 years.

144.    Defendants represented to Jansen that the MSGs would retain significant value after 5 years that exceeded the loan balance still owed to DC Solar at such time.

145.    Nixon Peabody LLP ("**Nixon**"), is a law firm headquartered in New York and operating in additional states and issued tax opinion letters to Plaintiff Purchasers, and the Funds opining to the valid tax benefits to Purchasers of MSGs.

### E.   The Funds' Basic Structure

146.    The basic structure of the MSG sales was as follows: DC Solar offered Purchase Agreements and Equipment Leases (defined below), under which Purchasers paid to purchase MSGs from DC Solar Solutions, while in turn simultaneously leasing them to DC Solar Distribution.

147.    DC Solar Distribution then promised that it would arrange to sub-lease the MSGs to end-users.

148.    Purchasers executed a standard package of agreements, including: (i) a Limited Liability Company Agreement ("**LLC Agreement**"); (ii) a Solar Equipment

1   Purchase Agreement ("**Purchase Agreement**"); (iii) a Secured Promissory Note

2   ("**Promissory Note**"); and (iv) a Mobile Solar Equipment Lease ("**Equipment Lease**")

3   (together the "**Fund Contracts**").

4       149.   The documents were executed at or around the same time, with Jeff Carpoff

5   signing the Purchase Agreements on behalf of DC Solar Solutions and Paulette Carpoff

6   typically signing the Equipment Leases on behalf of DC Solar Distribution.

7       150.   While certain contracts had minor variations in wording, all of the Fund

8   Contracts largely contained the same substantive terms.

9       151.   Under the terms of the LLC Agreements, an investor became the Purchasing

10   Member of an individual Fund, a special purpose LLC entity created specifically for the

11   purchase of MSGs.

12       152.   The Fund then purchased MSGs from DC Solar Solutions at a price of

13   $150,000 per MSG under a Purchase Agreement.

14       153.   The Purchase Agreement specified the total number of MSGs being

15   purchased in that specific transaction, as well as the total purchase price.

16       154.   An Exhibit to the Purchase Agreement contained a blank space for the

17   Vehicle Identification Numbers ("**VINs**") for the MSGs or stated that "VIN for each

18   Generator [MSG] to be Supplied at Delivery."

19       155.   In exchange for the specified payment, DC Solar Solutions agreed to deliver

20   the MSGs by a certain date or dates and warranted "to Buyer that all Equipment shall be in

21   good working order in conformity with the Specifications for a period" of five or ten years.

22       156.   The delivery dates for tranches of MSGs specified in the Purchase

23   Agreements were occasionally scheduled in stages.

24       157.   Likewise, the Purchase Agreements dictated that payments would be due to

25   DC Solar Solutions in stages according to a schedule in part dictated by capital contributions

26   being made by the Purchasing Member under the terms of the LLC Agreement.

27       158.   Those capital contributions were contingent on Purchasers receiving

28   confirmation that the Generators were "Placed in Service" as evidenced by an "IE

Snell & Wilmer
———— L.L.P. ————
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

**COMPLAINT**

[Independent Engineer] Certificate."

159.    Purchasing Members generally contributed about thirty percent (30%) of the purchase price in cash and financed the balance pursuant to a Promissory Note or Notes executed by the Fund in favor of DC Solar Solutions.

160.    The Promissory Note was an exhibit to the Purchase Agreement.

161.    The physical location of all of The Promissory Notes is currently under investigation.

162.    DC Solar told Purchasers, and arranged for a tax opinion letter from Nixon confirming, that the MSGs qualified for the "Energy Credit" under Internal Revenue Code § 48.

163.    IRS Code § 48 allows for a thirty percent tax credit for certain energy-related investments (hereafter, the "**Tax Credit**" or the "**Credit**").

164.    Thus, Purchasing Members expected to be able to take a Tax Credit for roughly the same amount as their cash contribution to the Fund.

165.    Under the Fund Contracts, the MSG business was left entirely to DC Solar.

166.    At the same time the Funds executed the Purchase Agreements with DC Solar Solutions, the Funds also executed Equipment Leases with DC Solar Distribution for at least the first batch of MSGs being purchased.

167.    Depending on the size of the transaction, as additional tranches of MSGs were manufactured, additional Equipment Leases were executed.

168.    Under the Equipment Leases, the Funds leased their MSGs to DC Solar Distribution for terms ranging up to 120 months.

169.    The Equipment Leases provided that DC Solar Distribution shall use "the Solar Equipment in a careful and proper manner" and "shall comply with all laws, regulations and ordinances."

170.    Moreover, the Equipment Leases stated that DC Solar Distribution shall be "solely responsible for the maintenance and repair of the Solar Equipment" and "shall ensure the Solar Equipment is operational and capable of producing solar energy at all

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

**COMPLAINT**

times."

171.   The Equipment Leases required DC Solar Distribution to "obtain, maintain and keep" insurance coverage on the MSGs in the amount of the replacement cost as well as "liability insurance."

172.   In addition, the Equipment Leases required DC Solar Distribution to "promptly pay when due, all license fees, registration fees, sales taxes, use and property taxes, assessments, charges and other taxes" imposed upon the MSGs.

173.   The Equipment Leases further provided for a set amount of "Base Rent" to be paid to the Fund in advance in monthly installments for the term of the lease as well as payment to the Fund of "Additional Rent" or "Variable Rent" to the extent DC Solar Distribution received revenue from subleasing the MSGs in excess of a certain amount.

174.   The amount of additional or variable rent due to the Fund varied depending on the deal and the calculation was specified in the Equipment Lease.

175.   The Fund Contracts were structured such that there was a flow of money between the Funds and DC Solar, all of which, in a legitimate business model, would have been contingent on the MSGs generating significant sub-lease revenue from legitimate end-users.

176.   DC Solar Distribution owed monthly lease payments to the Funds purportedly to be paid with the sub-lease revenue it received from third-party customers.

177.   The Funds would then use the lease payments they received from DC Solar Distribution under the terms of the Equipment Leases to make monthly payments due to DC Solar Solutions under the terms of the Promissory Notes.

178.   Purchasers expected several benefits under the arrangement, including the 30% Tax Credit and the ability to claim significant depreciation on the MSGs.

179.   In addition, Purchasers were entitled to receive some cash distributions from the Funds.

180.   In general, the LLC Agreements stated that "Distributable Cash," defined as the amount of cash from lease revenue remaining after loan payments and operating

**COMPLAINT**

expenses, would be paid out to Purchasers on an annual basis.

181.   Specifically, Purchasers expected to, and promised by DC Solar and other Defendants that they would, profit from the Fund Contracts due to Tax Credits, depreciation on the MSGs, lease payments, and ownership of the MSGs.

182.   Purchasers thus played an entirely passive role under the DC designed structure.

183.   The success of the venture, and thus the profits to Purchasers and DC Solar, turned entirely on the efforts of DC Solar to make, maintain, market, and lease the MSGs.

184.   DC Solar marketed itself as having extensive experience and capabilities in the renewable energy field and in executing successful transactions for purchasers.

185.   For example, pitch-books for Purchasers, which were prepared by, among others, Hacker, Bermudez and CohnReznick, and other brokers working on behalf of DC Solar using information provided by DC Solar, emphasized that DC Solar had thousands of MSGs deployed and manufacturing capabilities of 900 MSGs per month.

186.   These brokers and other parties highlighted that DC Solar had closed many prior funds with "headline" or "notable" Purchasing Members, including funds with fair market values near or over $100 million, and that the "performance of each of the funds remains in good standing."

187.   In addition, the materials claimed DC Solar had "customer relationships with leading companies in the telecommunications, entertainment and construction industries" and provided case studies of the established leasing arrangements with many of those customers.

188.   Finally, certain of the pitch-books provided a "Summary of Investor Returns" with estimated internal rates of return ranging from 40 to as high as 50 percent.

189.   One such lease touted, was a lease with Ahern Rentals, which purchasers were not told was backstopped by an agreement from DC Solar Solutions in favor of Ahern.

190.   For example, in an email dated July 11, 2018 from Bermudez to Karmann, Hacker and Carpoff, an attached lease schedule claims a 94.31% MSG "utilization rate",

**COMPLAINT**

with 12,164 units allegedly being subleased as of December 31, 2017 out of 12,898 Fund-owned MSGs.

191.    By design, Purchasers never physically took possession of the MSGs that they purchased because the MSGs were leased to DC Solar Distribution upon purportedly being placed in service.

192.    Pursuant to the terms of the Purchase Agreements and LLC Agreements, Purchasers made payments to DC Solar Solutions for the MSGs in installments after receiving proof that the MSGs had been placed in service as evidenced by the delivery of the "IE Certificate."

193.    The LLC Agreements defined "IE Certificate" as "a certificate to be issued by the Independent Engineer" with respect to the MSGs "upon achievement of Placement in Service." Beginning in 2014, the LLC Agreements further stated that "'Independent Engineer' means "Joseph Bayliss of Bayliss Innovative Services."

194.    Jeff Carpoff arranged for Bayliss and his firm to serve as the "Independent Engineer."

195.    The Bayliss arrangement deceived Purchasers, because Bayliss was neither independent nor an engineer.

196.    While Bayliss holds general contractor and electrical licenses from the State of California, he was never a licensed engineer.

197.    Bayliss has known Jeff Carpoff and Paulette Carpoff since high school.

198.    In fact, the Company and Jeff Carpoff hired Bayliss to perform various projects for DC Solar and other businesses owned by Jeff Carpoff.

199.    DC Solar purported to sell more than 18,400 MSGs from its inception.

200.    Bayliss executed IE Certificates, titled "IE Commissioning Reports," for nearly all of the sold MSGs from 2014 through 2018.

201.    In thousands of instances, Bayliss admittedly signed IE Commissioning Reports for MSGs without inspecting them, and without any basis for making the representations in the IE Certificates.

**COMPLAINT**

202.    Further, Purchasers routinely requested financial statements from DC Solar Distribution and DC Solar Solutions before purchasing MSGs.

203.    In response, DC Solar and Defendants often provided Purchasers with putative financial statements.

204.    Roach issued "Accountants' Compilation Reports" for DC Solar Distribution and DC Solar Solutions covering various periods between 2011 through July 2018.

205.    Roach signed these reports on the letterhead of his firm, Ronald J. Roach Accountancy Corporation.

206.    The financial statements accompanying Roach's compilation reports included a statement of income in each.

207.    Roach prepared these reports at the direction of the Carpoffs and provided them to Lauer, despite knowing of the circular flow of funds between DC Solar Solutions and DC Solar Distribution.

**F.  General Background - Defendants Causing or Contributing to Plaintiff's Injuries**

208.    On information and belief, Wilde knew or should have known of the financial failure of the sublease program and the lack of existence or continued production of MSGs. On information and belief, Wilde assisted in presenting false or misleading information to Plaintiff and others or concealing information from Plaintiff and others.

209.    On information and belief, Guidry knew or should have known of the financial failure of the sublease program and the lack of existence or continued production of MSGs. On information and belief, Guidry assisted in presenting false or misleading information to Plaintiff and others or concealing information from Plaintiff and others.

210.    On information and belief, Moore knew of the substantial problems with DC Solar and acted as a party who collected money for the Carpoffs from difficult individuals.

211.    Montage, Wentz, Yee, on information and belief, performed tax work, oversaw or participated in an audit or financial compilation, and acted directly and helped DC Solar create international companies built to keep assets and income outside of the United States.

**COMPLAINT**

212.   Upon information and belief, among other work, Montage audits of DC Solar, the Funds, and/or the Carpoffs were performed by Montage through its employees and the employees of Radius.

213.   Upon information and belief, Montage, Wentz, Yee, Radius, and Vistra knew or should have known of misrepresentations regarding the financial status of DC Solar.

214.   Montage, Wentz, Yee, Radius, and Vistra, however, performed tax work and audits or financial compilations for DC Solar and provided that information to Plaintiff and others with knowledge that it would be relied upon.

215.   At some point Yee, Wentz, and Montage learned of significant transfers of cash from DC Solar Solutions to DC Solar Distribution in multiple years as part of preparation of certified audited financial statements for DC Solar Solutions.

216.   Despite this information, the certified audited financial statements for DC Solar Solutions did not reflect or accurately reflect these payments

217.   On information and belief, Ahern assisted DC Solar in the creation of an invalid or improper sublease that it knew or should have known would be presented to Plaintiff and others to rely upon.

218.   Upon information and belief, Carson only made approximately 6,800 trailers, but gave DC Solar over 17,000 VINs used by DC Solar to falsify commissioning reports with non-existent MSGs and corresponding VINs, even after it became clear that DC Solar had no intent to acquire more trailers.

219.   On information and belief, Carson knew or should have known that DC Solar was providing the VINs to Plaintiff and other purchasers and that Plaintiff and other purchasers would rely upon the existence of a VIN to establish the existence of an MSG.

220.   On information and belief, Endres knew or should have known that DC Solar was providing the VINs to Plaintiff and other purchasers and that Plaintiff and other purchasers would rely upon the existence of a VIN to establish the existence of an MSG.

221.   On information and belief, Alvarez & Marsal did not have a sufficient basis upon which to base its appraisals, the appraisals were negligently prepared, the appraisals were not

**COMPLAINT**

properly adjusted over time, and the appraisals did not meet professional and industry standards.

222.    Halo, despite being the managing member of multiple funds, took no actions to protect or preserve the MSGs owned by the funds it was managing.

223.    Plaintiff, at the request of members in Halo-managed funds and at its own expense, assisted by advancing money or services relating to the Halo-managed funds and Halo has not provided compensation to Plaintiff for those efforts.

### G. The First Sign of Trouble (the Audits) & the Appraisals

224.    Starting as early as 2013, red flags began emerging in the DC operations.

225.    DC Solar, the Funds and the Carpoffs individually became subject of audits by the Internal Revenue Service ("**IRS**") and the State of California regarding income, sales and franchise taxes.

226.    As of 2018, the potential tax liability with respect to these audits was hundreds of millions of dollars.

227.    Specifically, the IRS questioned the $150,000 valuation of each MSG.

228.    The IRS also determined that DC Solar was not properly recognizing the income from the "sale" of the MSGs.

229.    On information and belief, DC Solar only paid taxes on the 30% down payment received from the Purchasers for the MSGs. DC Solar did not pay taxes on the Promissory Notes held by DC Solar Solutions.

230.    Over the course of the IRS audit, the aggregate amount owed on the notes held by DC Solar Solutions was approximately $1.2 billion, resulting in a significant tax liability to the Carpoffs.

231.    DC Solar was taxable as an S corporation for federal income tax purposes.

232.    This corporation status meant that DC Solar did not pay federal income tax, but rather passed through the taxable income to the Carpoffs as shareholders of DC Solar.

233.    The IRS was contesting the $150,000 valuation of the MSGs in at least 5 separate federal income tax audits of tax equity funds.

234.    To support the $150,000 claimed value of each MSG, DC Solar retained

Alvarez & Marsal, a well-known valuation firm, to create appraisals (collectively, the "**Appraisals**") validating that price.

235.   The brokers sometimes worked directly with Alvarez & Marsal in producing a final draft of the Appraisals.

236.   The Appraisals were based on the Carpoffs' and other Core Defendants' representations of a 95% sublease utilization rate, average rents of $700-$1000/month per unit, and projections for additional long term leases and related future cash flow.

237.   Alvarez and Marsal continued to use its initial valuation of the MSGs for years, even after learning of the IRS fund audits, without following up on the accuracy of the Appraisals or the underlying data that purportedly supported the Appraisals.

238.   Upon information and belief, Alvarez and Marsal never changed its $150,000 initial valuation to include new information about actual leases, nor did Alvarez and Marsal investigate to determine if the valuation should change for a number of reasons including obsolete technology.

239.   Upon information and belief, Alvarez and Marsal never received actual copies of the subleases, and did not investigate if alleged lease revenue was legitimate or even existed.

240.   Upon information and belief, Alvarez & Marsal never questioned the exorbitant markup of the MSGs over the cost of production.

241.   Upon information and belief, DC Solar initially retained Montage, Wentz and Yee in 2013, to respond to the California sales tax audits.

242.   Wentz and Yee learned about the structure whereby DC Distribution was supposed to sublease the MSGs as part of representing DC Solar with respect to the California sales tax audit.

243.   Wentz and Yee sent information regarding the subleases to the State of California demonstrating small amounts of sublease revenue.

244.   Wentz and Yee expanded their workload beyond the California sales tax audits by providing certified audited financial statements for DC Solar, Solarmore, and

26

COMPLAINT

certain Funds.

245.   Montage was later acquired by Radius in 2016, and Radius in turn acquired by Vistra.

246.   Plaintiff also retained Wentz and Montage to complete tax returns and certified audited financial statements.

247.   Upon information and belief, in cooperation with the Carpoffs and DC Solar, Montage, and Wentz concealed requested financial and tax documents and information from Solarmore.

248.   Some key employees of Montage or "Legacy Montage" worked for both Montage, and Radius or Vistra, simultaneously during 2016 through 2018.

### H. **The Phaseout of Solarmore**

249.   Halo was created in 2016, with Roselli as the managing member.

250.   Upon information and belief, Roselli was or is a personal friend of the Carpoffs, and had a previous business relationship with Paulette Carpoff.

251.   During 2016 and 2017, as some of the Funds began nearing the five-year equity flip benchmark, Jansen, believing Plaintiff would soon be the majority member of those Funds and effective owner of thousands of MSGs, began asking questions of the Carpoffs and other Core Defendants regarding potential tax implications and other ownership-related effects on Plaintiff.

252.   Further, Jansen attempted to ask Kershaw questions on behalf of Plaintiff about the Plaintiff's bank account at Heritage Bank. Upon information and belief, Kershaw acting in her capacity as an officer of Heritage Bank would not give the requested information to Jansen, and would instead email the Carpoffs informing them of Jansen's contact and questions even though Jansen was the primary account signer and party.

253.   Soon thereafter, in or about 2017, rather than reveal the ongoing Schemes to Jansen and Plaintiff, the Carpoffs stopped using Solarmore and instead used Halo as the manager of funds created from that point forward from late 2016 through 2018.

**COMPLAINT**

# I.   <u>The Collapse of DC Solar</u>

254.   As early as mid-2016, the Core Defendants knew that the sublease program was a huge financial failure, and that DC Solar had a massive cash shortfall from lack of real lease revenues.

255.   Lease revenue from end-users of the MSGs was critical to the legitimacy of the businesses of DC Solar Solutions and DC Solar Distribution because it was supposed to provide the money that DC Solar Distribution needed to make lease payments to the Funds, and those payments were critical to the Funds' ability to make payments on the Promissory Notes to DC Solar Solutions.

256.   Although DC Solar Distribution purported to be earning millions each month in lease revenue from end-users of the MSGs, bank records demonstrate that DC Solar Distribution generated minimal lease revenue from subleases to end-users.

257.   To further illustrate, in an email dated July 18, 2016 from Roach to Carpoff and Lauer, Roach attached five spreadsheets summarizing the sublease activity for DC Solar from 2012-2015.

258.   The 2016 Roach documents reflect sublease revenue of $138,138.64 for 2012, $278,179.74 for 2013, $321,717.06 for 2014, and $1,419,570.80 for 2015, for a grand total over four years of $2,157,606.24.

259.   The actual cash requirement from the subleases of the MSGs under DC Solar's lease program over that four-year time period – stated as a percentage of promised utilization-- was a dismal 3.78%.

260.   This failure of the sublease program also endangered the touted tax benefits of the Defendants' MSG transactions.

261.   This failure of the sublease program also invalidated the stated appraisal value of MSGs for ongoing or new purchaser transactions.

262.   In an email dated March 2, 2017 from Roach to Lauer and various individuals at Nixon and major accounting firms Hays, Foley and Deloitte, provides the same information for 2013-2015 , adding the $2,071,664.85 in sublease revenues for 2016.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

**COMPLAINT**

263.    Roach also stated in his 2017 email that following amounts were paid by DC Solar Solutions to DC Solar Distribution on a "re-rent" basis for each of those years:

2013 - $1,595,370

2014 - $13,975,770

2015 - $30,562,024

2016 - $61,545,737

264.    On information and belief, the Core Defendants knew about the foregoing.

265.    Over the time periods, the Core Defendants began taking drastic measures to conceal the financial failure of the MSG transactions, and to conceal the fact that the Core Defendants had masked that financial failure by moving money received from new purchasers from DC Solutions to DC Distribution, and falsely representing the new purchasers' money as revenues received from subleases of MSGs to end users.

266.    The Core Defendants created fake subleases, circular subleases, and dummy third party sublessors to make the sublease program appear legitimate.

267.    To hide the fact that insufficient money was coming in from subleases, the Core Defendants circulated new monies received by DC Solar Solutions to DC Solar Distribution, which then paid the Funds with alleged "lease revenues." Most of the supposed lease revenue paid to the Funds were actually recirculations of later down payments paid by later Purchasing Members under later Purchase Agreements.

268.    For example, during the period of January 2013 through December 2018, a total of about $409,930,000 was deposited to DC Solar *Distribution's* bank accounts.

269.    Of that amount, approximately $383,347,000 -- or 93.5% -- consisted of transfers from DC Solar *Solutions'* bank accounts. And, another $8,268,000 -- or 2.0% -- consisted of transfers from the bank accounts of different Funds.

270.    At most, $18,316,000 -- or 4.5% -- of the deposits to DC Solar Distribution's bank accounts during the time period represented sub-lease payments from end-users of the MSGs.

271.    Yet, during this period, DC Solar Distribution paid about $347,800,000 to

1    various Funds and purchasers, mostly of which took the form of circular "lease payments"

2    owed by DC Solar Distribution under the operative Equipment Leases.

3        272.   Accordingly, DC Solar Distribution's payments were not funded by

4    legitimate sub-lease revenue, but instead by investor funds cycled through DC Solar

5    Solutions.

6        273.   Wentz and Yee were informed of these large payments prior to the completion

7    of the 2017 certified audited financial statements, and on information and belief as early as

8    2016.

9        274.   The Core Defendants prepared and disseminated false financial statements

10   and compilation reports falsely stating that DC Solar Distribution generated hundreds of

11   millions of dollars of revenues in "Rental Income."

12       275.   In reality, the overwhelming majority of purported "Rental Income" consisted

13   of intercompany transfers from DC Solar Solutions.

14       276.   The cash infusions of hundreds of millions of dollars from DC Solar Solutions

15   to DC Solar Distribution were hidden in the "Direct Costs" category of DC Solar Solutions'

16   income statements.

17       277.   These putative Direct Cost payments had nothing to do with the costs of

18   manufacturing the MSGs.

19       278.   The Core Defendants began storing and stashing away MSGs they failed to

20   sublease, which were stacking up, in some cases incurring significant storage costs.

21       279.   The Core Defendants started giving away MSGs for free through DC Solar

22   Freedom and essentially using the MSGs as advertising props in an attempt to attract

23   attention.

24       280.   Starting in 2016, DC Solar stopped buying and manufacturing MSGs

25   altogether.

26       281.   In fact, DC Solar never manufactured or received delivery of the majority of

27   the MSGs that it "sold" to Purchasers.

28       282.   Recent intensive efforts by Plaintiff to locate those MSGs turned up roughly

6,800 MSGs of the approximately 18,400 MSGs for which Bayliss provided IE Commissioning Reports.

283. The Core Defendants began putting new VIN numbers on old units, or misrepresenting VINs in order to conceal the fact that new MSGs were not being produced and older units were never subleased.

284. The VIN subterfuge was made possible by Carson's willingness to provide DC Solar Solutions with reserved VINs before building the associated trailers reserved for the VINs.

285. At times, DC Solar Solutions sold the same MSG to different Purchasers, but with changed VINs, with no awareness of either the old or new Purchasers.

286. The Core Defendants made false representations to Plaintiff and others regarding production of MSGs, alleged lease revenue, and other lies or misrepresentations as part of the Schemes.

287. The Core Defendants knew when making those representations that MSGs were no longer being produced or received, and that the Core Defendants did not intend to produce or receive MSGs on any timely basis.

288. The Core Defendants directed each other, and others including but not limited to the other Defendants, to lie and present false information to perpetuate and/or cover up the Schemes.

289. On or about 2017, SolarSense, a solar energy provider, began negotiations to buy MSGs from DC Solar Solutions.

290. However, rather than taking a promissory note carryback note to DC Solar Solutions (as was the usual structure for most of the DC Solar tax equity transactions)- SolarSense attempted to arrange financing for its purchase of MSGs through KeyBank.

291. During KeyBank's due diligence review for the deal, KeyBank requested, among other things, a list of end-user/sublessees, pro forma financials for DC Solar Distribution, samples of subleases, and DC Solar Distribution's' QuickBooks.

292. On information and belief, KeyBank began to suspect, after closing, the

**COMPLAINT**

1  claimed subleases and claimed sublease revenues were false.

2    293.   On information and believe, Carpoff and Lauer instructed Jano, a former

3  employee of DC Solar who was putting together the SolarSense/Keybank deal, to shut down

4  the deal, knowing that the KeyBank's requested data would reveal the fraud underlying the

5  Schemes.

6    294.   On information and belief, SolarSense and KeyBank closed their transaction

7  in reliance on Defendants representation and promise of information to be delivered.

8    295.   Jano subsequently resigned his employment with DC Solar, and sent a letter

9  through counsel to the Carpoffs in February 2018, providing specific details about the

10  Schemes, and threatening to expose the Schemes if he was not paid $5 million.

11    296.   In December 2018, law enforcement agents executed federal search warrants

12  at DC Solar Solutions' headquarters and other locations, seizing over $60 million in assets.

13    297.   On January 30, 2019, the first DC Solar company filed for Chapter 11

14  bankruptcy.

15    298.   Thereafter, additional DC Solar-affiliated companies filed for Chapter 11

16  bankruptcy.

17    299.   Subsequently all of the DC Solar Chapter 11 cases were converted to Chapter

18  7 Liquidation Bankruptcy cases.

19            **J.   The Carpoffs' Preparations for Escape**

20    300.   In or about 2018, the Carpoffs in various ways began withdrawing large

21  amounts of money from DC Solar, including a payment of $20,000,000 to Panda.

22    301.   In May 2018, the Carpoffs held extensive discussion with Strauss about

23  obtaining citizenship in Nevis Island, a well-known asset shelter in the Caribbean.

24    302.   Later in August 2018 the Carpoffs bought property in Nevis for $5 million

25  and used DC Solar International, a Nevis affiliation to undertake a sale leaseback

26  transaction.

27    303.   Upon information and belief, The Carpoffs also started making plans to flee

28  the United States if necessary which included an expedited renewal of their passports.

**COMPLAINT**

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

304.   Strauss, the Strauss Firm, Muraco, and Praeditis, assisted in the creation of the Nevis transactions and had already created offshore accounts, offshore trusts, and captive insurance companies such as Bayshore and Champion Select that permitted the Carpoffs to hide assets outside of the United States. [expand]

305.   For example, the Carpoffs created a Cook Islands trust in 2016, utilizing Wentz, the Strauss Firm, Muraco, and Praeditis.

306.   As part of this scheme, the Carpoffs were to execute a statement of solvency, which was at that time, completely untrue.

307.   The Carpoffs also instructed Wentz to create Panda, a company located in Hong Kong, to purportedly purchase batteries for the MSGs, which allowed for funds to be effectively parked outside of the United States.

308.   Upon information and belief, the over $20,000,000 that had been placed in the Panda account was removed by the Asset Hiders.

309.   With assistance from Lauer, the Strauss Firm, Strauss and Hacker, among others, the Carpoffs also created DC Solar International a Nevis Island International Corporation in Nevis, a notorious off-shore tax shelter, to be party to certain sale-leaseback deals rather than DC Solar Solutions, in order to keep income out of the United States.

310.   During the time that the Carpoffs were setting up offshore, in August 2018, Jeffrey Carpoff pushed to collect more funds and involved Moore in a collection matter where the debtor feared for his family's safety.

## V.   ALLEGATIONS RELATED TO RICO VIOLATIONS

311.   Plaintiff is a "person" within the meaning of 18 U.S.C. § 1964(c).

312.   At all times relevant hereto, Plaintiff and the Defendants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

### A. Enterprise

313.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

314.   In this case, the enterprise ("**RICO**") for RICO purposes consists of DC Solar

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

**COMPLAINT**

1   Companies.

2        315.   These Defendants individually and through their agents represented to their

3   victims that these purchases qualified for an "Energy Credit" under Internal Revenue Code

4   § 48, as well as depreciation.

5        316.   However, on information and belief, these purchases' qualifications for the

6   Tax Credit under the Code is unclear, as most of the MSGs purportedly sold to Purchasers

7   were never manufactured or delivered to the RICO Enterprise.

8        317.   The Schemes were devised solely to generate significant funds thereafter

9   consumed by the Core Defendants for personal purposes or to pay off earlier Purchasers,

10  rather than to manufacture or pay for delivery of the promised new MSGs.

11       318.   Because the terms of the Fund Contracts tied the fortunes of the Purchasers

12  to those of DC Solar and its ability to manufacture and then sub-lease them at optimal or

13  above true-market value rates, Purchasers were investing in a common enterprise.

14       319.   Because the terms of the Fund Contracts made Purchasers entirely dependent

15  on DC Solar to manufacture, operate and maintain their purported MSGs, DC Solar and the

16  Core Defendants' efforts were essential to the failure or success of the common enterprise.

17       320.   Purchasers also had an expectation of profits from the tax benefits and

18  payment stream to be generated from the enterprise.

19       321.   The Core Defendants engaged in a common plan, transaction and course of

20  conduct described herein in connection with the solicitation of purchases of MSGs, pursuant

21  to which they knowingly or recklessly engaged in acts, transactions, practices and a course

22  of business that operated as a fraud upon the Plaintiff, the primary purpose and effect of

23  which was to generate significant income by fraudulently selling and subleasing MSGs.

24       322.   The Core Defendants sought out large, prominent Purchasing Members with

25  high visibility and high taxable income in order to carry out the Schemes.

26       323.   While the Core Defendants participated in the RICO Enterprise and were a

27  part of it, the Core Defendants also had an existence separate and distinct from the

28  Enterprise.

34                                              **COMPLAINT**

324. The Core Defendants maintained an interest in and control of the RICO Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

325. The Core Defendants' control and participation in the RICO Enterprise were necessary for the successful operation of the Core Defendants' Schemes.

326. The RICO Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Core Defendants engaged.

### B. Operation of the RICO Enterprise

327. The Core Defendants perpetrated the Schemes described in detail above.

328. Each of the Core Defendants were vital to the implementation of the Schemes, played an important role in the RICO Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise.

329. The Core Defendants intended to commit wire and/or mail fraud in connection with the promotion and operation of the Schemes based on the significant evidence uncovered in this case.

330. The Core Defendants' racketeering activity in creating, designing, establishing, promoting, and vouching for the Schemes involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

331. Plaintiff relied on the Core Defendants' representations in perpetrating the Schemes, and have been damaged by the Core Defendants' actions.

### C. Predicate Acts

332. With respect to the activities alleged herein, the Core Defendants acted at all times with malice toward the Plaintiff, intending to engage in the conduct complained of for the benefit of Defendants and with knowledge that such conduct was unlawful.

333. The conduct of the Core Defendants was done with actionable wantonness and reckless disregard for the rights of Plaintiff, as well as the laws to which the Core Defendants are subject, the same amounting to actionable wantonness.

334. With respect to the activities alleged herein, each Core Defendant agreed to

**COMPLAINT**

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

the operation of the transaction or artifice to deprive Plaintiff of property interests.

335.   In furtherance of these agreements, each Core Defendant also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Core Defendants were not entitled.

336.   With respect to the overt acts and activities alleged herein, each Core Defendant conspired with each other to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

337.   Each Core Defendant also agreed and conspired with each other Core Defendant to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Core Defendants were not entitled.

338.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by the Core Defendants designed to defraud the Plaintiff of money and property interests under false pretenses.

339.   As a victim of these unlawful patterns of illegal activity, Plaintiff has and continues to suffer losses as a result of these activities. The acts which caused injuries to the Plaintiff were performed for financial gain.

340.   In carrying out the overt acts and fraudulent transactions described above, the Core Defendants engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1343-1346, and 18 U.S.C. §1961 *et seq*.

341.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1343 (relating to wire fraud) and §1346 (relating to scheme or artifice to defraud).

### D.  Violations of 18 U.S.C. § 1343

342.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

343.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

Core Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire and/or mail matter and things therefrom including but not limited to contracts, instructions, correspondence, funds, and other interstate transmittals and transfers.

344.    The Core Defendants' violations of 18 U.S.C. § 1343 are subject to continuing investigation and revaluation.

345.    However, the acts described *supra,* provide, by way of illustration but not limitation, representative examples of the Core Defendants' 18 U.S.C. § 1343 violations.

346.    Each of the documents, invoices, letters, emails, applications, and/or tax forms that the Core Defendants sent by wire and/or mail to Plaintiff served at least two roles in the RICO Enterprise.

347.    First, these documents, standing alone, were fraudulent. The Core Defendants knew that the vast majority of MSGs allegedly being sold were not in existence or being subleased.

348.    Second, in addition to being fraudulent standing alone, these documents were used to advance the fraudulent Schemes that the Core Defendants perpetrated on Plaintiff.

349.    In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail the Core Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiff as described above, in violation of 18 U.S.C. § 1343.

350.    The Core Defendants' fraudulent statements and omissions include insufficient demand in the market for the MSGs, i.e., that the MSGs would all be leased and would retain sufficient value after five years to repay the Promissory Notes to DC Solar Solutions and return additional revenue to the relevant Fund.

351.    The Core Defendants' fraudulent statements and omissions include that DC Solar had subleased thousands of MSGs to legitimate third-party lessees for amounts that would support each MSG's $150,000 valuation.

352.    The Core Defendants' fraudulent statements and omissions includes that DC Solar Solutions, or one of the other Core Defendants, had separate agreements with the

37                                    **COMPLAINT**

1  major sublessees which negated or paid the lease payments that DC Solar Distribution
2  owed.

3      353.   The Core Defendants' fraudulent statements and omissions include that all
4  MSGs sold had been built and were "placed in service" as of the closing date of each
5  Purchase Agreement, or any subsequent dated provided therein.

6      354.   The Core Defendants' fraudulent statements and omissions include that
7  Bayliss was an independent engineer who had viewed and tested all of the MSGs sold.

8      355.   On information and belief, the predicate acts, including the predicate acts of
9  wire fraud, are continuing.

10      356.   The Core Defendants, on their own and as part of a common fraudulent
11  scheme and conspiracy, defrauded Plaintiff as set out above.

12      357.   The Core Defendants intentionally and knowingly made these material
13  misrepresentations and intentionally and knowingly suppressed material facts from
14  Plaintiff, for the purpose of deceiving it and thereby obtaining financial gain.

15      358.   The Core Defendants either knew or recklessly disregarded that the
16  misrepresentations and omissions described above were material. Plaintiff was injured as a
17  result of the misrepresentations.

18      359.   The Core Defendants made continual use of wire transmissions, in addition
19  to communications made outside the interstate wire systems, to effectuate their fraudulent
20  Schemes. In addition to using in person, telephonic, and other means of communication to
21  make fraudulent statements, the Core Defendants transmitted numerous specific fraudulent
22  statements to Plaintiff through the mail, by fax, and/or by email.

23      360.   The Core Defendants intentionally and knowingly made these material
24  misrepresentations and intentionally and knowingly suppressed material facts from
25  Plaintiff, for the purpose of deceiving it and thereby obtaining financial gain.

26      361.   The Core Defendants either knew or recklessly disregarded that the
27  misrepresentations and omissions described above were material. Plaintiff was injured as a
28  result of the misrepresentations.

362.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire fraud, committed by the Core Defendants pursuant to their transactions to defraud Plaintiff.

363.   Plaintiff has therefore been injured in its business or property as a result of the Core Defendants' overt acts and racketeering activities.

### E.   Pattern of Racketeering Activity

364.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

365.   As set forth above, the Core Defendants have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years.

366.   Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiff.

367.   The multiple acts of racketeering activity committed and/or conspired to by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5). Plaintiff alleges that the course of conduct engaged in by the Core Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5).

368.   Plaintiff can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the schemes so that the Core Defendants could defraud Plaintiff. Plaintiff alleges that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

extended since at least 2011 (a substantial period of time).

369.    Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicates are attributed to the Core Defendants' operations as part of a long-term association that existed for criminal purposes. Further, the last act of racketeering activity that is alleged as the basis of Plaintiff's claims occurred within four years of a prior act of racketeering.

370.    Three key individuals that assisted with the operations of the RICO Enterprise have plead guilty to federal felonies.

371.    Plaintiff therefore has been injured in its business or property as a result of the Core Defendants' overt acts and racketeering activities as described above and throughout this Complaint.

## VI.    DAMAGES

372.    Plaintiff was damaged by all Defendants in various ways.

373.    First, Plaintiff suffered costs for the presumptive value of the MSGs purchased by Funds but never delivered.

374.    Second, Plaintiff incurred significant costs related to closing the deals to purchase the MSGs, as well as to locate and store MSGs after the Schemes were uncovered.

375.    Third, Plaintiff was deprived of the benefit of its bargain, specifically the value of promised Tax Credit, depreciation, rental, and management income.

376.    Fourth, Plaintiff paid for services not rendered, and those amounts should be disgorged.

## VII.    CLAIMS FOR RELIEF

### Count I

### (Federal RICO - 18 U.S.C. §1962(c) – Core Defendants)

377.    Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

378.    Section 1962(c) of RICO provides that it "shall be unlawful for any person

employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

379.   Plaintiff incorporates, as though fully set out herein, its allegations regarding Enterprise.

380.   Plaintiff incorporates, as if fully set forth herein, its allegations that the Core Defendants have engaged in a pattern of racketeering activity.

381.   The Core Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint.

382.   Through the fraudulent and wrongful conduct described in this Complaint, the Core Defendants seek and have sought to deprive Plaintiff of money and property rights.

383.   To successfully execute their Schemes in the manner set forth in this Complaint, the Core Defendants must have a system that allows Core Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

384.   With respect to the activities alleged herein, the Core Defendants have acted at all times with malice toward Plaintiff in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

385.   In carrying out the overt acts and fraudulent scheme described above, the Core Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1343 and 1346, and 18 U.S.C. §1961, *et seq*. as set forth more fully above.

386.   Therefore, the Core Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under any of the following provisions of 18 U.S.C. §1343 (relating to wire fraud) ...."

387.   As a proximate result of the Core Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiff has been injured in its business or property

**COMPLAINT**

as described above.

## Count II

### (Federal RICO - 18 U.S.C. §1962(d) – Core Defendants)

388.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

389.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Core Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

390.   Plaintiff incorporates, as if fully set forth herein, its allegations regarding the Enterprise. Plaintiff incorporates, as if fully set forth herein, its allegations that the Core Defendants have engaged in a pattern of racketeering activity. Absent the Core Defendants' conspiracy and joint efforts, the Core Defendants' Schemes would not be successful. Acting jointly, the Core Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

391.   The Core Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

392.   As demonstrated in detail above, the Core Defendants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Plaintiff of money and other property interests.

393.   The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Core Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity. The Core Defendants have

**COMPLAINT**

engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by the Core Defendants from such pattern of racketeering activity, including:

394.    Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

395.    Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

396.    As a proximate result of the Core Defendants' conduct as described above, Plaintiff has been injured in its business or property as described above.

## Count III

### (Fraud: Intentional Misrepresentation – Core Defendants)

397.    Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

398.    In perpetrating the Schemes, the Core Defendants represented to the Plaintiff that the Funds would receive certain tax and other monetary benefits, and obtain title to MSGs, from the Funds' purchase of MSGs from DC Solar Solutions.

399.    The Core Defendants' representation was false.

400.    The Core Defendants knew that the representation was false when they made it.

401.    The Core Defendants intended that the Plaintiff rely on the representation.

402.    Plaintiff reasonably relied on the Core Defendants' representation.

403.    Plaintiff became a member in the Funds and undertook obligations as a managing member based upon the representations of the Core Defendants.

404.    Plaintiff was harmed.

405.    Plaintiff's reliance on the Core Defendants' representation was a substantial factor in causing Plaintiff's harm.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

43                                            **COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

## <u>Count IV</u>

### <u>(Fraud: Intentional Concealment – Core Defendants)</u>

406.    Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as fully set forth here.

407.    In perpetrating the Schemes, the Core Defendants intentionally failed to disclose certain facts to Plaintiff, i.e., that the MSGs were not being manufactured or subleased, and that the alleged lease revenues paid to the Funds by DC Solar Distribution were in reality circulated Purchaser monies paid to DC Solar Solutions for new MSGs.

408.    The Core Defendants intentionally failed to disclose these and other material facts to Plaintiff, which were known only to the Core Defendants, and prevented Plaintiff from discovering these facts.

409.    Plaintiff did not know the concealed facts.

410.    The Core Defendants intend to deceive Plaintiff by concealing the facts.

411.    Plaintiff became a member in the Funds and undertook obligations as a managing member based upon the concealment of the Core Defendants.

412.    If the omitted information had been disclosed to Plaintiff, Plaintiff would have reasonably acted differently.

413.    Plaintiff was harmed.

414.    The Core Defendants' concealment was a substantial factor in causing Plaintiff's harm.

## <u>Count V</u>

### <u>(Fraud in the Inducement- Core Defendants)</u>

415.    Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

416.    In perpetrating the Schemes, the Core Defendants represented to the Plaintiff that the Funds would receive certain tax and other monetary benefits, and obtain title to MSGs, from the Funds' purchase of MSGs from DC Solar Solutions.

417.    Further, the Core Defendants represented to the Plaintiff that there were sufficient

44                                    **COMPLAINT**

1  lease revenues and third-party leases to lease the MSGs being sold to the Funds.

2  418.  Further, the Core Defendants represented to the Plaintiff that the MSGs for each

3  Fund were built and would exist at the end of the five to seven years, when Plaintiff would become

4  the 95% owner of each Fund.

5  419.  The Core Defendants' representation was false.

6  420.  The Core Defendants knew that the representation was false when they made it.

7  421.  The Core Defendants intended that the Plaintiff rely on the representation.

8  422.  Plaintiff reasonably relied on the Core Defendants' representation.

9  423.  Plaintiff became a member in the Funds and undertook obligations as a managing

10  member based upon the representations of the Core Defendants.

11  424.  Plaintiff was harmed.

12  425.  Plaintiff's reliance on the Core Defendants' representation was a substantial factor

13  in causing Plaintiff's harm

14  **Count VI**

15  **(Conversion- Core Defendants)**

16  426.  Plaintiff repeats, realleges and incorporates each and every prior factual

17  allegation in the preceding paragraphs as if fully set forth here.

18  427.  As a member of the Funds, Plaintiff holds an ownership interest in the MSGs

19  and/or the money paid to DC Solar Solutions for the purchase of the purportedly-existing

20  MSGs.

21  428.  The Core Defendants substantially interfered with Plaintiff's property.

22  429.  Plaintiff did not consent.

23  430.  Plaintiff was harmed.

24  431.  The Core Defendants' conduct was a substantial factor in causing Plaintiff's

25  harm.

26  **Count VII**

27  **(Civil Conspiracy – Core Defendants and Scheme Aiders/Abettors)**

28  432.  Plaintiff repeats, realleges and incorporates each and every prior factual allegation

Snell & Wilmer

45        **COMPLAINT**

in the preceding paragraphs.

433.   The Core Defendants acted in combination.

434.   The Core Defendants intended to accomplish an unlawful objective together.

435.   The Core Defendants, through their acts or omissions, sought to fraudulently induce Plaintiff to take actions and undertake obligations relating to the Funds, to make fraudulent misrepresentations to Plaintiff, or to fraudulently conceal information from Plaintiff relating to the Funds, the MSGs, and DC Solar.

436.   The Core Defendants agreed to a concert of actions to accomplish the objective.

437.   The Core Defendants each committed the acts set forth in the preceding paragraphs to accomplish the objective.

438.   The Core Defendants intended to accomplish an unlawful objective for the purpose of harming Plaintiff and others.

439.   The Core Defendants committed unlawful acts in furtherance of the agreement.

440.   Plaintiff suffered damages as a result of the act or acts.

## Count VIII

### (Unjust Enrichment – Core Defendants and Halo)

441.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as fully set forth here.

442.   The Core Defendants were enriched as a result of the Plaintiff's management services, services in locating and moving MSGs, and/or monetary participation in the Core Defendants' businesses.

443.   Halo was enriched by Plaintiff advancing funds and incurring costs by which Halo benefitted, but refused or failed to reimburse for or pay to Plaintiff.

444.   The Plaintiff was impoverished as a result of these services and/or participation without promised compensation from the Core Defendants.

445.   If no adequate remedy at law is available for Plaintiff's impoverishment, the Plaintiff is entitled to recover under a theory of unjust enrichment.

**COMPLAINT**

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

## Count IX

## (Intentional Interference with Contractual Relationship or Business Expectancy – Core Defendants)

446.    Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

447.    There was a contract or contracts between Plaintiff and third parties, or a business expectancy between Plaintiff and third parties.

448.    The Core Defendants knew of the contract or business expectancy.

449.    The Core Defendants' conduct prevented performance under the contracts or business expectancy, or made performance more expensive or difficult.

450.    The Core Defendants intended to disrupt the performance of this contract or business expectancy, and/or knew that disruption of performance was certain or substantially certain to occur.

451.    Plaintiff was harmed.

452.    The Core Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## Count X

## (Negligence – Alvarez & Marsal)

453.    Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

454.    Alvarez & Marsal owed a duty to the Plaintiff in preparing the Appraisals.

455.    Alvarez & Marsal breached its duty and was negligent in preparing the Appraisals.

456.    Plaintiff was harmed.

457.    Alvarez & Marsal's conduct caused Plaintiff's harm.

## Count XI

## (Negligent Misrepresentation – Alvarez & Marsal)

458.    Plaintiff repeats, realleges and incorporates each and every prior factual

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

allegation in the preceding paragraphs as if fully set forth here.

459.   Alvarez & Marsal represented to the Plaintiff that the Appraisals were true and accurate representations of the value of the MSGs.

460.   Alvarez & Marsal's representation was not true.

461.   Alvarez & Marsal had no reasonable grounds for believing the representation was true when it made it.

462.   Alvarez & Marsal intended that Plaintiff rely on this representation.

463.   Plaintiff reasonably relied on Alvarez & Marsal's representation.

464.   Plaintiff was harmed.

465.   Plaintiff's reliance on Alvarez & Marsal's representation was a substantial factor in causing Plaintiff's harm.

### Count XII

### (Professional Negligence – Roach)

466.   Plaintiff repeats, realleges and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

467.   Plaintiff retained Roach to provide accounting services and counsel to Plaintiff with respect to the Funds, MSG purchases and related deals.

468.   As accountant for Plaintiff, Roach had a duty to exercise reasonable care, skill, and diligence in performing services and providing advice to Plaintiff.

469.   Plaintiff reasonably relied on the skill and expertise of Roach to provide advice and counsel consistent with the standards other members of the accounting profession commonly possess and exercise.

470.   Roach breached the duty of care owed to Plaintiff by failing to use the skill and care that a reasonably careful accountant would have used in providing services and advice in similar circumstances.

471.   Plaintiff was harmed by this breach.

**COMPLAINT**

1

**Count XIII**

2

**(Breach of Fiduciary Duty – Roach)**

3      472.   Plaintiff repeats, realleges and incorporates each and every prior factual

4   allegation in the preceding paragraphs as if fully set forth here.

5      473.   Roach was Plaintiff's accountant, and acted on behalf of Plaintiff with respect

6   to the Funds, MSG purchases and related deals.

7      474.   Roach failed to act as a reasonably careful accountant would have acted under

8   the same or similar circumstances.

9      475.   Plaintiff was harmed by this failure.

10     476.   Roach's conduct was a substantial factor in causing Plaintiff's harm.

11

**Count XIV**

12

**(Professional Negligence – Wentz, Yee, Montage, & Radius/Vistra)**

13     477.   Plaintiff repeats, realleges and incorporates each and every prior factual

14  allegation in the preceding paragraphs as if fully set forth here.

15     478.   Plaintiff retained Wentz, Yee, Montage and Radius/Vistra employees to

16  provide accounting services and counsel to Plaintiff with respect to the Funds, MSG

17  purchases and related deals.

18     479.   As accountants for Plaintiff, Wentz, Yee, Montage and Radius/Vistra

19  employees had a duty to exercise reasonable care, skill, and diligence in performing services

20  and providing advice to Plaintiff.

21     480.   Plaintiff reasonably relied on the skill and expertise of Wentz, Yee, Montage

22  and Radius/Vistra employees to provide advice and counsel consistent with the standards

23  other members of the accounting profession commonly possess and exercise.

24     481.   Wentz, Yee, Montage and Radius/Vistra employees breached the duty of care

25  owed to Plaintiff by failing to use the skill and care that a reasonably careful accountant

26  would have used in providing services and advice in similar circumstances.

27     482.   Plaintiff was harmed by this breach.

28

49                                    **COMPLAINT**

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

Snell & Wilmer

L.L.P.

law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1

2

**Count XV**

**(Breach of Fiduciary Duty- Wentz, Yee, Montage & Radius/Vistra)**

3      483.    Plaintiff repeats, realleges and incorporates each and every prior factual

4    allegation in the preceding paragraphs as if fully set forth here.

5      484.    Wentz, Yee, Montage, and Radius/Vistra employees were Plaintiff's

6    accountants, and acted on behalf of Plaintiff with respect to the Funds, MSG purchases and

7    related deals.

8      485.    Wentz, Yee, Montage, and Radius/Vistra employees failed to act as

9    reasonably careful accountants would have acted under the same or similar circumstances.

10      486.    Plaintiff was harmed by these failures.

11      487.    Wentz, Yee, Montage, and Radius/Vistra employees conduct was a

12    substantial factor in causing Plaintiff's harm.

13

**Count XVI**

14

**(Negligent Misrepresentation – All Defendants)**

15      488.    Plaintiff repeats, realleges and incorporates each and every prior factual

16    allegation in the preceding paragraphs as if fully set forth here.

17      489.    All Defendants represented to Plaintiff that certain information was true.

18      490.    All Defendants representations were not true.

19      491.    All Defendants had no reasonable grounds for believing the representations

20    were true when they made it or within the time periods of their involvement.

21      492.    All Defendants intended that Plaintiff rely on these representations.

22      493.    Plaintiff reasonably relied on All Defendants' representations.

23      494.    Plaintiff was harmed.

24      495.    Plaintiff's reliance on all Defendants' representations was a substantial factor

25    in causing its harm.

26      496.    All Defendants failed to disclose information that was known, or should have

27    been known, to be important to the Plaintiff and Purchasers in their transactions.

28      497.    **Reservation of Rights.** Solarmore hereby reserves and does not waive:

50

**COMPLAINT**

a. Any and all rights, claims, or remedies against other individuals and/or entities currently the subject of tolling agreements with Plaintiff;

b. To the extent applicable, any and all claims or remedies that are asserted through Plaintiff's instant suit, and which might benefit any other Purchasers, Fund LLCs, and/or other Court-appointed representatives for said Purchasers, and/ or Fund LLC's; and/or

c. the right to name additional individuals and/or entities and seek additional claims and/or further remedies based upon ongoing investigations.

## VIII.  PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendants as follows:

A.      For damages against all Defendants in an amount in excess of $75,000 to be proven at trial.

B.      For treble damages under RICO.

C.      For an award of Plaintiff's reasonable attorneys' fees in an amount to be proven at trial.

D.      For such other relief as the Court may determine.

## IX.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues in this litigation that are triable to a jury.

DATED: December 17, 2019

SNELL & WILMER L.L.P.

By: _/s/ Nathan G. Kanute_
Nathan G. Kanute
50 W. Liberty Street, Suite 510
Reno, NV  89501

Don Bivens (*pro hac vice pending*)
Donald L. Gaffney (*pro hac vice pending*)
One Arizona Center, Suite 1900
400 East Van Buren Street
Phoenix, AZ 85004-2202
*Attorneys for Plaintiff*

**COMPLAINT**