1  Nathan G. Kanute (CA Bar No. 300946)
   SNELL & WILMER L.L.P.
2  50 West Liberty Street, Suite 510
   Reno, Nevada 89501
3  Telephone: 775-785-5440
   E-Mail: nkanute@swlaw.com
4
   Don Bivens *(admitted pro hac vice)*
5  (AZ Bar No. 005134)
   SNELL & WILMER L.L.P.
6  One Arizona Center, Suite 1900
   400 East Van Buren Street
7  Phoenix, AZ 85004-2202
   Telephone: (602) 382-6000
8  Email: dbivens@swlaw.com

9  *Attorneys for Plaintiff*

10

11

12

13  SOLARMORE MANAGEMENT
    SERVICES, INC., a California corporation,

14                  Plaintiff,

15  v.

16

17  JEFF CARPOFF and PAULETTE
    CARPOFF, husband and wife; LAUREN
18  CARPOFF, an individual; ROBERT V.
    AMATO, an individual; PRISCILLA
19  AMATO, an individual; ROBERT
    KARMANN, an individual; RONALD J.
20  ROACH, an individual; JOSEPH BAYLISS,
    an individual; BAYLISS INNOVATIVE
21  SERVICES, INC., a California corporation;
    ARI J. LAUER, an individual; LAW
22  OFFICES OF ARI J. LAUER; ALAN
    HANSEN; an individual; SEBASTIAN
23  JANO, an individual; STEVE WILDE, an
    individual; RYAN GUIDRY, an individual;
24  CARRIE CARPOFF-BODEN, an individual;
    PATRICK MOORE, an individual; HALO
25  MANAGEMENT SERVICES LLC, a
    Nevada limited liability company;
26  ALVAREZ & MARSAL VALUATION
    SERVICES, LLC, a Delaware limited
27  liability company; BARRY HACKER, an
    individual; MARSHALL & STEVENS, INC.,
    a Delaware corporation; COHNREZNICK
28  CAPITAL MARKETS SECURITIES, LLC, a

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

Case No. 2:19-cv-02544-JAM-DB

**FIRST AMENDED COMPLAINT**

**(JURY TRIAL DEMANDED)**

*[left margin:]* Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

\4832-6691-7075

1   Maryland limited liability company;
    FALLBROOK CAPITAL SECURITIES
2   CORPORATION, a Florida corporation;
    SCOTT WENTZ, an individual; RAINA
3   YEE, an individual; VISTRA
    INTERNATIONAL EXPANSION (USA)
4   INC., fka RADIUS GGE (USA), INC., fka
    HIGH STREET PARTNERS INC., a
5   Maryland corporation; RADIUS GGE (USA),
    INC., fka HIGH STREET PARTNERS INC.,
6   a Maryland corporation; MONTAGE
    SERVICES, INC., a California corporation;
7   HERITAGE BANK OF COMMERCE, a
    California corporation; DIANA KERSHAW,
8   an individual; CARSON TRAILER, INC., a
    California corporation; DAVID ENDRES, an
9   individual; AHERN RENTALS INC., a
    Nevada corporation, AHERN AD, LLC, a
10  Nevada limited liability company; EVAN
    AHERN, an individual; THE STRAUSS
11  LAW FIRM, LLC, a South Carolina limited
    liability company; PETER STRAUSS, an
12  individual; PANDA BEAR
    INTERNATIONAL, LTD., a Hong Kong
13  corporation; PANDA SOLAR SOLUTIONS
    LLC, a Nevada limited liability corporation;
14  DC SOLAR INTERNATIONAL, INC., a
    Nevis corporation; BAYSHORE SELECT
15  INSURANCE, a Bahamian Corporation;
    CHAMPION SELECT INSURANCE, a
16  Bahamian Corporation; JPLM DYNASTY
    TRUST, a Cook Island Trust; BILLIE JEAN
17  TRUST, a Cook Island Trust; SOUTHPAC
    INTERNATIONAL, INC., a Cook Islands
18  Corporation,

19                  Defendants.

20

21

22

23

24

25

26

27

28

\4832-6691-7075

2

FIRST AMENDED COMPLAINT

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...................................................................... 5

II.    PARTIES ...................................................................................................... 6

     A.     Plaintiff ............................................................................................ 6
     B.     Defendants ....................................................................................... 8

         The Core Defendants ...................................................................... 8
         Scheme Aiders/Abettors ............................................................... 12
         Asset Hiders ................................................................................. 16

III.   JURISDICTION & VENUE ...................................................................... 17

IV.   FACTUAL ALLEGATIONS ...................................................................... 19

     A.     MSGs' $150,000 Valuation ............................................................ 19
     B.     The Typical Transaction Contracts ............................................... 20
     C.     The Core Defendants' Seminal Fraudulent Misrepresentations ................. 24
     D.     Plaintiff Becomes a Purchaser and a Managing Member of the Funds
         that Purchased MSGs .................................................................... 26
     E.     "Marketing" of the MSGs Where There Was No Market.......................... 26
     F.     Fraudulent and Wrongful Conduct by the Carpoffs.................................... 27
     G.     Fraudulent and Wrongful Conduct by Lauer ............................................ 29
     H.     Fraudulent and Wrongful Conduct by Bayliss and Bayliss Innovative ...... 30
     I.      Fraudulent and Wrongful Conduct by Roach ............................................ 32
     J.      Fraudulent and Wrongful Conduct of Karmann ...................................... 32
     K.     Fraudulent and Wrongful Conduct of Guidry ........................................... 34
     L.     Fraudulent and Wrongful Conduct of Hansen .......................................... 35
     M.    Fraudulent and Wrongful Conduct of Boden ............................................ 36
     N.     Wrongful Conduct of Wentz, Yee, Montage, Radius and Vistra................ 37
     O.     Wrongful Conduct of Carson ...................................................................... 40
     P.     Wrongful Conduct of Endres ...................................................................... 41
     Q.     Wrongful Conduct of Ahearn Rentals......................................................... 42
     R.     Wrongful Conduct of Ahern Ad .................................................................. 44
     S.     Wrongful Conduct by Ahearn ..................................................................... 46
     T.     Wrongful Conduct by Alvarez & Marsal ..................................................... 46
     U.     Wrongful Conduct of Halo .......................................................................... 48
     V.     Wrongful Conduct of Wilde ........................................................................ 48
     W.    Wrongful Conduct of Moore ....................................................................... 49
     X.     Wrongful Conduct of Jano .......................................................................... 49
     Y.     The Federal Tax Audits and the State of California Tax Audits................ 50
     Z.     Plaintiff Asks Questions, and the Carpoffs Stop Dealing with
         Plaintiff ......................................................................................... 50
     AA.   The Truth About Subleases of MSGs to End Users and the Collapse
         of the DC Solar Enterprises.......................................................... 51

Snell & Wilmer

L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

BB.   The Carpoffs' Preparations for Escape and the Hiding of Assets ............... 54
CC.   Allegations Related to RICO Violations ...................................................... 55

    1)   The Enterprise ........................................................................... 56
    2)   Operation of the Enterprise ....................................................... 57
    3)   Predicate Facts .......................................................................... 58
    4)   Violations of 18 U.S.C. § 1343 ................................................. 59
    5)   Pattern of Racketeering Activity ............................................... 61

V.   DAMAGES ..................................................................................................... 63

VI.   CLAIMS FOR RELIEF ................................................................................... 63

Count I (Federal RICO – 18 U.S.C. § 1962(c) – Core Defendants) ..................... 63
Count II (Federal RICO – 18 U.S.C. § 1962(d) – Core Defendants) .................... 65
Count III (Fraud: Intentional Misrepresentation – Core Defendants) ................... 66
Count IV (Fraud: Concealment – Core Defendants) ............................................. 67
Count V (Fraud in the Inducement – Core Defendants) ........................................ 68
Count VI (Conversion – Core Defendants) ........................................................... 69
Count VII (Civil Conspiracy – Core Defendants and Scheme
    Aiders/Abettors) ......................................................................................... 69
Count VIII (Unjust Enrichment/Restitution – Core Defendants and Halo) ........... 70
Count IX (Intentional Interference with Contractual Relations – Core
    Defendants) ................................................................................................. 71
Count X (Intentional Interference with Prospective Economic Relations –
    Core Defendants) ........................................................................................ 71
Count XI (Professional Negligence – Lauer) ........................................................ 72
Count XII (Breach of Fiduciary Duty – Lauer) ..................................................... 72
Count XIII (Professional Negligence – Roach) ..................................................... 73
Count XIV (Breach of Fiduciary Duty – Roach) ................................................... 73
Count XV (Negligence – Alvarez & Marsal) ......................................................... 74
Count XVI (Negligent Misrepresentation – Alvarez & Marsal) ............................ 74
Count XVII (Professional Negligence – Wentz, Yee, Montage, and
    Radius/Vistra) ............................................................................................. 75
Count XVIII (Breach of Fiduciary Duty – Wentz, Yee, Montage, and
    Radius/Vistra) ............................................................................................. 76
Count XIX (Negligent Misrepresentation – All Defendants) ................................ 76
Count XX (Equitable Contribution/Indemnification – All Defendants) ................ 77

VII.   DEFENDANTS ARE EQUITABLY RESPONSIBLE FOR ANY
DAMAGES SUFFERED BY PLAINTIFF AS A RESULT OF CLAIMS
OR CAUSES OF ACTION AGAINST PLAINTIFF RELATED TO THE
DEFENDANTS' SCHEMES. RESERVATION OF RIGHTS ............................ 77

VIII.   PRAYER FOR RELIEF .................................................................................. 78

IX.   DEMAND FOR JURY TRIAL ........................................................................ 78

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

1

# I.    **PRELIMINARY STATEMENT**

Plaintiff Solarmore Management Services, Inc.'s ("Plaintiff") claims arise from two parallel fraud schemes that wrested almost $1 billion from innocent purchasers – including Plaintiff – who thought they had purchased revenue-producing mobile solar generators ("MSGs") that also qualified for valuable energy tax credits. Each MSG transaction had two promised facets, both of which proved fraudulent.

First, from 2011 to 2018, certain Defendants, named below, built and sold thousands of MSGs to unwitting purchasers. Purchasers paid $150,000 for each MSG (which supposedly qualified for renewable energy tax credits), with: (1) a down payment between $35,000 and $45,000; and (2) a promissory note for the balance payable over twenty years.

Second, certain Defendants told these same purchasers that Defendants would lease back the MSGs, then sublease the MSGs to end users. The subleases were represented to provide a steady flow of lease revenues to more than cover any payments the purchasers owed on their promissory notes. Both facets of the MSG transactions were shams.

To begin with, some purchasers paid for thousands of MSGs that were never built. Of the MSGs that were built and sold, none were worth the $150,000 sales price because there was never a true market for the MSGs, and thus no prospects for promised sublease revenues. By far, most of the MSGs that were built were never used. They had to be stored at considerable expense. A majority of the promised leases to end users never materialized. As a result, purchasers grossly overpaid for non-existent or over-priced MSGs, and the MSG transactions may not generate the amount of the promised tax credits.

All purchasers, including Plaintiff, suffered significant damages in different amounts, depending on the size of their transactions. Most MSG purchase transactions involved multiple millions of dollars.

Defendants tried as long as possible to disguise their fraud. Among other things, Defendants covered up the lack of a rental market for MSGs. To achieve this coverup, Defendants transferred large sums of cash from the sale, or in some cases, the purported sale of MSGs, by one of the Defendant's companies to another of Defendant's companies

Snell & Wilmer
L.L.P.
LAW OFFICES
50 W. Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

that was supposed to be subleasing the MSGs to end users. This resulted in purchasers thinking that end users had subleased the MSGs as Defendants had promised. In truth, practically no subleases existed. The recirculation of cash helped with the perception that each of the MSGs had a value of $150,000 because there was a rental market for the MSGs and the tax credits taken by Plaintiff was based upon the $150,000 valuation.

In sum, Defendants lied to all purchasers, covered up their fraud, and ran their fraudulent enterprise over a course of years. By recirculating the same cash between and among related companies, Defendants also created the illusion of financial stability, when just the opposite was true. Defendants enriched themselves with lavish lifestyles and exorbitant luxuries that included buying numerous luxury and collector vehicles, a baseball team, a NASCAR race team, expensive real estate within and without the United States, and the use of private jets. Defendants also tried to hide their ill-gotten gains from the taxation by the United States government – until the federal government, through the FBI, raided their homes and offices, the "FBI Raid", and seized their ill-gotten assets on December 18, 2018. At the time of this First Amended Complaint, several Defendants have pled guilty to federal crimes.

Defendants named in this First Amended Complaint fall into three main categories: (1) certain Defendants were core schemers, who orchestrated and perpetuated the fraudulent enterprise from beginning to end; (2) certain Defendants who aided and abetted the fraudulent enterprise over time; and (3) certain Defendants who facilitated hiding money and hiding MSGs (or the lack of MSGs) from purchasers and other investigating parties.

Against this background, for its First Amended Complaint against all Defendants, Plaintiff alleges as follows:

## II.    PARTIES

### A.    Plaintiff

1.    Plaintiff is a California corporation authorized to do and doing business in California. Plaintiff is solely owned by Carl Jansen ("Jansen"), Jansen is President of Plaintiff.

2.      Until December 12, 2019, Plaintiff was the managing member and at all relevant times Plaintiff was part owner of the following California limited liability companies, collectively called the "Purchasers" or "Funds:"

a.      Solar Eclipse Investment Fund V, LLC

b.      Solar Eclipse Investment Fund VI, LLC

c.      Solar Eclipse Investment Fund VII, LLC

d.      Solar Eclipse Investment Fund VIII, LLC

e.      Solar Eclipse Investment Fund X, LLC

f.      Solar Eclipse Investment Fund XI, LLC

g.      Solar Eclipse Investment Fund XII, LLC

h.      Solar Eclipse Investment Fund XIV, LLC

i.      Solar Eclipse Investment Fund XV, LLC

j.      Solar Eclipse Investment Fund XVI, LLC

k.      Solar Eclipse Investment Fund XVII, LLC

l.      Solar Eclipse Investment Fund XVIII, LLC

m.      Solar Eclipse Investment Fund XIX, LLC

n.      Solar Eclipse Investment Fund XXI, LLC

o.      Solar Eclipse Investment Fund XXII, LLC

p.      Solar Eclipse Investment Fund XXIII, LLC

q.      Solar Eclipse Investment Fund XXIV, LLC

r.      Solar Eclipse Investment Fund XXVI, LLC

s.      Solar Eclipse Investment Fund XXVIII, LLC

t.      Solar Eclipse Investment Fund XXXI, LLC

3.      Plaintiff currently owns 95% of Solar Eclipse Investment Fund V, Solar Eclipse Investment Fund VI, Solar Eclipse Investment Fund VII, Solar Eclipse Investment Fund X, Solar Eclipse Investment Fund XI, and Solar Eclipse Investment Fund XII. Plaintiff currently owns 1% of the remaining Funds.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

4.      The Funds are tax-equity investment funds under the Internal Revenue Code (the "Code"), created specifically to purchase and own MSGs.

5.      Each Fund has a purchasing member or members (as further defined in paragraph 106 below, the "Purchasing Member"), which provided most of the money to purchase the MSGs.

6.      As of December 18, 2019, Plaintiff consented to resignation as managing member of the Funds, but still remains a member of the Funds.

### B.      Defendants

### *The Core Defendants*

7.      Jeff Carpoff ("Mr. Carpoff") and Paulette Carpoff ("Mrs. Carpoff," and collectively the "Carpoffs") are a married couple who, on information and belief, reside in Las Vegas, Nevada.

8.      The Carpoffs own three affiliated entities called: (a) DC Solar Solutions, Inc. ("Solutions"), (b) DC Solar Distribution, Inc. ("Distribution"), and (c) DC Solar Freedom, Inc. ("Freedom"). Defendants Ari Lauer and Ronald Roach (each defined below) also owned equity in Freedom. This First Amended Complaint refers collectively to these four entities as the "DC Solar Enterprises."

9.      The DC Solar Enterprises are currently debtors in the jointly administered Chapter 7 bankruptcy proceedings pending in the United States Bankruptcy Court, District of Nevada ("Bankruptcy Court") under the lead case styled *In re Double Jump, Inc.,* Case No. 19-50102-gs (the "Bankruptcy Case").

10.     The Carpoffs are the founders of the DC Solar Enterprises and the masterminds behind the fraudulent schemes described in this First Amended Complaint.

11.     In addition, the Carpoffs own or control various other entities and trusts described elsewhere in this First Amended Complaint.

12.     On January 22, 2020, the Carpoffs were charged by the United States with felony acts. Mr. Carpoff was charged with conspiracy to commit wire fraud and money laundering. *See* Case No. 2:20-cr-00017-JAM. Mrs. Carpoff was charged with conspiracy

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

to commit an offense against the United States and money laundering. *See* Case No. 2:20-cr-00018-JAM. The Carpoffs pled guilty to these charges on January 24, 2020. These charges and guilty pleas are related to the Carpoffs' roles in the DC Solar Enterprises and related fraud.

13.     Lauren Carpoff is the adult daughter of the Carpoffs and, on information and belief, resides in California.

14.     Lauren Carpoff received funds and/or wages from the DC Solar Enterprises.

15.     On information and belief, Lauren Carpoff was involved in keeping track of a master list of Vehicle Identification Numbers ("VINs") for MSGs, which included assigning VINs to non-existent MSGs that were never built.

16.     Robert V. Amato ("Mr. Amato") is Paulette Carpoff's brother and, on information and belief, resides in California.

17.     Mr. Amato was on the payroll of the DC Solar Enterprises.

18.     According to the DOJ Seizure Document (defined below), on information and belief Mr. Amato planted GPS devices in various locations. The GPS devices were supposed to be attached to MSGs, to permit purchasers to track and verify the location of their MSGs. But many GPS devices were simply planted alone, intended to give the false impression that certain MSGs actually existed at certain locations, when they did not.

19.     Priscilla Amato ("Ms. Amato") is related to Mr. Amato and the Carpoffs and, on information and belief, resides in California.

20.     Ms. Amato was also on the payroll of the DC Solar Enterprises. On information and belief, Ms. Amato managed real properties purchased with money that came from the purchasers of MSGs.

21.     Robert Karmann ("Karmann") is an accountant who, on information and belief, resides in California. Karmann worked for the DC Solar Enterprises as controller or CFO from approximately 2014 through the companies' closing with the FBI Raid.

22.     On December 12, 2019, Karmann was charged by the United States with felony acts of conspiracy to commit an offense against the United States and securities

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

fraud. *See* Case No. 2:19-cr-00222-JAM. Karmann pled guilty on December 17, 2019. The charges and guilty plea are related to Karmann's role in the fraudulent schemes of the DC Solar Enterprises.

23.    Ronald J. Roach ("Roach") is an accountant who, on information and belief, resides in California. Roach runs the company Ronald J. Roach Accountancy Corp., through which Roach performed accounting services for, among others, the DC Solar Enterprises and Plaintiff.

24.    Joseph Bayliss ("Bayliss") is a contractor who, on information and belief, resides in California. Bayliss runs Bayliss Innovative Services, Inc. ("Bayliss Innovative"), a California corporation. Bayliss is not an engineer, but he was identified as the "independent engineer" who signed off on the existence of specified MSGs in commissioning/engineering reports, which were issued as part of MSG purchase transactions.

25.    On October 21, 2019, Roach and Bayliss were charged by the United States with felony acts of conspiracy to commit an offense against the United States and securities fraud. *See* Case No. 2:19-cr-00182-JAM.

26.    Roach and Bayliss pled guilty to those counts on October 22, 2019 and are set for sentencing in 2021. The above-referenced charges and guilty pleas are related to Roach's and Bayliss' respective roles in fraudulent schemes of the DC Solar Enterprises.

27.    Ari J. Lauer ("Lauer") is an attorney who resides in California. Lauer runs the Law Offices of Ari J. Lauer in Walnut Creek, California. On information and belief, the Law Offices of Ari J. Lauer is either a dba of Lauer or a California entity owned and controlled by Lauer.

28.    Lauer was legal counsel for the Carpoffs, the DC Solar Enterprises, the Funds, and Plaintiff at various and overlapping times.

29.    Alan Hansen ("Hansen") is a former telecommunications professional and employee of the DC Solar Enterprises who, on information and belief, resides in California. In 2015, Hansen was an employee of T-Mobile. At that time, in exchange for $1,000,000

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

from the DC Solar Enterprises, Hansen signed a fake lease for MSGs ostensibly between T-Mobile, as lessee, and DC Solar Distributions, Inc., as lessor. The DC Solar Enterprises used this fake T-Mobile lease to make its operations appear legitimate and to lure new purchasers of MSGs. Hansen later left T-Mobile to work for the DC Solar Enterprises.

30.     On January 21, 2020, Hansen was charged by the United States with felony acts of conspiracy to commit an offense against the United States and aiding and abetting money laundering and pled guilty to those charges on July 28, 2020. *See* Case No. 2:20-cr-00016-JAM.

31.     Sebastian Jano ("Jano") is a former employee of the DC Solar Enterprises who, on information and belief, resides in California.

32.     Steve Wilde ("Wilde") is an accountant and the former controller of the DC Solar Enterprises who, on information and belief, resides in California.

33.     Ryan Guidry ("Guidry") was involved in operations of the DC Solar Enterprises from at least early 2012, and, on information and belief, resides in California.

34.     On information and belief, Guidry assisted in presenting false or misleading information to Plaintiff and others and/or concealing information from Plaintiff and others.

35.     On January 6, 2020, Guidry was charged by the Department of Justice with felony acts of conspiracy to commit an offense against the United States and aiding and abetting money laundering. *See* Case No. 2:20-cr-00003-JAM. Guidry pled guilty to the charges on January 14, 2020. These charges and guilty plea are related to Guidry's role in the fraudulent schemes of the DC Solar Enterprises.

36.     Carrie Carpoff-Boden ("Boden") was the Facilities Manager for the DC Solar Enterprises from at least 2015 until at least 2017, and, on information and belief, resides in California.

37.     On information and belief, Boden is Jeff Carpoff's sister.

38.     In addition, on information and belief, Boden and Mr. Carpoff owned and operated J & C Consulting, Inc.

39. On information and belief, Boden worked closely with the Carpoffs and with Guidry on matters related to the MSGs, and she had and has knowledge of the fraudulent schemes of the DC Solar Enterprises.

40. The Defendants listed above in paragraphs 7 through 39, are collectively entitled the "Core Defendants**.**"

41. Additional Defendants may be included among these Core Defendants as investigation and discovery proceed in this case or in related cases.

### *Scheme Aiders/Abettors*

42. Patrick Moore ("Moore") is or was the 21% minority owner of Solarmore Investments, Inc. ("S Investments"), which was an entity separate and apart from Plaintiff. On information and belief, Moore resides in California. S Investments was the managing member of certain early purchasers of MSGs from the DC Solar Enterprises at a time period *before* the formation of Plaintiff and the Funds identified in paragraph 2, who later engaged in MSG transactions with the DC Solar Enterprises.

43. According to the DOJ Seizure Document, on information and belief, an informant tipster contacted and told the FBI that Moore admitted that Moore had been part of a fraudulent scheme with the Carpoffs involving MSGs.

44. Halo Management Services LLC ("Halo") is a Nevada limited-liability company which is or was managed by Peter Roselli ("Roselli") who, on information and belief, is a Nevada resident. Halo was the managing member of a separate and final group of funds that also purchased MSGs from the DC Solar Enterprises.

45. Alvarez & Marsal Valuation Services, LLC is a Delaware limited liability company with its principal place of business in New York, NY ("Alvarez & Marsal").

46. Alvarez & Marsal completed appraisals of MSGs for the DC Solar Enterprises that supposedly validated the $150,000 value of all MSGs as sold to purchasers. Plaintiff and Purchasers relied on the appraised value of the MSGs as represented by Alvarez & Marsal.

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

47.     Barry Hacker ("Hacker") was a broker and sometimes senior officer at Marshall & Stevens, Inc. ("Marshall & Stevens") who, on information and belief, resides in California.

48.     Marshall & Stevens is a Delaware corporation.

49.     On information and belief, Hacker brokered some MSG purchases, worked directly with Alvarez & Marsal in representing the putative $150,000 value of the MSGs to purchasers, promoted the DC Solar Enterprises as a potential borrower, and assisted the Carpoffs with moving assets and/or business operations to Nevis Island.

50.     CohnReznick Capital Markets Securities, LLC ("CohnReznick") is a Maryland limited liability company and consulting firm with its principal place of business in New York, New York.

51.     CohnReznick and its employees brokered some MSG purchases and, on information and belief, worked directly with Alvarez & Marsal in establishing and representing the putative $150,000 value for the MSGs to purchasers.

52.     CohnReznick, is an affiliate of CohnReznick, LLP, which worked on the financial projections for each of the MSG transactions that CohnReznick brokered.

53.     Fallbrook Capital Securities Corporation ("Fallbrook") is a Florida corporation and broker with its principal place of business in California.

54.     Fallbrook and its employees brokered some MSG purchases and, on information and belief, worked directly with Alvarez & Marsal in establishing and representing the putative $150,000 value for the MSGs to purchasers.

55.     Scott Wentz ("Wentz") is an accountant who, on information and belief, resides in California. Wentz owns Montage Services, Inc. ("Montage"), a California corporation based in San Francisco.

56.     Wentz, acting through Montage, Radius, and Vistra, performed tax work, oversaw or participated in an audit or financial compilation, and acted directly to help the DC Solar Enterprises create international companies to keep assets and income outside of the United States.

57.     Raina Yee ("Yee") is an accountant who, on information and belief, resides in California. Yee was affiliated with and/or employed by Wentz and Montage. On behalf of the DC Solar Enterprises Yee – working in concert with Wentz and Montage – was responsible for responding to audits by taxing authorities of the DC Solar Enterprises, the Funds, and/or the Carpoffs individually, all related to the fraudulent schemes of the DC Solar Enterprises.

58.     Radius GGE (USA), Inc., fka High Street Partners Inc., is a Maryland corporation headquartered in Massachusetts ("Radius"). On or about June 2016, Radius acquired Montage's assets. Radius also entered into contractual agreements with Montage at that time for cooperative sharing of employees, facilities, and equipment, including employees Wentz and Yee.

59.     Vistra International Expansion (USA), Inc., fka Radius GGE (USA), Inc., fka High Street Partners, Inc., is a Maryland corporation headquartered in Massachusetts ("Vistra"). Vistra acquired Radius on or about May 2018.

60.     Throughout this series of acquisitions and contracts, Radius and Vistra – acting through Wentz, Yee, Montage and other agents and employees – continued to provide tax work, auditing, and other services to the DC Solar Enterprises, the Funds, and Plaintiff.

61.     Heritage Bank of Commerce ("Heritage Bank") is a California Corporation primarily operating in California.

62.     Diana Kershaw ("Kershaw") is or was an officer or employee or former employee of Heritage Bank who, on information and belief, resides in California.

63.     On information and belief, as an officer, agent, or employee of Heritage Bank, Kershaw cooperated with the Carpoffs to conceal or restrict relevant information from Plaintiff about its own bank accounts at Heritage Bank.

64.     Carson Trailer, Inc. ("Carson") is a California corporation with its principal place of business in Gardena, California. Carson produced and sold the physical trailers upon which solar generators were to be attached then sold as a single MSG unit to

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

FIRST AMENDED COMPLAINT

purchasers.

65.     On information and belief, Carson facilitated the Core Defendants' fraud and subterfuge by providing the DC Solar Enterprises with reserved VINs for trailers that were to become MSG units – knowing such trailers and MSGs would never be built. The Core Defendants then used the reserved VIN numbers to defraud purchasers into thinking they had purchased new MSGs, each with a supposedly valid VIN, when in truth the trailers and MSGs were never built.

66.     David Endres ("Endres") is a former employee of Carson and the DC Solar Enterprises who, on information and belief, resides in California.

67.     On information and belief, Endres, as an employee of Carson, cooperated with the Carpoffs and the DC Solar Enterprises to provide VINs without providing the corresponding trailers to which the VINs were supposed to attach.

68.     Ahern Rentals, Inc. is a Nevada corporation headquartered in Las Vegas ("Ahern Rentals").

69.     On information and belief, Ahern Rentals assisted the DC Solar Enterprises in the creation of invalid or improper leases and subleases that Ahern Rentals knew or should have known would be presented to Plaintiff and others for reliance in deciding to purchase MSGs from the DC Solar Enterprises.

70.     Ahern Ad, LLC ("Ahern Ad") is a Nevada limited-liability company headquartered in Las Vegas, Nevada.

71.     On information and belief, Ahern Ad assisted the DC Solar Enterprises in the creation of an invalid or improper lease that Ahern Ad knew or should have known would be presented to Plaintiff and others for their reliance in deciding to purchase MSGs from the DC Solar Enterprises.

72.     Evan Ahern ("Ahern") is the former President of Ahern Rentals and the owner of Ahern Ad who, on information and belief, resides in Nevada.

73.     On information and belief, Ahern was actively involved with Mr. Carpoff and the DC Solar Enterprises in MSG product design and marketing efforts to lease MSGs to

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1    third parties.

2        74.    On information and belief, Ahern, through his involvement with Mr. Carpoff

3    and his role in Ahern Rentals and Ahern Ad, knew or should have known there was no

4    legitimate lease market for the MSGs, and that business prospects for leasing MSGs to third

5    parties were doomed to fail.

6        75.    The Defendants listed in paragraphs 42 through 74 above are identified

7    collectively as the "Scheme Aiders/Abettors."

8        76.    Additional Defendants may be included among the Scheme Aiders/Abettors

9    as investigation and discovery proceeds in this case or in related cases.

10                                   ***Asset Hiders***

11       77.    The Strauss Law Firm ("Strauss Firm") is a law firm located in Hilton Head,

12   South Carolina. The Strauss Firm helped the Carpoffs and/or the DC Solar Enterprises to

13   conceal or move assets acquired with monies paid by the purchasers to the DC Solar

14   Enterprises.

15       78.    Peter Strauss ("Strauss") is an attorney and, on information and belief, resides

16   in South Carolina. Strauss is the principal or owner of the Strauss Firm.

17       79.    Panda Solar Solutions LLC ("Panda Solutions") is a Nevada limited-liability

18   company, entirely owned by the Carpoffs.

19       80.    Panda Bear International, Ltd. ("Panda International") is an international

20   Hong Kong corporation that was utilized in the movement of the DC Solar Enterprises'

21   monies in and out of Hong Kong and China Bank & Trust.

22       81.    On information and belief, Panda International was formed by the DC Solar

23   Enterprises with assistance from Wentz, ostensibly for the purchase of batteries for MSGs,

24   but in reality, to keep the DC Solar Enterprises' profits out of the United States to avoid

25   federal income taxation.

26       82.    Panda Solutions was the sole owner of Panda International.

27       83.    DC Solar International, Inc. ("DC Solar International") is an international

28   Nevis corporation. DC Solar International was formed by DC Solar Enterprises, Inc. with

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

assistance from Lauer, and Strauss, among others, to serve as the seller in certain sale-leaseback deals, designed to move the DC Solar Enterprises' profits out of the United States and to keep those profits tax-free.

84.    Bayshore Select Insurance ("Bayshore") is a Bahamian company that acts as a captive insurance company for the DC Solar Enterprises.

85.    Champion Select Insurance ("Champion") is a Bahamian company that acts as a captive insurance company for the DC Solar Enterprises.

86.    JPLM Dynasty Trust ("JPLM Trust") is a Cook Island trust administered in the Cook Islands with Southpac Trust International, Inc., a Cook Island corporation ("Southpac"), as its Trustee, and, on information and belief, was formed for the benefit of the Carpoffs and their children.

87.    Billie Jean Trust (together with the "JPLM Trust," collectively, the "Trusts") is a trust administered in the Cook Islands with Southpac as its Trustee, and, on information and belief, was formed for the benefit of the Carpoffs and their children.

88.    The Defendants listed in paragraphs 77 through 87 above are identified collectively as the "Asset Hiders."

89.    The Core Defendants, the Scheme Aiders/Abettors, and the Asset Hiders identified above in paragraphs 7 through 87 above, are referred to collectively as the "Defendants."

90.    Additional Defendants may be added to these three categories as further investigation or discovery proceed in this case or related cases.

### III.    JURISDICTION & VENUE

91.    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337 because the claims arise under the laws of the United States, including the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et. seq.*

92.    This Court has supplemental jurisdiction over Plaintiff's claims arising out of state law pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or

1   controversy as Plaintiff's claims brought under federal law.

2       93.   Plaintiff also asserts jurisdiction under 28 U.S.C. § 157.

3       94.   Personal jurisdiction comports with due process under the United States

4   Constitution, the long-arm statutes of California, and the provisions of 18 U.S.C. § 1965(b)

5   and (d).

6       95.   Without limiting the generality of the foregoing, each Defendant (directly or

7   through agents who were at the time acting with actual and/or apparent authority, and within

8   the scope of such authority) has:

9           a.   Transacted business in California;

10          b.   Contracted to supply or obtain services in California;

11          c.   Availed themselves intentionally of the benefits of doing business in

12               California;

13          d.   Produced, promoted, sold, marketed, and/or distributed their products

14               or services in California and, and thereby, have purposefully profited

15               from their access to markets in California;

16          e.   Caused tortious damage by act or omission in California;

17          f.   Caused tortious damage in California by acts or omissions committed

18               outside California while: (i) regularly doing business or soliciting

19               business in California, and/or (ii) engaging in other persistent courses

20               of conduct within California, and/or (iii) deriving substantial revenue

21               from goods used or consumed or services rendered in California;

22          g.   Committed acts and omissions which Defendants knew or should have

23               known would cause damage (and, in fact, did cause damage) in

24               California to Plaintiff while: (i) regularly doing or soliciting business

25               in California, and/or (ii) engaging in other persistent courses of

26               conduct within California, and/or (iii) deriving substantial revenue

27               from goods used or consumed or services rendered in California;

28          h.   Engaged in a conspiracy with others doing business in California that

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1    caused tortious damage in California; and/or

2        i.    Otherwise had the requisite minimum contacts with California such

3            that, under the circumstances, it is fair and reasonable to require

4            Defendants to come before this Court to defend this action.

5    96.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a

6    substantial part of the events or omissions giving rise to Plaintiff's claims occurred in

7    Benicia, California, the headquarters of the DC Solar Enterprises, which is located in this

8    judicial district.

9    **IV.    FACTUAL ALLEGATIONS**

10    **A.    MSGs' $150,000 Valuation**

11    97.    A typical MSG consisted of photovoltaic ("PV") modules, PV inverters,

12    batteries, other miscellaneous ancillary components all attached to a trailer suitable for

13    towing. In the beginning, the cost of production for one MSG was purportedly $78,000,

14    however this "cost" was largely overhead and labor. The actual component parts of an MSG

15    cost less.

16    98.    The Core Defendants, Alvarez & Marsal, Hacker, CohnReznick, and

17    Fallbrook held out the value of the MSGs to be $150,000.

18    99.    On information and belief, the Internal Revenue Service ("IRS") challenged

19    this valuation of the MSGs as early as 2013.

20    100.    Alvarez & Marsal was retained in 2014 by Solar Eclipse Investment Fund V,

21    LLC to produce a *retroactive* appraisal of MSGs to bolster an earlier 2011 appraisal issued

22    by another appraisal firm – Mesirow Financial Consulting, LLC – which had valued the

23    earliest MSGs at $150,000 each.

24    101.    The same individuals who had appraised the MSGs in 2011 for Mesirow

25    Financial Consulting, LLC, had moved to Alvarez & Marsal by 2013. On April 24, 2015,

26    Alvarez & Marsal produced a retroactive appraisal valuing each MSG at $150,000

27    regardless of when made and when supposedly placed into service.

28

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

102.    In the years that followed, Alvarez & Marsal produced multiple additional appraisals of MSGs. Every appraisal valued each MSG at $150,000 based overwhelmingly on the premise that each MSG could be leased into continuous service by end users, who would pay a steady stream of rent revenues back to the purchaser of a MSG.

103.    On information and belief, Alvarez & Marsal never undertook the requisite due diligence for the valuation of the MSGs by reviewing subleases to end-users for prospective or past transactions and never undertook the requisite due diligence to determine whether the variable rent component for the master leases was reasonable.

104.    As economic facts and circumstances changed over time, Alvarez & Marsal continued to appraise the MSGs at $150,000, even after it became absolutely clear and known to Alvarez & Marsal that at least one previous transaction was being audited by the IRS whereby the IRS was challenging such valuation and there was no rental market for MSGs to end users to support such an appraised value, as further described below.

105.    Plaintiff and the Funds reasonably relied on the valuation of the MSGs.

**B.      The Typical Transaction Contracts**

106.    Starting in December 2009, the Carpoffs owned and operated both Solutions, and Distribution. They began selling MSGs through Solutions

107.    Mr. Carpoff was the principal of Solutions, and he was primarily responsible for its operations.

108.    The Carpoffs wholly owned Solutions after the departure of a former 21% owner.

109.    Mrs. Carpoff was the principal of Distribution and was primarily responsible for its operations.

110.    Solutions represented the market value of MSGs to be $150,000, and sold MSGs to purchasers at that overvalued price. By design, Solutions did not actually deliver MSGs to a purchaser because simultaneously Distribution leased back the MSGs with a promise to sublease the machines to end users, thus generating ongoing rental revenues for the purchaser.

111.   To effectuate these integrated transactions, the parties executed a standard package of agreements, including: (i) a Limited Liability Company Agreement ("LLC Agreement"); (ii) a Solar Equipment Purchase Agreement ("Purchase Agreement"); (iii) a Secured Promissory Note ("Promissory Note"); and (iv) a Mobile Solar Equipment Lease ("Equipment Lease," and collectively, the "Transaction Contracts").

112.   The Transaction Contracts were executed at or about the same time, typically with Mr. Carpoff signing the Purchase Agreements on behalf of Solutions and Mrs. Carpoff signing the Equipment Leases on behalf of Distribution

113.   While certain contracts had minor variations in wording, all the Transaction Contracts largely contained the same substantive terms.

114.   Under the terms of the LLC Agreement, a purchaser became the Purchasing Member of an individual investment Fund, a special purpose LLC entity created specifically for the purchase of MSGs.

115.   The Fund then purchased MSGs from Solutions at a price of $150,000 per MSG under a Purchase Agreement.

116.   The Purchase Agreement specified the total number of MSGs being purchased in that specific transaction, and the total purchase price.

117.   An Exhibit to the Purchase Agreement contained a blank space for insertion of VINs for the MSGs, or else stated that the "VIN for each Generator [MSG] to be Supplied at Delivery."

118.   In exchange for the specified payment, Solutions agreed to deliver the MSGs by a certain date or dates and warranted "to Buyer that all Equipment shall be in good working order in conformity with the Specifications for a period" of five or ten years.

119.   The delivery dates for tranches of MSGs specified in the Purchase Agreements were occasionally scheduled in stages.

120.   Likewise, the Purchase Agreements dictated that payments would be due from the Fund to Solutions in stages according to a schedule dictated in part by capital contributions from the Purchasing Member under the terms of the LLC Agreement.

121.   Those capital contributions were contingent on the Fund receiving confirmation that the MSGs were "Placed in Service" as evidenced by an "IE [Independent Engineer] Certificate."

122.   Purchasing Members generally contributed about thirty percent (30%) of the purchase price in a cash down payment (which supposedly qualified for energy tax credits) and financed the balance under a twenty-year Promissory Note executed by the Fund in favor of Solutions

123.   The Promissory Note was an exhibit to the Purchase Agreement.

124.   The physical location today of all Promissory Notes is currently under investigation.

125.   Solutions, the Carpoffs, Roach, Karmann, Lauer, Bayliss, and Bayliss Innovative represented to the Fund that the MSGs as constructed and sold qualified for a 30% "Energy Credit" permitted by Internal Revenue Code § 48 (hereafter, the "Tax Credit" or the "Credit"). The Purchasing Members expected to receive a Tax Credit for roughly at least the same amount as their initial cash contribution, or down payment, to the Fund.

126.   Under the Master Services Agreement, all post-purchase operations of the MSG business were left entirely to Distribution

127.   The Equipment Leases provided that Distribution shall use "the Solar Equipment in a careful and proper manner" and "shall comply with all laws, regulations and ordinances."

128.   Moreover, the Equipment Leases provided that Distribution shall be "solely responsible for the maintenance and repair of the Solar Equipment" and "shall ensure the Solar Equipment is operational and capable of producing solar energy at all times."

129.   The Equipment Leases further required Distribution to "obtain, maintain and keep" insurance coverage on the MSGs in the amount of the replacement cost as well as "liability insurance."

130.   In addition, the Equipment Leases required Distribution to "promptly pay when due, all license fees, registration fees, sales taxes, use and property taxes, assessments,

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

charges and other taxes" imposed upon the MSGs.

131.    The Equipment Leases further provided that the Funds would receive a set amount of "Base Rent" in monthly installments for the term of the Equipment Lease, plus "Additional Rent" or "Variable Rent" to the extent Distribution achieved certain rent revenue thresholds from subleasing the MSGs to third-party end users. On information and belief, CohnReznick, Hacker, Fallbrook, and other brokers played a role in manipulating the amount of Variable Rent in order to justify a valuation of $150,000 per MSG.

132.    The amount of additional or variable rent due to the Fund sometimes varied from Fund to Fund, but each calculation was specified in the Equipment Lease.

133.    The Transaction Contracts were structured such that – in a legitimate business model – a Fund's ongoing payments due to Solutions were contingent upon the MSGs generating significant sublease revenue from end-users, which revenues would be paid, first to Distribution and then passed through to the Fund in the form of "Base Rent," "Additional Rent" or "Variable Rent."

134.    The Fund would then use the rent revenues received from Distribution under the Equipment Leases to make monthly payments due to Solutions under the terms of the Promissory Notes.

135.    In sum, based on the representations of the Carpoffs, Solutions, Distribution, and, on information and belief, CohnReznick, Hacker, and Fallbrook, Plaintiff and the Fund expected several benefits under the MSG transactions, including: (a) the 30% Tax Credit, (b) the ability to claim significant depreciation on the MSGs over five years, and (c) lease revenues from Distribution exceeding the amounts the Fund owed to Solutions under the Promissory Notes.

136.    In general, the LLC Agreements provided for the annual payment of "Distributable Cash" to Purchasing Members, defined as the amount of cash from lease revenue remaining after loan payments and operating expenses.

137.    The business success of the MSG transaction, and thus the profits to the Fund, turned entirely on the efforts of Solutions and Distribution to make, maintain, market, and

Snell & Wilmer

L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

lease the MSGs as represented to the Fund.

138.    The supposed proof that MSGs had been built and placed into service came by what the LLC Agreements defined as an "IE Certificate," which was "a certificate to be issued by an Independent Engineer" with respect to the MSGs "upon achievement of Placement in Service." Beginning in 2014, the LLC Agreements further stated that "Independent Engineer" means "Joseph Bayliss of Bayliss Innovative Services."

139.    Once a Fund received the IE Certificate as proof that its MSGs had been built and placed into service, the Fund began to make payments to Solutions and the Funds began to receive lease revenues from Distribution in accord with the Equipment Leases. Or so purchasers thought. But that is not what happened.

**C.    <u>The Core Defendants' Seminal Fraudulent Misrepresentations</u>**

140.    The Carpoffs, Solutions, and Distribution, touted themselves to Plaintiff and potential purchasers as major players in the MSG industry, with thousands of MSGs operating in the field, lucrative sublease contracts with large customers, a proven record of major lease revenues, and extensive experience in making and maintaining MSGs.

141.    From December 2011 through December 2018, Solutions received almost $1 billion from innocent purchasers, who thought they had purchased revenue-producing MSGs worth $150,000 each, which also qualified for valuable renewable energy tax credits.

142.    In reality, Solutions manufactured far fewer MSGs than it claimed. On information and belief, Solutions manufactured or acquired about one third of the MSGs it sold. Intensive efforts by Plaintiff to locate the MSGs have identified roughly 6,800 of the approximately 18,400 MSGs that Solutions sold.

143.    Of the MSGs that Solutions did actually manufacture, far fewer MSGs were ever actually leased to end users, than represented to Plaintiff and purchasers. In reality, the MSGs never generated promised lease revenues. Distribution realized only a tiny fraction – less than 5% – of its revenues from subleases of MSGs to third-party end users.

144.    The vast majority of Distribution's putative "lease revenues" actually came from payments by Solutions, under a purported "re-rent agreement", that were falsely

booked to masquerade as "lease revenues" supposedly generated by subleasing MSGs to third-party end users. But these supposed "lease revenues" were false, and the false data was intended to defraud both early and later purchasers, including Plaintiff. This false sublease revenue helped support the illusion that the valuation of each of the MSGs were $150,000.

145.   When purchasers, including Plaintiff, inquired to confirm the status and existence of leases to third-party end users, the Carpoffs, Karmann, Roach, Lauer, and others would flash a few sublease documents to the purchasers and represent (falsely) that there were many more such sublease agreements. These representations were false when made and intended to defraud Plaintiff and other purchasers.

146.   In reality, the Carpoffs pilfered the cash paid by ongoing purchasers to: (a) cover up the business failures and losses incurred by DC Distribution, Inc., and (b) support a lavish personal lifestyle that included buying numerous luxury and collector vehicles, a baseball team, a NASCAR race team, expensive real estate within and without the United States, and the use of private jets.

147.   In total, Solutions closed transactions with Plaintiff, the Funds, and other purchasers involving approximately 18,400 MSGs at approximately $2.76 billion in purported face value, financed through down payments and promissory notes.

148.   The payments Plaintiff and purchasers made to Solutions were all transferred through interstate commerce, as were the fraudulent transfer of monies from Solutions to Distribution to cover up the lack of expected lease revenues.

149.   Solutions directly and indirectly, solicited purchasers across the country through brokers and salespeople using various methods, including email, conference calls, in-person meetings and sponsored an event with CohnReznick at a large renewable energy conference. Solutions offered and sold MSGs to the Funds through contracts (the "Fund Contracts") involving interstate commerce.

150.   The Core Defendants were attempting to close additional large purchase transactions of MSGs by the end of 2018 or in early 2019 when activities collapsed with

the FBI Raid and seizures of assets.

**D.**    **Plaintiff Becomes a Purchaser and a Managing Member of the Funds that Purchased MSGs**

151.    The first investment funds to buy MSGs were created by the Carpoffs, and managed by another Carpoff-related entity called Solarmore Investments, which was a separate entity *not* related to Plaintiff. The earlier entity, Solarmore Investments, was controlled by Mr. Carpoff and owned by Mr. Carpoff and Moore.

152.    Plaintiff was formed later in 2013 as a separate entity by Lauer. Initially, Mr. Carpoff owned 79% of Plaintiff.  The remaining 21% was owned by Jansen.

153.    In December 2014, Jansen became the 100% owner of Plaintiff.

154.    Plaintiff became the managing member of the twenty Funds identified in paragraph 2 above that purchased MSGs from Solutions under the Transaction Contracts.

155.    In exchange for entering into these transactions, which involved a guarantee by Plaintiff, the Carpoffs, Roach and Lauer promised Plaintiff an initial 1% ownership of each Fund, plus ownership of 95% of each Fund – in effect 95% ownership of the MSGs – once the ownership of the Funds "flipped" in five years.

156.    The Carpoffs, Lauer, and Roach also represented to Plaintiff and Jansen that the MSGs would still retain significant value after five years, which would exceed any loan balance still owed to Solutions at such time.

157.    In fall of 2017, Mr. Carpoff and Lauer informed Jansen that a third party had acquired MSGs, from a fund that did not involve Plaintiff, at a purchase price that was $10,000 per MSG over the current outstanding debt that the fund owed to Solutions. This led Plaintiff to believe that the MSGs had a greater fair market value that Plaintiff already believed.

**E.**    **"Marketing" of the MSGs Where There Was No Market**

158.    The DC Solar Enterprises and the Carpoffs marketed themselves to Plaintiff and other purchasers as having extensive experience and capabilities in the renewable energy field and in executing successful transactions for purchasers.

159.   Other Defendants also participated in marketing to the Funds. For example, Defendants Hacker, CohnReznick, Fallbrook, and other brokers working on behalf of the Carpoffs and the DC Solar Enterprises, and using information supplied by the Carpoffs, Karmann, Roach, Lauer, and Bayliss, prepared "pitch books" for use in marketing to purchasers. The pitch books emphasized that the DC Solar Enterprises had thousands of MSGs deployed and manufacturing capabilities of 900 MSGs per month.

160.   These brokers and other parties highlighted that the DC Solar Enterprises had closed many prior MSG transactions with "headline" or "notable" Purchasing Members, including transactions with fair market values near or over $100 million, and that the "performance of each of the [prior] funds remains in good standing."

161.   In addition, the pitch books claimed that the DC Solar Enterprises had "customer relationships with leading companies in the telecommunications, entertainment and construction industries" and provided case studies of the established leasing arrangements with many of those customers.

162.   Finally, certain of the pitch books provided a summary of returns with estimated internal rates of return ranging from 40% to as high as 50%.

163.   One touted example of a supposedly profitable lease to a third-party was a lease with Ahern Rentals, which leases – the Funds were *not* told – were in truth backstopped financially by Solutions in an undisclosed agreement with Ahern Rentals.

164.   Another example was an email dated July 11, 2018 from Marcelo Bermudez, a broker, to Karmann, Hacker, and Mr. Carpoff, with an attached lease schedule claiming a 94.31% MSG "utilization rate," with 12,164 MSG units allegedly being subleased as of December 31, 2017 out of 12,898 Fund-owned MSGs. This information was false.

### F.   Fraudulent and Wrongful Conduct by the Carpoffs

165.   Mr. Carpoff, in his January 2020 plea agreement, admitted to: (a) organizing and directing the DC Solar Enterprises and conspiracy starting in roughly March 2011 through December 2018; (b) undertaking and directing others to undertake acts intended to mislead purchasers about material facts, conceal facts, and lull victims of the fraud; (c)

causing the dissemination of materially false information to victims to induce them to enter into transactions with the DC Solar Enterprises and to lull them after those deals closed; (d) using money from later purchasers to pay obligations owed to other purchasers arising from the fraudulent transactions; (e) participating in an accounting fraud to conceal the true nature of the operations from victims and others; and (f) paying co-conspirators large sums of money to advance and conceal the conspiracy.

166.    Mrs. Carpoff, in her January 2020 plea agreement, admitted to: (a) working with Mr. Carpoff to initiate and advance the conspiracy; (b) undertaking and directing others to undertake acts intended to mislead purchasers about material facts, conceal facts, and lull victims of the fraud; (c) making and directing transfers of money from new purchasers to cover debt obligations for existing purchasers; (d) managing transfers from Solutions to third-party lessees to create the appearance of legitimate lease agreements; (d) causing Bayliss to make and deliver false commissioning reports for MSGs that were sold to purchasers but never built; and (e) concealing the false nature of the commissioning reports and the true financial situation of the DC Solar Enterprises.

167.    In addition, the Carpoffs, the Core Defendants, Hacker, CohnReznick, and Fallbrook made representations to Plaintiff and other purchasers that Distribution generated tens of millions of dollars in lease revenue when, in reality, roughly 94% of all revenues claimed by Distribution came in the form of undisclosed cash transfers from Solutions.

168.    Additionally, the Carpoffs, the Core Defendants, Ahern Rentals, Ahern AD, and Ahern did not inform Plaintiff or other purchasers that transactions with the outward appearance of valid subleases to third parties were propped up by undisclosed side deals with Solutions. Under these side deals, Solutions actually paid the ostensible third-party lessees, including Ahern Rentals and Ahern AD, the money required to make sublease payments back to Distribution. The money paid by Solutions under these side deals came from payments made by innocent purchasers, like Plaintiff and the Funds, who thought they were buying, then leasing, valuable MSGs in tax-favored transactions.

169.    These side deal payments were specifically approved by Mrs. Carpoff.

170.    The acts of the Carpoffs and other Core Defendants caused the execution of many interstate wire transfers from the purchasers totaling roughly $1 billion.

171.    The Carpoffs made other multiple transfers of these ill-gotten gains, including transfers to purchase over 150 luxury and collector vehicles, luxury real estate, suites at sporting events, and a minor-league baseball team. The Carpoffs also made illicit payments to other Core Defendants, including Hansen and Guidry, to keep the truth of the DC Solar Enterprises hidden from Plaintiff and other purchasers.

172.    The fraudulent schemes perpetrated by the Carpoffs and the other Core Defendants defrauded Plaintiff, the Funds, and other purchasers.

**G.    Fraudulent and Wrongful Conduct by Lauer**

173.    Lauer acted in concert with the Carpoffs to initiate and perpetuate the fraudulent schemes of the DC Solar Enterprises against Plaintiff and other purchasers.

174.    Lauer acted as counsel for the Carpoffs and various Carpoff-related entities, including Solutions and DC Distribution, Inc.

175.    Lauer also acted as counsel for Plaintiff.

176.    Lauer's fiduciary duties to Plaintiff conflicted with his continued representation of the Carpoffs and the DC Solar Enterprises.

177.     On information and belief, Lauer knew that Solutions fraudulently sold MSGs that were never built to unwitting purchasers, including non-existent MSGs sold to Plaintiff and the Funds.

178.    On information and belief, Lauer knew that the MSGs did not have a true market value of $150,000.

179.    On information and belief, Lauer knew that Distribution's putative leasing program was a failure and that there was no market for leasing the MSGs sold to Plaintiff, the Funds, and other purchasers.

180.    On information and belief, Lauer knew that most of the money Distribution tried to tout as lease revenues from third parties actually came from cash contributions from

Solutions.

181.   On October 29, 2014, via an email, Lauer and Roach discussed the money transfers between Solutions and Distribution, and the failure of Distribution's subleasing program.

182.   On information and belief, Lauer prepared a "re-rent agreement" that was used to account for the payment of funds between Solutions and Distribution.

183.   In an email dated July 17, 2014 to Mr. Carpoff, Lauer discouraged the disclosure of the "re-rent agreement" to a purchaser as it, "seriously undermines the integrity of the lease and the value of the generators."

184.   On information and belief, Lauer knew that all monies that flowed from the Carpoffs and their DC Solar Enterprises, including monies paid to Lauer, were obtained from Plaintiff, the Funds, and other purchasers through fraud.

185.   On information and belief, despite the knowledge of all the foregoing, Lauer continued to represent Plaintiff, the Carpoffs, and the DC Solar Enterprises, and various other Carpoff-related entities, even though clear, unwaivable conflicts existed between and among them.

186.   In addition, on information and belief, Lauer affirmatively presented false or misleading information to, or withheld material information from, Plaintiff, the Funds, and other purchasers to further the fraudulent schemes of the Carpoffs, the DC Solar Enterprises, and the other Core Defendants.

187.   On information and belief, Lauer often acted as a buffer or conduit between – on the one hand – Plaintiff, the Funds, other purchasers, and prospective purchasers, and – on the other hand – the Carpoffs, the DC Solar Enterprises, and the other Core Defendants when the latter group either withheld true information or disseminated false information.

188.   On information and belief, Lauer coordinated with the Carpoffs and the other Core Defendants to defraud Plaintiff, the Funds, and other purchasers.

**H.**   **Fraudulent and Wrongful Conduct by Bayliss and Bayliss Innovative**

189.   Solutions purported to sell more than 18,400 MSGs to purchasers, including

Plaintiff and the Funds.

190.    On information and belief, Solutions never built or acquired more than 7,000 MSGs.

191.    Hiding this deception was made possible, in part, by a conspiracy between the Carpoffs, Bayliss Innovative, and Bayliss.

192.    Bayliss has known the Carpoffs since high school.

193.    Mr. Carpoff arranged for Bayliss, through Bayliss Innovative, to serve as the "Independent Engineer" to issue "IE" certificates required in the Transaction Contracts.

194.    The Bayliss IE arrangement was false and deceptive because Bayliss was neither independent nor a licensed engineer.

195.    Bayliss executed IE Certificates, titled "IE Commissioning Reports," for nearly all of the sold MSGs from 2014 through 2018.

196.    In thousands of instances, Bayliss admittedly signed IE Commissioning Reports for MSGs without inspecting the MSGs, and without any basis for making the representations in the IE Certificates.

197.    Bayliss has acknowledged that the IE Commissioning Reports provided to purchasers and the Funds, were intended to, and did, trigger interstate wire transfers from purchasers to Solutions.

198.    Bayliss also knew that the IE Commissioning Reports would trick Plaintiff, the purchasers, and the Funds, into believing their purchased MSGs existed and were operational.

199.    In addition, on at least two occasions, Bayliss assisted Mr. Carpoff and others in removing and replacing VIN stickers on MSGs to disguise the fact that some MSGs were never built.

200.    Specifically, after the December 2018 FBI Raid, Bayliss agreed to the Carpoffs' request to travel to Las Vegas, Nevada to remove VIN stickers from MSGs and to destroy evidence of the VIN tampering in which Bayliss, Mr. Carpoff, and others had engaged.

201.   Bayliss agreed with the Carpoffs to perform the Carpoffs' requested actions, knowing that his conduct was an attempt to hide the cover up related to the failure to build MSGs, and knowing of the theft by Solutions from Plaintiff, the Funds, and other and purchasers.

**I.     Fraudulent and Wrongful Conduct by Roach**

202.   Purchasers, including Plaintiff, Purchasing Members, and the Funds, routinely requested financial statements from Solutions and Distribution before purchasing MSGs.

203.   In response, the DC Solar Enterprises and Roach often provided purchasers with false and deceptively inaccurate financial statements.

204.   Roach issued his "Accountants' Compilation Reports" for Solutions and Distribution, covering various periods between 2011 through July 2018.

205.   Roach signed these reports on the letterhead of his firm, Ronald J. Roach Accountancy Corporation.

206.   The financial statements accompanying Roach's compilation reports included a statement of income in each.

207.   Roach prepared these reports at the direction of the Carpoffs and in concert with Lauer and Karmann. Roach, despite knowing of the payments, did not disclose in these reports the irregular, circular flow of funds between Solutions and Distribution required to disguise the lack of promised lease revenues flowing to Distribution.

**J.     Fraudulent and Wrongful Conduct of Karmann**

208.   Karmann began working for the DC Solar Enterprises in approximately August of 2014.

209.   Karmann, at the time of the FBI Raid in December 2018, was the Chief Financial Officer for DC Solar Solutions.

210.   Karmann was a certified public accountant and was employed at the Company as its Controller and, then employed at the Company as its Chief Financial Officer (CFO).

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

211.   On information and belief, Karmann reported directly to the Carpoffs.

212.   On information and belief, Karmann was responsible for facilitating and overseeing the intercompany transfers from Solutions to Distribution.

213.   Karmann assisted in operating and administering the Distribution sublease scheme, which involved the misrepresentation of the existence of MSGs and rentals.

214.   Pursuant to his plea agreement, Karmann had knowledge of the movement of funds from Solutions to Distribution as early as 2014.

215.   As evidence of this knowledge, Karmann, in an email dated March 9, 2018, responds to an email inquiry regarding a transfer of funds from Solutions to Distribution where Karmann explained that he was going to create bills and invoices to document the transfer of funds between the two entities.

216.   Karmann actively worked to conceal the fraud from purchasers, including Plaintiff, by delivering false financial statements to purchasers.

217.   On information and belief, Karmann knew that audited financial statements for Distribution, as opposed to compiled financial statement, would reveal the absence of earned third party lease revenue and expose the intercompany transfers and the fraud.

218.   On information and belief, when a purchaser or other party sought an audited financial statement from Distribution, Karmann discussed the request with Mr. Carpoff who in turn answered that they would provide audited financial statements at a later time.

219.   On information and belief, Karmann specifically engaged in actions to mislead and purposely kept information from various parties, including Plaintiff, on a number of occasions.

220.   On information and belief, Karmann delivered false information about the location and lease revenue purportedly earned by MSGs, which included reports and other records that were intended to conceal the conspirators' fraud and to pacify Plaintiff and purchasers with the belief that the MSGs they purchased were deployed in specific locations and earning third-party lease revenue.

**K.** **Fraudulent and Wrongful Conduct of Guidry**

221.    Guidry began working for the DC Solar Enterprises in approximately 2012.

222.    Guidry, at the time of the FBI Raid in December 2018, was the Vice President of Operations for Distribution.

223.    On information and belief, Guidry reported directly to the Carpoffs.

224.    On information and belief, Guidry managed, among other departments, distribution, service, and leasing of MSGs.

225.    Guidry assisted in operating and administering the Distribution sublease scheme, which involved the misrepresentation of MSGs and rentals to end users.

226.    Guidry obtained unauthorized signatures on false contracts with T-Mobile that Mr. Carpoff used as evidence of a true sublease program to present to Plaintiff, the Funds, and other purchasers.

227.    Guidry knew that this false information was being presented to Plaintiff, the Funds, and other purchasers.

228.    Guidry was personally paid over $1,000,000 for obtaining the unauthorized signatures, which he laundered through a friend's company in Florida disguised as consulting fees.

229.    Guidry also specifically worked with Hansen to obtain the false signatures for T-Mobile, and Guidry facilitated the payment of an additional $1,000,000 to Hansen from Mr. Carpoff for Hansen's participation.

230.     Plaintiff was provided the T-Mobile Lease and relied upon its existence and validity.

231.    Guidry knew that the money paid to him came from monies paid by Plaintiff, the Funds, and other purchasers, and that his participation in the fraudulent schemes of the DC Solar Enterprises contributed to inducing those payments.

232.    Guidry knew or should have known of the financial failure of the sublease program.

233.   Guidry knew or should have known of the lack of existence and lack of continued production of MSGs.

234.   Specifically, Guidry participated in compiling false MSG information to present to purchasers, and he worked with Mr. Carpoff, Bayliss, and others to remove original VIN stickers from MSGs to replace them with VINs reserved for another transaction.

235.   Guidry also assisted with burying GPS devices to provide false location information for MSGs, and he assisted with coordinating misleading inspections to present false information about MSG locations to purchasers such as Plaintiff and the Funds.

236.   Guidry presented or assisted in presenting false or misleading information to Plaintiff, the Funds, and others and/or concealing accurate information about the DC Solar Enterprises.

237.   Guidry's actions were part of the criminal enterprise designed to harm Plaintiff, the Funds, and other Purchasers.

**L.   Fraudulent and Wrongful Conduct of Hansen**

238.   Hansen worked for T-Mobile and, on or about September 11, 2015, in exchange for $1,000,000 from Mr. Carpoff, or a related entity, signed a fake lease between T-Mobile and DC Solar Distributions, Inc. (the "T-Mobile Lease") under which T-Mobile allegedly leased 1,000 MSGs for approximately $1,100 per month each for a period of at least ten years.

239.   The Carpoffs, Roach, Lauer, and Karmann used this fake lease to make the DC Solar Enterprises' operations appear legitimate to Plaintiff and the Funds and to bring in new purchasers.

240.   In or about 2015, Hansen left T-Mobile to work for the DC Solar Enterprises, where he was employed until 2018.

241.   In or about July 2017, in exchange for $20,000, which he split with Guidry, Hansen forged the signature of a former T-Mobile employee on an estoppel agreement, purporting to assign Distribution's right to receive revenue for MSG rentals by T-Mobile

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

pursuant to the T-Mobile Lease. That estoppel agreement was used to support the 2017 sale of used MSGs referenced above.

### M. Fraudulent and Wrongful Conduct of Boden

242.   On information and belief, Boden worked for Solutions out of the DC Solar Enterprises' facility in Buena Park, California.

243.   Boden was responsible for inventory control, forecasting, warehousing, transportation, and other business needs for Solutions

244.   Included in Boden's work for Solutions, was creating work orders, creating invoices, monitoring equipment progress and performance, executing delivery of and logistics relating to MSGs, registering and licensing MSGs, and acting as dispatch for deployment of equipment.

245.   On information and belief, Boden worked closely with the Carpoffs and Guidry on matters related to the MSGs.

246.   On information and belief, Boden was aware that MSGs were being sold to Funds and not being produced.

247.   On information and belief, Boden was aware that the third-party leasing program for the MSGs was a failure.

248.   On information and belief, Boden was aware that Plaintiff, the Funds, and other purchasers were being given false information about the location of MSGs and Distribution's third-party leasing program.

249.   On information and belief, Boden and Mr. Carpoff were involved in investments through various other businesses, including but not limited to an entity called J & C Consulting, Inc ("J & C Consulting").

250.   On information and belief, J & C Consulting was involved in making payments to influence employees at certain banks, brokers, and business affiliates to further the conspiratorial acts of the Core Defendants.

251.   On information and belief, Boden knew or should have known that the money used for the investments in other businesses came either from the DC Solar Enterprises, the

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

Funds, or other purchasers.

252.   On information and belief, Boden knew that Mr. Carpoff would attempt to recover money on these other investments through threats, including by having Moore threaten parties owing Mr. Carpoff money.

**N.   Wrongful Conduct of Wentz, Yee, Montage, Radius and Vistra**

253.   On information and belief, Solutions initially retained Montage, Wentz, and Yee in 2013, to respond to the California sales tax audits, described more fully later in this First Amended Complaint.

254.   In this process, Montage, Wentz, and Yee learned about the structure whereby DC Distribution Inc. was supposed to sublease MSGs to end users.

255.   Montage, Wentz, and Yee sent information regarding subleases to the State of California demonstrating small amounts of sublease revenue.

256.   Montage, Wentz, and Yee then expanded their workload beyond the California sales tax audits by providing certified audited financial statements for Solutions, the Carpoffs, the Funds, and other related entities.

257.   In 2014, Wentz orchestrated the creation of Panda Solutions and Panda International, a Hong Kong based entity. Wentz traveled to Hong Kong to set up bank accounts and meet with various individuals regarding Panda International.

258.   In July 2015, Wentz introduced Peter Strauss to Mr. Carpoff in order to facilitate the creation of offshore captive insurance companies: Bayshore and Champion, both Bahamian Captive Insurance Companies.

259.   Wentz, Yee, and Montage also prepared audited financial statements for Plaintiff. On information and belief, these financials statements do not properly reflect information reviewed by Wentz, Yee, or Montage to prepare these financial statements.

260.   On information and belief, Yee and Wentz communicated regularly regarding their work for Plaintiff and Solutions.

261.   Yee, Wentz, and Montage learned of significant transfers of cash from Solutions to Distribution in multiple years as part of preparation of certified audited

financial statements for Solutions.

262. As early as 2015, when preparing Solution's Audited Financial Statements for the 2012 and 2013 fiscal years, pursuant to multiple emails, Wentz and Yee inquired about transfers of cash from Solutions to Distribution in material amounts.

263. Based upon a review of Solutions 2012 and 2013 Audited financial statements prepared by Yee and Wentz, such transfers of cash do not appear to be reflected in the final issued Audited Financial Statement for such years.

264. On or about June 20, 2016, Montage became aware of additional payments of cash between Solutions and Distribution in material amounts.

265. In preparing the 2014 Audited Financial Statements for Solutions, a spreadsheet was provided to Yee by Solutions in August of 2015 demonstrating that at least $14.8 million was paid from Solutions to Distribution during 2014.

266. Based upon a review of 2014 Audited Financial Statements for Solutions prepared by Yee and Wentz, the transfers described above of cash from Solutions to Distribution are not reflected.

267. In June of 2016, while working on the 2015 Audited Financial Statement for Solutions, employees of Montage and Radius sent emails (and copied Yee) to Solutions asking for the rental agreement between Solutions and Distribution. The employees were responding to large sums of money that were transferred from Solutions to Distribution on a regular basis as identified in General Ledger Reports for Solutions.

268. Based upon a review of Solutions 2015 Audited Financial Statements prepared by Yee and Wentz, the transfers described above of cash from Solutions to Distribution are not reflected.

269. In September of 2017, while working on the 2016 Audited Financial Statement, employees of Montage and Radius sent emails (and copied Yee) to Solutions asking about discrepancies between slight variances between the general ledger and actual cash transfers of approximately $60 million of payments made by Solutions to Distribution.

270. Based upon a review of Solutions 2016 Audited Financial Statements prepared by Yee and Wentz, the transfers described above of cash from Solutions to Distribution are not reflected.

271. In May of 2018, while working on the 2017 Audited Financial Statements for Solutions, a spreadsheet was provided to Yee by Solutions demonstrating that the transfers of cash from Solutions to Distribution were in the amount of approximately $105 million.

272. In May of 2018, while working on the 2017 Audited Financial Statements for Solutions, an employee of Montage and Radius sent an email (and copied Yee) to Solutions noting that the transfers of cash from Solutions to Distribution should be disclosed on the financial statement.

273. Based upon a review of 2017 Audited Financial Statements for Solutions prepared by Yee and Wentz, the transfers described above of cash from Solutions to Distribution are not reflected.

274. In August of 2018, Wentz and employees of Montage and Radius were working on the 2017 Federal Income Tax Return for Solutions and Federal Income Tax Returns for Distribution.

275. Some of these employees working on such income tax returns also worked on the 2017 Audited Financial Statements for Solutions.

276. In September 2018, Wentz prepared and filed the 2018 Federal Income Tax Returns for Solutions and Distribution, and neither of these income tax returns reported a transfer of cash in the amount of approximately $105 million from Solutions to Distribution.

277. Despite knowledge of this information, the certified audited financial statements for Solutions did not accurately reflect these transfers of cash to Distribution.

278. On information and belief, in cooperation with the Carpoffs and Solutions, Montage and Wentz concealed requested financial and tax documents and information from Plaintiff.

279. In addition, Montage, Wentz, Yee, on information and belief, performed tax work, oversaw or participated in an audit or financial compilation, and acted directly to help

the DC Solar Enterprises create international companies intended to keep assets and income outside of the United States.

280.   On or about June 2016, Radius acquired a portion of Montage's assets. Radius also entered into contractual agreements with Montage at that time for cooperative sharing of employees, facilities, and equipment, including employees Wentz and Yee.

281.   Vistra acquired Radius on or about May 2018.

282.   Throughout this series of acquisitions and contracts, Radius and Vistra – acting through Wentz, Yee, Montage and others – continued to provide tax work and other services to the DC Solar Enterprises, the Funds, and Plaintiff.

283.   On information and belief, among other work, Montage audits of the DC Solar Enterprises, the Funds, and/or the Carpoffs were performed under the Montage name, but were performed through employees of Montage, Radius, and Vistra.

284.   On information and belief, Montage, Wentz, Yee, Radius, and Vistra knew or should have known of misrepresentations regarding the financial status of the DC Solar Enterprises.

285.   Montage, Wentz, Yee, Radius, and Vistra, nevertheless, performed tax work and audits or financial compilations for the DC Solar Enterprises, and provided that inaccurate financial information to Plaintiff and others, with knowledge that they would rely upon the inaccurate financial information.

**O.   Wrongful Conduct of Carson**

286.   On information and belief, Carson made approximately 6,800 trailers, which were the largest component part of every MSG.

287.   However, on information and belief, Carson gave Solutions over 17,000 VINs for purported placement on trailers.

288.   On information and belief, Carson knew or should have known that: (a) Solutions was providing the VINs to Plaintiff, the Funds, and other purchasers, and (b) that Plaintiff, the Funds, and other purchasers would rely upon the existence of a VIN to establish the existence of an MSG.

289.   On information and belief, Solutions, Bayliss Innovative, and Bayliss used the Carson VINs to create commissioning reports for non-existent MSGs.

290.   The VIN subterfuge was made possible by Carson's willingness to provide Solutions with reserved VINs before building any associated trailers for the reserved VINs.

291.   On information and belief, Carson continued to provide VINs to Solutions, even after it became clear that Solutions would not order sufficient trailers and would not produce enough MSGs for legitimate use of the reserved VINs.

292.   On information and belief, Carson further assisted in the DC Solar Enterprises' fraudulent schemes by assigning VINs to trailers being built that gave the false impression those trailers had actually been built and delivered in an earlier year.

293.   For example, Carson was registering trailers built in 2018 with the California Department of Motor Vehicles as 2015 or 2016 model year trailers.

294.   On information and belief, between 2010 and 2018, Carson assigned and affixed VINs to trailers being produced that falsely reflected that the trailers were produced in an earlier year.

**P.    Wrongful Conduct of Endres**

295.   On information and belief, Endres knew or should have known that: (a) the DC Solar Enterprises were providing false VINs to Plaintiff, the Funds, and other purchasers, and (b) that Plaintiff, the Funds, and other purchasers would rely upon the existence of a false VIN to establish the existence of a MSG.

296.   On information and belief, the DC Solar Enterprises used the Carson VINs to create false commissioning reports for non-existent MSGs.

297.   The VIN subterfuge was made possible by Endres' willingness to provide Solutions with reserved VINs before building any associated trailers for the reserved VINs.

298.   On information and belief, Endres continued to provide VINs to Solutions, even after it became clear that Solutions would not order sufficient trailers, and would not produce sufficient MSGs for legitimate use of the reserved VINs.

299.   On information and belief, Endres knew or should have known that his actions

Snell & Wilmer

L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

and Carson's acts of assigning VINs to trailers being built that created the false impression that the trailers had been built years earlier, were assisting the fraudulent schemes of the DC Solar Enterprises.

300.   For example, Endres was personally aware and participated in Carson's registration of trailers built in 2018 with the California Department of Motor Vehicles as 2015 or 2016 model year trailers.

301.   On information and belief, between 2010 and 2018, Endres was personally aware and participated in Carson's acts of assigning and affixing VINs to trailers that created the false impression that the trailers had been produced in prior years.

302.   On information and belief, despite Endres' knowledge of the DC Solar Enterprises' practices, Endres began working for Solutions in the summer of 2018.

303.   On information and belief, Endres, through his employment at Solutions, learned additional information about the fraudulent schemes and further assisted the DC Solar Enterprises in continuing those fraudulent schemes.

**Q.   Wrongful Conduct of Ahearn Rentals**

304.   On information and belief, in 2015, Ahern Rentals negotiated a purported Solar Generators Lease (the "Ahern Lease") with Distribution, under which Ahern Rentals would lease 1,000 MSGs, for an initial term of five years, at a base rental rate of $900 per month with additional rent of 50% of any monthly lease revenue generated by each MSG over $1,800.

305.   On information and belief, Ahern Rentals agreed that the Ahern Lease, which was actually created in 2015, could be backdated to June 2014.

306.   On information and belief, Ahern Rentals also negotiated a Solar Generators Sublease (the "Ahern Sublease") in 2015, under which Ahern Rentals subleased to Solutions the same 1,000 MSGs that Ahern Rentals had leased from Distribution.

307.   On information and belief, the Ahern Sublease provided that Solutions would pay Ahern Rentals as much, or more, than Ahern Rentals owed to Distribution under the Solar Generator Lease.

308.   On information and belief, the Ahern Sublease also provided that Ahern Rentals would also be able to separately lease the same 1000 MSGs to end users, and still receive the agreed monthly sublease payments from Solutions.

309.   Like the Ahern Lease, the Ahern Sublease was backdated to June 2014.

310.   On information and belief, Ahern Rentals, in connection with the Ahern Lease and Ahern Sublease, also negotiated a Guaranty Agreement wherein Mr. Carpoff guaranteed all of Solutions' obligations under the Ahern Sublease (the "Ahern Guaranty").

311.   The Ahern Guaranty was also negotiated in 2015, but backdated to June 2014.

312.   On information and belief, in 2015, Ahern Rentals entered into another lease (the "Fund IX Lease") with Solar Eclipse Fund IX, LLC ("Fund IX"), under which Ahern Rentals would lease 319 MSGs from Fund IX at a base rental rate of $900 per month with additional rent of 50% of any monthly lease revenue generated by each MSG over $1,800.

313.   On information and belief, Ahern Rentals agreed that the Fund IX Lease that was negotiated in 2015 could be backdated to September 2014.

314.   On information and belief, Ahern Rentals also negotiated a separate sublease for Fund IX, under which Ahern Rentals leased to Efficient Energy Distribution the same 319 MSGs that Ahern Rentals leased from Fund IX (the "Efficient Energy Distribution Sublease").

315.   On information and belief, Efficient Energy Distribution is a company owned and operated by Moore.

316.   On information and belief, Solutions, not Efficient Energy Distribution, was the entity that received and paid the invoices to Ahern Rentals for the sublease of the 319 MSGs.

317.   On information and belief, Ahern Rentals knew or should have known that Solutions was the entity that received and paid the invoices to Ahern Rentals for the sublease of the 319 MSGs.

318.   The Ahern Lease, the Fund IX Lease, and the Ahern Sublease were signed by Ahern, as President of Ahern Rentals.

319.   On information and belief, Ahern Rentals knew or should have known that Solutions was using the Ahern Lease and the Fund IX Lease to mislead Plaintiff, the Funds, and other purchasers as supposed evidence of legitimate market transactions to support the $150,000 purchase price of each MSG.

320.   On information and belief, Ahern Rentals knew or should have known that the Ahern Lease and the Fund IX Lease would be relied upon by Plaintiff, the Funds, and other purchasers for MSGs.

321.   On information and belief, Ahern Rentals knew or should have known that the reliance on the Ahern Lease and the Fund IX Lease would cause harm to Plaintiff, the Funds, and other purchasers.

322.   On information and belief, Ahern Rentals knew or should have known that Solutions would not disclose the true nature of the Ahern Sublease, the Efficient Energy Distribution Sublease, or the Ahern Guaranty to Plaintiff, the Funds, or other purchasers.

323.   On information and belief, Ahern Rentals knew or should have known that the omission of true information about the Ahern Sublease, the Efficient Energy Distribution Sublease, or the Ahern Guaranty would constitute a material misrepresentation to Plaintiff, the Funds, and other purchasers.

324.   On information and belief, Ahern Rentals knew or should have known that the omission of true information set out in the Ahern Sublease, the Efficient Energy Distribution Sublease, or the Ahern Guaranty would cause harm to Plaintiff, the Funds, and other purchasers.

**R.   Wrongful Conduct of Ahern Ad**

325.   On information and belief, in 2017, Ahern Ad negotiated a purported Solar Generators Lease (the "Ahern Ad Lease") with DC Solar Distributions, Inc., under which Ahern Ad would lease 1,500 MSGs at a base rental rate of $900 per month with additional rent of 50% of any monthly lease revenue generated by each MSG over $1,800.

326.   On information and belief, Ahern Ad never leased more than 50 MSGs under the Ahern Ad Lease.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

327.    On information and belief, Ahern Ad executed a second Solar Generators Lease (the "Second Ahern Ad Lease") with Distribution, under which Ahern Ad would only lease 50 MSGs at a base rent of $70,000 ($1,400 per MSG) per month.

328.    Both the Ahern Ad Lease and the Second Ahern Ad Lease were signed by Ahern, as President of Ahern Ad.

329.    On information and belief, Ahern Ad knew or should have known that the DC Solar Enterprises were using the Ahern Ad Lease to provide misleading information to Plaintiff, the Funds, and other purchasers.

330.    On information and belief, Ahern Ad knew or should have known that the DC Solar Enterprises would not inform Plaintiff, the Funds, or other purchasers about of the true number of MSGs actually leased under to the Second Ahern Ad Lease.

331.    On information and belief, Ahern Ad knew or should have known that Plaintiff, the Funds, and other purchasers rely on the information set out in the Ahern Ad Lease.

332.    On information and belief, Ahern Ad knew or should have known that Plaintiff, the Funds, and other purchasers would be harmed by reliance on the Ahern Ad Lease.

333.    On information and belief, Ahern Ad knew or should have known that Plaintiff, the Funds, and other purchasers would rely on the omission of the information set out in the Second Ahern Ad Lease.

334.    On information and belief, Ahern Ad also executed acceptance certificates for hundreds of MSGs or knew or reasonably should have known that the DC Solar Enterprises had provided acceptance certificates for hundreds of MSGs purportedly signed by Ahern Ad to Plaintiff, the Funds, and other purchasers.

335.    On information and belief, Ahern Ad knew or should have known that Plaintiff, the Funds, and other purchasers would rely on the acceptance certificates signed by Ahern Ad and would be harmed by such reliance.

**S.    Wrongful Conduct by Ahearn**

336.    On information and belief, Ahern negotiated or executed the Ahern Lease, Fund IX Lease, Ahern Guaranty, Ahern Sublease, Efficient Energy Distribution Sublease, Ahern Ad Lease, and Second Ahern Ad Lease.

337.    On information and belief, Ahern knew or should have known that the DC Solar Enterprises were using the Ahern Lease, the Fund IX Lease, and the Ahern Ad Lease to provide misleading information to Plaintiff, the Funds, and other purchasers.

338.    On information and belief, Ahern knew or should have known that Plaintiff, the Funds, and other purchasers would rely upon the Ahern Lease and the Ahern Ad Lease and be harmed by such reliance.

339.    Ahern knew or should have known that the DC Solar Enterprises would not provide the Ahern Sublease, Ahern Guaranty, Efficient Energy Distribution Sublease, or Second Ahern Ad Lease to Plaintiff, the Funds, or other purchasers, or inform the same of the actual number of MSGs leased by Ahern Rentals and Ahern Ad.

340.    On information and belief, Ahern knew or should have known that Plaintiff, purchasers, and prospective purchasers would rely on these omissions and be harmed by such reliance.

341.    On information and belief, Ahern also executed acceptance certificates for hundreds of MSGs or knew or reasonably should have known that the DC Solar Enterprises had provided acceptance certificates for hundreds of MSGs purportedly signed by Ahern to Plaintiff, the Funds, and other purchasers.

**T.    Wrongful Conduct by Alvarez & Marsal**

342.    On information and belief, Alvarez & Marsal rendered its appraisal services in a careless and negligent manner. Plaintiff was an intended user of the appraisals in its own right and as the agent of the Funds, who were also intended users.  Thus, Alvarez & Marsal owed duties of care to Plaintiff and the Funds.

343.    Among other aggregating errors, Alvarez & Marsal: (a) failed to use due diligence and care to collect, verify, and analyze all information necessary for accurate

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

appraisal results; (b) failed to identify and weigh actual historical information and trends; (c) failed to identify and weigh actual supply and demand factors; (d) failed to identify and weigh the fact that only about 6,800 MSGs were ever manufactured, whereas 18,400 MSGs were sold to purchasers; (e) failed to identify and weigh the fact that the leasing program by which purchasers were supposed to receive rental income was a complete failure and therefore could never support Alvarez & Marsal's appraisal analyses; and (g) failed to identify product obsolescence and market competition of MSGs over time.

344.   Among other aggregating errors, Alvarez & Marsal: (a) did not perform periodic physical inspection of the MSGs; (b) did not investigate or verify Bayliss' credentials to serve as the "Independent Engineer" upon which Alvarez & Marsal relied for its appraisals; (c) used supposedly "comparable" market data from a company that had gone out of business years before; and (d) used "comparable" MSG units from a business that was no longer manufacturing MSGs.

345.   The Appraisals were unreliably based on the Carpoffs' and other Core Defendants' misrepresentations of a 95% sublease utilization rate, average rents of $700-$1000/month per unit, and projections for additional long-term leases and related future cash flow.  On information and belief, Alvarez & Marsal never verified the accuracy of this underlying data, even when the facts and circumstances cast severe doubt on the truth of the data.

346.   Alvarez & Marsal continued to use unreliable data and continued for years to appraise the MSGs at $150,000 each, regardless of the facts, even after learning about the IRS fund audits, in which the IRS cast serious doubt on the accuracy of the appraisals.

347.   On information and belief, Alvarez & Marsal never changed its $150,000 initial valuation to account for new information about actual lease data, nor did Alvarez & Marsal investigate to determine whether its valuation of MSGs should change over time for a number of reasons, including obsolete technology.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

348.   On information and belief, Alvarez & Marsal never received actual copies of the subleases, and did not investigate whether fraudulent lease revenue was legitimate, accurate, or even existed.

349.   On information and belief, Alvarez & Marsal never questioned the exorbitant markup of the MSGs' putative value over and above the actual cost of production.

350.   As a result of a series of theses aggregating errors, among others, the appraisals rendered by Alvarez & Marsal breached the duty of care owed to Plaintiff, the Funds, and other purchasers, fell below applicable professional standards, as described in more detail below, and were the proximate cause of damages to Plaintiff, the Funds, and other purchasers.

**U.**   **Wrongful Conduct of Halo**

351.   Halo, despite being the managing member of multiple Funds, took no actions after the FBI Raid to protect or preserve the MSGs owned by the Funds it was managing.

352.   Plaintiff, at the request of members in Halo-managed Funds and at its own expense, assisted by advancing money or services relating to the Halo-managed Funds and Halo has not provided compensation to Plaintiff for those monies and services.

**V.**   **Wrongful Conduct of Wilde**

353.   On information and belief, Wilde knew or should have known of the financial failure of the sublease program and the lack of existence or continued production of MSGs.

354.   On information and belief, Wilde assisted in presenting false or misleading information to Plaintiff, the Funds, and other purchasers, and assisted in concealing information from Plaintiff, the Funds, and other purchasers.

355.   By way of example, Wilde is copied on March 14, 2018 email from Karmann regarding draft financial statements for DC Solar Distribution to which Karmann replies, "Draft financial statements – DC Solar Distribution … balance sheet might need some work/adjustments". The balance sheet attached to the aforementioned email discloses that Distribution owed over $20,000,000 to Solutions and that the amount had increased during 2017 by over $18.7 million.

**W.    Wrongful Conduct of Moore**

356.    On information and belief, Moore knew of the substantial irregularities with the DC Solar Enterprises and assisted other Core Defendants to perpetuate the fraud by the DC Solar Enterprises.

357.    On information and belief, Moore is the owner of Efficient Energy Distribution, Inc. ("Efficient Energy").

358.    On information and belief, Moore, through Efficient Energy, entered into leases or subleases of MSGs that he knew or should have known would be used by the DC Solar Enterprises to show Plaintiff, the Funds, and other purchasers as evidence of third-party leases for the MSGs.

359.    On information and belief, Moore knew that Efficient Energy would not make the payments under the leases or subleases and that such payments would be made by Solutions or a related entity.

360.    On information and belief, Moore knew or should have known that Plaintiff, the Funds, and other purchasers would not be told of the payments by Solutions or a related entity and would rely on these omissions and be harmed by such reliance

361.    On information and belief, Moore assisted the Carpoffs in continuing to carry out the scheme of the DC Solar Enterprises by, among other things, assisting with collecting money from individuals who owed money to the Carpoffs or one of their entities.

362.    On information and belief, Moore had regular meetings with, among other Core Defendants, Roach. On information and belief, those meetings involved discussions of the actions of the DC Solar Enterprises that harmed Plaintiff, the Funds, and purchasers.

**X.    Wrongful Conduct of Jano**

363.    On information and belief, Jano started working for the DC Solar Enterprises in early 2017.

364.    During his employment with the DC Solar Enterprises, Jano uncovered the fraudulent financial scheme of DC Solar Enterprises, including discovering that the leases

Snell & Wilmer

L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

and revenues were virtually non-existent and that most of the revenue of Distribution came from Solutions.

365. On information and belief, Jano resigned his employment in 2018.

366. However, Jano did not inform Plaintiff or, on information and belief, any of the other purchasers about the fraudulent scheme of the DC Solar Enterprises.

367. Instead, Jano sought compensation from the DC Solar Enterprises or the Carpoffs after resigning his position.

**Y.    The Federal Tax Audits and the State of California Tax Audits**

368. Starting as early as 2013, red flags began emerging in the operations of the DC Solar Enterprises.

369. Solutions, some of the Funds, and the Carpoffs individually became subject of audits by the IRS and by the State of California regarding income, sales, and franchise taxes.

370. As of 2018, the potential tax liability of Solutions with respect to these audits was hundreds of millions of dollars.

371. The IRS contested the $150,000 valuation of the MSGs in at least five separate federal income tax audits of tax equity funds.

372. On information and belief, many of the Defendants had knowledge of the audits with the IRS and the State of California.

**Z.    Plaintiff Asks Questions, and the Carpoffs Stop Dealing with Plaintiff**

373. During 2016 and 2017, as some of the Funds began nearing the five-year equity flip benchmark, Jansen, believing Plaintiff would soon become the majority member of those Funds and effective owner of thousands of MSGs, began asking questions of the Carpoffs and the other Core Defendants regarding potential tax implications and other ownership-related effects on Plaintiff.

374. Further, Jansen asked Kershaw questions on behalf of Plaintiff about Plaintiff's bank account at Heritage Bank. On information and belief, Kershaw acting in her capacity as an officer of Heritage Bank, would not give the requested information to Jansen,

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

and instead contacted the Carpoffs informing them of Jansen's contact and questions, even though Jansen was the primary account signer for Plaintiff.

375.    Soon thereafter, in or about later 2016 or early 2017, rather than answer Jansen's inquiries and risk revelation of the fraudulent nature of the DC Solar Enterprises, the Carpoffs stopped dealing with Plaintiff and instead created Halo as new manager of investments in the DC Solar Enterprises.

376.    Halo was created in 2017 with Roselli as the managing member.

377.    On information and belief, Roselli was or is a personal friend of the Carpoffs, and had a previous business relationship with the Carpoffs.

## AA.    **The Truth About Subleases of MSGs to End Users and the Collapse of the DC Solar Enterprises**

378.    No later than 2014, the Core Defendants knew that the sublease program of the DC Solar Enterprises was a huge financial failure, and that Distribution had a massive cash shortfall from lack of real lease revenues.

379.    Although Distribution purported to be earning millions each month in lease revenue from end users of the MSGs, bank records demonstrate that Distribution generated minimal lease revenue from subleases to end users.

380.    To further illustrate, in an email dated July 18, 2016 from Roach to Mr. Carpoff and Lauer, Roach attached five spreadsheets summarizing the sublease activity for Distribution from 2012 to 2015.

381.    These documents reflect sublease revenue of $138,138.64 for 2012, $278,179.74 for 2013, $321,717.06 for 2014, and $1,419,570.80 for 2015, for a grand total over four years of $2,157,606.24.

382.    The actual cash requirement from the subleases of the MSGs under Distribution's lease program over that four-year time period – stated as a percentage of promised utilization – was a dismal 3.78%.

383.    This failure of the sublease program also endangered the touted tax benefits of the MSG transactions.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

384.   This failure of the sublease program also invalidated the stated appraisal value of $150,000 for MSGs.

385.   In a later email dated March 2, 2017, Roach updated the dismal four-year performance to include another dismal performance for sublease revenue for 2016 – $2,071,664.85.

386.   Roach also stated in this email that the following amounts were paid by Solutions to Distribution on a "re-rent" basis from 2013 to 2016: (i) 2013 – $1,595,370, (ii) 2014 – $13,975,770, (iii) 2015 – $30,562,024, (iv) 2016 – $61,545,737.

387.   On information and belief, the Core Defendants knew about the foregoing sublease revenues, and the massive cash payments from Solutions to Distribution required to disguise the massive shortfall in revenues promised to Plaintiff, the Funds, and other purchasers.

388.   Over time, the Core Defendants took drastic measures to conceal the financial failure of the MSG transactions from Plaintiff, the Funds, and other purchasers.

389.   The Core Defendants created fake subleases, circular subleases, and dummy third-party sublessors to make the sublease program appear legitimate.

390.   During the period of January 2013 through December 2018, a total of about $409,930,000 was deposited into Distribution's bank accounts.

391.   Of that amount, approximately $383,347,000 – or 93.5% – consisted of transfers from Solutions' bank accounts. Another $8,268,000 – or 2.0% – consisted of transfers from the bank accounts of different Funds.

392.   At most, $18,316,000 – or 4.5% – of the deposits to Distribution's bank accounts during that 2013 to 2018 time period represented sublease payments from end users of the MSGs.

393.   Wentz and Yee were informed of these large cash transfers prior to the completion of the 2017 certified audited financial statements for the DC Solar Enterprises, and, on information and belief, as early as 2015.

394.   The Core Defendants prepared and disseminated false financial statements and compilation reports falsely stating that Distribution generated hundreds of millions of dollars of revenues in "Rental Income."

395.   On information and belief, the cash infusions of hundreds of millions of dollars from Solutions to Distribution were hidden in the "Direct Costs" category of Solutions' income statements.

396.   These putative Direct Cost payments had nothing to do with the costs of manufacturing the MSGs.

397.   Because the MSGs could not be leased, the Core Defendants began storing and stashing away MSGs they failed to sublease, which were stacking up, in some cases incurring significant storage costs.

398.   Because the MSGs could not be leased, the Core Defendants started "leasing" MSGs for free, including through Freedom, and essentially using the MSGs as advertising props in an attempt to attract attention.

399.   On information and belief, starting in 2016, Solutions stopped buying and manufacturing MSGs for some of the Funds altogether, but never disclosed this fact.

400.   In truth, Solutions never manufactured or received delivery of nearly two-thirds of the MSGs that it "sold" to purchasers.

401.   Intensive efforts by Plaintiff to locate those MSGs turned up roughly 6,800 MSGs of the approximately 18,400 MSGs for which Bayliss provided IE Commissioning Reports.

402.   The Core Defendants began putting new VIN numbers on old units, or misrepresenting VINs in order to conceal the fact that new MSGs were not being produced and older units were never subleased.

403.   On information and belief, at times, Solutions represented that the same MSG had been sold to different purchasers, but with changed VINs, with no awareness by either the old or new purchaser of the fraud.

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

404.   The Core Defendants made false representations to Plaintiff, the Funds, and others purchasers regarding production of MSGs, alleged lease revenue, and other lies or misrepresentations as part of the schemes.

405.   The Core Defendants knew when making those representations that MSGs were not being produced or received, and that the Core Defendants did not intend to produce or receive MSGs on any timely basis.

406.   The Core Defendants directed each other and others, including but not limited to, the other Defendants, to lie and present false information to perpetuate and/or cover up the fraudulent schemes.

407.   In December 2018, law enforcement agents executed federal search warrants at DC Solar Solutions Inc.'s headquarters and other locations, seizing tens, if not hundreds, of millions of dollars' worth in assets.

408.   On January 30, 2019, the first DC Solar Enterprise company filed for Chapter 11 bankruptcy.

409.   Thereafter, additional DC Solar Enterprise-affiliated companies filed for Chapter 11 bankruptcy.

410.   Subsequently, all of the DC Solar Enterprise Chapter 11 cases were converted to Chapter 7 liquidation cases.

**BB.   The Carpoffs' Preparations for Escape and the Hiding of Assets**

411.   In or about 2018, the Carpoffs, in various ways, began withdrawing large amounts of money from the DC Solar Enterprises, including a transfer of $20,000,000 to Panda International.

412.   In May 2018, the Carpoffs held extensive discussion with Strauss about obtaining citizenship in Nevis Island, a well-known asset shelter in the Caribbean.

413.   Later, in August 2018, the Carpoffs bought property in Nevis Island for $5 million and used DC Solar International, a Nevis corporation, to undertake a sale leaseback transaction.

414. On information and belief, the Carpoffs also started making plans to flee the United States if necessary, which included obtaining expedited renewal of their passports.

415. Strauss and the Strauss Firm created the Nevis transactions and also created offshore accounts, offshore trusts, and captive insurance companies such as Bayshore and Champion, which permitted the Carpoffs to hide their ill-gotten assets outside of the United States.

416. For example, the Carpoffs created the Trusts in 2016, utilizing Wentz and the Strauss Firm.

417. As part of their continuing scheme to conceal the fraud behind the DC Solar Enterprises, the Carpoffs were to execute a statement of solvency, which was at that time, completely untrue.

418. The Carpoffs also instructed Wentz to utilize Panda International, a company located in Hong Kong that had been created earlier to purportedly purchase batteries for the MSGs, but which allowed for funds to be effectively parked outside of the United States.

419. On information and belief, the $20,000,000 that the Carpoffs transferred to Panda International was then placed in the hands of the Asset Hiders.

420. With assistance from Lauer, the Strauss Firm, Strauss, and Hacker, among others, the Carpoffs also created DC Solar International, an international corporation in Nevis, a notorious off-shore tax shelter, to be party to certain sale-leaseback deals rather than Solutions, in order to keep income out of the United States.

421. During the time that the Carpoffs were setting up offshore, in August 2018, Mr. Carpoff pushed to collect more monies from many sources, and he involved Moore to collect on a debt for which the debtor feared for his family's safety.

**CC. Allegations Related to RICO Violations**

422. Plaintiff is a "person" within the meaning of 18 U.S.C. § 1964(c).

423. At all times relevant hereto, Plaintiff and all Defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

### 1) *The Enterprise*

424.    An enterprise for purposes of RICO violations need not be a specific legal entity, but rather may be "any union or group of individuals associated in fact although not a legal entity."

425.    In this case, the enterprise for RICO purposes consists of the Core Defendants (the "Enterprise").

426.    The Core Defendants, individually and through their agents, represented to their victims that the MSG purchases qualified for an "Energy Credit" under Internal Revenue Code § 48, as well as for depreciation.

427.    However, on information and belief, these purchases' qualification for the Tax Credit under the Internal Revenue Code is unclear because most of the MSGs purportedly sold to purchasers were never manufactured, delivered, or placed into service.

428.    The fraudulent schemes of the Core Defendants were devised solely to generate significant monies, thereafter consumed by the Core Defendants for personal purposes or to pay off earlier purchasers, rather than to manufacture or pay for delivery of the promised new MSGs.

429.    Because the terms of the Fund Contracts tied the fortunes of the purchasers to those of the DC Solar Enterprises and its ability to manufacture and then sublease them at optimal or above true-market value rates, purchasers were investing in a common Enterprise.

430.    Because the terms of the Fund Contracts made purchasers entirely dependent on the DC Solar Enterprises to manufacture, operate, and maintain their purported MSGs, the DC Solar Enterprises, and the Core Defendants' efforts, were essential to the failure or success of the common Enterprise.

431.    Purchasers also had an expectation of profits from the tax benefits and payment stream to be generated from the Enterprise.

432.    The Core Defendants engaged in a common plan, transaction, and course of conduct described in this First Amended Complaint in connection with the solicitation of

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

purchases of MSGs, pursuant to which the Core Defendants knowingly or recklessly engaged in acts, transactions, practices, and a course of business that operated as a fraud upon Plaintiff, the Funds, and other purchasers. The primary purpose and effect of the business was to generate significant income by fraudulently selling and subleasing MSGs.

433.   The Core Defendants sought out large, prominent Purchasing Members with high visibility and high taxable income in order to carry out the fraudulent schemes.

434.   While the Core Defendants participated in the Enterprise and were a part of it, the Core Defendants also had an existence separate and distinct from the Enterprise.

435.   The Core Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

436.   The Core Defendants' control and participation in the Enterprise was necessary for the successful operation of the Core Defendants' fraudulent schemes.

437.   The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Core Defendants engaged.

### 2)   *Operation of the Enterprise*

438.   The Core Defendants perpetrated the fraudulent schemes detailed in this First Amended Complaint.

439.   Each of the Core Defendants was vital to implementation of the fraudulent schemes, played a central role in the Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise.

440.   The Core Defendants intended to commit wire and/or mail fraud and money laundering in connection with the promotion and operation of the fraudulent schemes based on the significant evidence uncovered in this case to date by law enforcement, Plaintiff, and others.

441.   The Core Defendants' racketeering activity in creating, designing, establishing, promoting, and vouching for the fraudulent schemes involved numerous false

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

442.   Plaintiff, the Funds, and other purchasers relied on the Core Defendants' representations in perpetrating the fraudulent schemes, and have been damaged by the Core Defendants' actions.

### 3)   Predicate Facts

443.   With respect to the activities alleged herein, the Core Defendants acted at all times with malice toward Plaintiff and the Funds, intending to engage in the conduct complained of for the benefit of the Core Defendants and with knowledge that such conduct was unlawful.

444.   The conduct of the Core Defendants was done with actionable wantonness and reckless disregard for the rights of Plaintiff and the Funds, as well as the laws to which the Core Defendants are subject.

445.   With respect to the activities alleged in this First Amended Complaint, each Core Defendant agreed to the operation of the transaction or artifice to deprive Plaintiff and the Funds of property interests.

446.   In furtherance of these agreements, each Core Defendant also agreed to interfere with, obstruct, delay, or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Core Defendants were not entitled.

447.   With respect to the overt acts and activities alleged herein, each Core Defendant conspired with each other to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

448.   Each Core Defendant also agreed and conspired with each other Core Defendant to participate, directly or indirectly, in interfering with, obstructing, delaying, or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Core Defendants were not entitled.

449.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by the Core Defendants designed

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1   to defraud Plaintiff and the Funds of money and property interests under false pretenses.

2   450.   Each Core Defendant also agreed and conspired with each other Core

3   Defendant to participate, directly or indirectly in monetary transactions that each Core

4   Defendant knew involved criminally derived property worth more than $10,000, which

5   property was derived from wire fraud in violation of 18 U.S.C. § 1343.

6   451.   As a victim of these unlawful patterns of illegal activity, Plaintiff and the

7   Funds have suffered and continue to suffer losses as a result of these activities. The acts

8   which caused injuries to Plaintiff and the Funds were performed for financial gain.

9   452.   In carrying out the overt acts and fraudulent transactions described above, the

10   Core Defendants engaged in, *inter alia*, conduct in violation of federal laws, including 18

11   U.S.C. §§ 1343-1346, 18 U.S.C. § 1957, and 18 U.S.C. § 1961 *et seq*.

12   453.   Section 1961(1) of RICO provides that "racketeering activity" means any act

13   indictable under any of the following provisions of Title 18, United States Code § 1343

14   (relating to wire fraud), § 1346 (relating to scheme or artifice to defraud), and § 1957

15   (relating to engaging in monetary transactions in property derived from specified unlawful

16   activity).

17   *4)   Violations of 18 U.S.C. § 1343*

18   454.   For the purpose of executing and/or attempting to execute their transactions

19   to defraud and to obtain money by means of false pretenses, representations or promises,

20   the Core Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire

21   and/or mail matter and things therefrom including but not limited to contracts, instructions,

22   correspondence, funds, and other interstate transmittals and transfers.

23   455.   The Core Defendants' violations of 18 U.S.C. § 1343 are subject to continuing

24   investigation and revaluation.

25   456.   However, the acts described *supra*, provide, by way of illustration but not

26   limitation, representative examples of the Core Defendants' 18 U.S.C. § 1343 violations.

27   457.   Each of the documents, invoices, letters, emails, applications, and/or tax

28   forms that the Core Defendants sent by wire and/or mail to Plaintiff served at least two roles

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

in the Enterprise.

458.   First, these documents, standing alone, were fraudulent. The Core Defendants knew that the vast majority of MSGs allegedly being sold were not in existence or being subleased.

459.   Second, in addition to being fraudulent standing alone, these documents were used to advance the fraudulent schemes that the Core Defendants perpetrated on Plaintiff.

460.   In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail the Core Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiff as described above, in violation of 18 U.S.C. § 1343.

461.   The Core Defendants' fraudulent statements and omissions include insufficient demand in the market for the MSGs, i.e., that the MSGs would all be leased and would retain sufficient value after five years to repay the Promissory Notes to Solutions and return additional revenue to the relevant Fund.

462.   The Core Defendants' fraudulent statements and omissions include that Distribution had subleased thousands of MSGs to legitimate third-party lessees for amounts that would support each MSG's $150,000 valuation.

463.   The Core Defendants' fraudulent statements and omissions include that Solutions or one of the other Core Defendants, had separate agreements with the major sublessees which negated or paid the lease payments that Distribution owed.

464.   The Core Defendants' fraudulent statements and omissions include that all MSGs sold had been built and were "placed in service" as of the closing date of each Purchase Agreement, or any subsequent dated provided therein.

465.   The Core Defendants' fraudulent statements and omissions include that Bayliss was an independent engineer who had viewed and tested all of the MSGs sold.

466.   On information and belief, the predicate acts, including the predicate acts of wire fraud, are continuing.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

467.   The Core Defendants, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Plaintiff as set out above.

468.   The Core Defendants intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiff, for the purpose of deceiving Plaintiff and thereby obtaining financial gain.

469.   The Core Defendants either knew or recklessly disregarded that the misrepresentations and omissions described above were material.

470.   Plaintiff was injured as a result of the misrepresentations.

471.   The Core Defendants made continual use of wire transmissions, in addition to communications made outside the interstate wire system, to effectuate their fraudulent schemes. In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the Core Defendants transmitted numerous specific fraudulent statements to Plaintiff through the mail, by fax, and/or by email.

472.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire fraud, committed by the Core Defendants pursuant to their transactions to defraud Plaintiff.

473.   Plaintiff has therefore been injured in its business or property as a result of the Core Defendants' overt acts and racketeering activities.

### 5)   *Pattern of Racketeering Activity*

474.   As set forth above, the Core Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years.

475.   Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiff.

476.   The multiple acts of racketeering activity committed and/or conspired to by Defendants, as described above, were related to each other and amount to and pose a threat

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5). Plaintiff alleges that the course of conduct engaged in by the Core Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

477.   Plaintiff can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise." All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the schemes so that the Core Defendants could defraud Plaintiff. Plaintiff alleges that the continuity of the pattern of racketeering activity is "closed-ended" in as much as a series of related predicate offenses extended since at least 2011 (a substantial period of time).

478.   Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicates are attributed to the Core Defendants' operations as part of a long-term association that existed for criminal purposes. Further, the last act of racketeering activity that is alleged as the basis of Plaintiff's claims occurred within four years of a prior act of racketeering.

479.   The Carpoffs, Roach, Karmann, Bayliss, Guidry, and Hansen, all Core Defendants who assisted with the operations of the Enterprise, have pled guilty to federal felonies, including Conspiracy to Commit Wire Fraud (under 18 U.S.C. § 1349), Money Laundering (under 18 U.S.C. § 1957(a)), Conspiracy to Commit an Offense Against the United States (under 18 U.S.C. § 371), and Aiding and Abetting Money Laundering (under 18 U.S.C. §§ 2 and 1957(a)).

480.   Plaintiff therefore has been injured in its business or property as a result of the Core Defendants' overt acts and racketeering activities as described above and throughout this First Amended Complaint.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

## V.  **DAMAGES**

481.   Plaintiff was damaged by all Defendants in various ways.

482.   First, Plaintiff suffered costs for the presumptive value of the MSGs purchased by the Funds but never delivered.

483.   Second, Plaintiff incurred significant costs related to closing the deals to purchase the MSGs, as well as to locate and store MSGs after the schemes were uncovered.

484.   Third, Plaintiff was deprived of the benefit of its bargain, specifically the value of the promised Tax Credit, depreciation, rental, and management income.

485.   Fourth, Plaintiff paid for services not rendered, and those amounts should be disgorged.

486.   Fifth, Plaintiff has been forced to hire counsel and is damaged in the amount of its attorneys' fees and costs.

## VI.   **CLAIMS FOR RELIEF**

### **Count I**

### **(Federal RICO – 18 U.S.C. § 1962(c) – Core Defendants)**

487.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

488.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

489.   Plaintiff incorporates, as though fully set out herein, its allegations regarding the existence of an Enterprise set forth above.

490.   The Core Defendants' Enterprise was engaged in activities that affected interstate or foreign commerce, including, but not limited to, wire transfers, transferring property across state and international lines, emails, mail, etc.

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

491.   The Core Defendants were each employed by, or associated with, the Enterprise.

492.   The Core Defendants knowingly conducted the Enterprise's affairs or knowingly participated, directly or indirectly, in the conduct of the Enterprise's affairs in various capacities.

493.   Plaintiff incorporates, as if fully set forth herein, its allegations that the Core Defendants have knowingly engaged in the Enterprise's affairs through a pattern of racketeering activity as set forth above.

494.   Through the fraudulent and wrongful conduct described in this First Amended Complaint, the Core Defendants seek and have sought to deprive Plaintiff of money and property rights.

495.   To successfully execute their schemes in the manner set forth in this First Amended Complaint, the Enterprise was the system that allowed to access their victims in a manner to effectuate the fraudulent transactions.

496.   With respect to the activities alleged herein, the Core Defendants have acted at all times with malice toward Plaintiff in their efforts to acquire and maintain an interest in an Enterprise that affects interstate or foreign commerce.

497.   In carrying out the overt acts and fraudulent scheme described above, the Core Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1343 and 1346, 18 U.S.C. § 1957(a), and 18 U.S.C. §1961, *et seq*. as set forth more fully above.

498.   Therefore, the Core Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under any of the following provisions of 18 U.S.C. § 1343 (relating to wire fraud) . . . section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity)… ."

499.   As a proximate result of the Core Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiff has been injured in its business or property

Snell & Wilmer

L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

as described above.

## Count II

### (Federal RICO – 18 U.S.C. § 1962(d) – Core Defendants)

500.    Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

501.    This claim for relief arises under 18 U.S.C. § 1964(a) and seeks relief from the Core Defendants' activities described herein for violations of 18 U.S.C. § 1962(d) for their conspiracy to violate 18 U.S.C. § 1962(c).

502.    Plaintiff incorporates, as if fully set forth herein, its allegations regarding the Enterprise as set forth above.

503.    Plaintiff incorporates, as if fully set forth herein, its allegations that the Core Defendants have engaged in a pattern of racketeering activity as set forth above.

504.    The Core Defendants, which consist of more than two persons, agreed to conduct or to participate, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

505.    The Core Defendants were each a party to or a member of that agreement.

506.    The Core Defendants joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity and intending to join together with at least one other alleged conspirator to achieve that objective; that is, the Core Defendants shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

507.    Absent the Core Defendants' conspiracy and joint efforts, the Core Defendants' schemes would not be successful. Acting jointly, the Core Defendants have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

508.   The Core Defendants have also violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the 18 U.S.C. § 1962(c) Enterprise described previously through a pattern of racketeering activity.

509.   As demonstrated in detail above, the Core Defendants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud Plaintiff of money and other property interests.

510.   The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that the Core Defendants not only agreed to the objective of a violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), but that they also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

511.   The Core Defendants have engaged in the commission of overt acts and the following described unlawful racketeering predicate acts that have generated income or proceeds received by the Core Defendants from such pattern of racketeering activity, including: (i) multiple instances of wire fraud violations of 18 U.S.C. § 1343; (ii) multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud; and (iii) multiple instances of money laundering violations of 18 U.S.C. § 1957.

512.   As a proximate result of the Core Defendants' conduct as described above, Plaintiff has been injured in its business or property as described above.

## Count III

### (Fraud: Intentional Misrepresentation – Core Defendants)

513.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

514.   In perpetrating the schemes, the Core Defendants represented to Plaintiff that certain facts were true – the Funds would receive certain tax and other monetary benefits,

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

and obtain title to MSGs, from the Funds' purchase of MSGs from Solutions.

515.   The Core Defendants' representations were false.

516.   The Core Defendants knew that the representations were false when they made them or that they made the representations recklessly and without regard for the truth.

517.   The Core Defendants intended that Plaintiff rely on the representations.

518.   Plaintiff reasonably relied on the Core Defendants' representations.

519.   Plaintiff became a member in the Funds and undertook obligations as a managing member based upon the representations of the Core Defendants.

520.   Plaintiff was harmed.

521.   Plaintiff's reliance on the Core Defendants' representation was a substantial factor in causing Plaintiff's harm.

## Count IV

### (Fraud: Concealment – Core Defendants)

522.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as fully set forth here.

523.   In perpetrating the schemes, the Core Defendants intentionally failed to disclose certain facts to Plaintiff, i.e., that the MSGs were not being manufactured or subleased, and that the alleged lease revenues paid to the Funds by Distribution were in reality circulated purchaser monies paid to Solutions for new MSGs.

524.   One or more of the Core Defendants had a fiduciary obligation to Plaintiff.

525.   The Core Defendants intentionally failed to disclose these and other material facts to Plaintiff, which were known only to the Core Defendants and could not be easily discovered by Plaintiff, and prevented Plaintiff from discovering these facts.

526.   Plaintiff did not know the concealed facts.

527.   The Core Defendants intended to deceive Plaintiff by concealing the facts.

528.   Plaintiff became a member in the Funds and undertook obligations as a managing member based upon the concealment of the Core Defendants.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

529.   If the omitted information had been disclosed to Plaintiff, Plaintiff would have reasonably acted differently.

530.   Plaintiff was harmed.

531.   The Core Defendants' concealment was a substantial factor in causing Plaintiff's harm.

### Count V

### (Fraud in the Inducement – Core Defendants)

532.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

533.   In perpetrating the schemes, the Core Defendants represented to Plaintiff that the Funds would receive certain tax and other monetary benefits, and obtain title to MSGs, from the Funds' purchase of MSGs from Solutions.

534.   Additionally, the Core Defendants represented to Plaintiff that there were sufficient lease revenues and third-party leases to lease the MSGs being sold to the Funds.

535.   Further, the Core Defendants represented to Plaintiff that the MSGs for each Fund were built and would exist at the end of the five to seven years, when Plaintiff would become the 95% owner of each Fund.

536.   The Core Defendants' representations were false.

537.   The Core Defendants knew that the representations were false when they made it.

538.   The Core Defendants intended that Plaintiff rely on the representations.

539.   Plaintiff and the Funds were induced into entering into transactions with Solutions based on the Core Defendants' false representations and fraud.

540.   Plaintiff reasonably relied on the Core Defendants' representations.

541.   Plaintiff became a member in the Funds and undertook obligations as a managing member based upon the representations of the Core Defendants.

542.   Plaintiff was harmed.

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

543.   Plaintiff's reliance on the Core Defendants' representation was a substantial factor in causing Plaintiff's harm.

### Count VI

### (Conversion – Core Defendants)

544.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

545.   As a member of the Funds, Plaintiff holds an ownership interest in the MSGs and/or the money paid to Solutions for the purchase of the purportedly-existing MSGs.

546.   The Core Defendants substantially interfered with Plaintiff's property rights by knowingly or intentionally preventing Plaintiff and the Funds from having access to the MSGs, which were largely non-existent.

547.   Plaintiff did not consent to the Core Defendants' interference with its property rights.

548.   Plaintiff was harmed as a result of the Core Defendants' interference.

549.   The Core Defendants' conduct was a substantial factor in causing Plaintiff's harm.

### Count VII

### (Civil Conspiracy – Core Defendants and Scheme Aiders/Abettors)

550.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs.

551.   The Core Defendants and Scheme Aiders/Abettors acted in combination.

552.   The Core Defendants and Scheme Aiders/Abettors intended to accomplish an unlawful objective together.

553.   The Core Defendants and Scheme Aiders/Abettors, through their acts or omissions, sought to fraudulently induce Plaintiff to take actions and undertake obligations relating to the Funds, to make fraudulent misrepresentations to Plaintiff, or to fraudulently conceal information from Plaintiff relating to the Funds, the MSGs, and the DC Solar Enterprises.

554.   The Core Defendants and Scheme Aiders/Abettors agreed to a concert of actions to accomplish this objective.

555.   The Core Defendants and Scheme Aiders/Abettors each intentionally committed the acts set forth in the preceding paragraphs to accomplish this objective.

556.   The Core Defendants and Scheme Aiders/Abettors were each aware that the others committed the acts set forth in the preceding paragraphs to accomplish this objective.

557.   The Core Defendants and Scheme Aiders/Abettors, by agreement, intended to accomplish an unlawful objective for the purpose of harming Plaintiff and others.

558.   The Core Defendants and Scheme Aiders/Abettors committed unlawful acts in furtherance of the agreement.

559.   Plaintiff suffered damages as a result of the acts of the Core Defendants and Scheme Aiders/Abettors.

## Count VIII

### (Unjust Enrichment/Restitution – Core Defendants and Halo)

560.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as fully set forth here.

561.   The Core Defendants were enriched as a result of Plaintiff's management services, services in locating and moving MSGs, and/or monetary participation in the Core Defendants' businesses.

562.   Halo was enriched by Plaintiff advancing funds and incurring costs by which Halo benefitted, but refused or failed to reimburse for or pay to Plaintiff.

563.   Plaintiff was impoverished as a result of these services and/or participation without promised compensation from the Core Defendants or Halo.

564.   The Core Defendants and Halo knew or should have known that the money and services provided by Plaintiff belonged to Plaintiff and/or should have been paid to Plaintiff.

565.   Plaintiff is entitled to restitution for the services and money it provided.

566.   If no adequate remedy at law is available for Plaintiff's impoverishment, Plaintiff is entitled to recover under a theory of unjust enrichment and/or restitution.

## Count IX

### (Intentional Interference with Contractual Relations – Core Defendants)

567.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

568.   There were contracts between Plaintiff and third parties.

569.   Specifically, Plaintiff had contracts with the Funds and the purchasers.

570.   The Core Defendants knew of the contracts.

571.   The Core Defendants' conduct prevented performance under the contracts or made performance more expensive or difficult.

572.   The Core Defendants intended to disrupt the performance of these contracts and/or knew that disruption of performance was certain or substantially certain to occur.

573.   Plaintiff was harmed as a result.

574.   The Core Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## Count X

### (Intentional Interference with Prospective Economic Relations – Core Defendants)

575.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

576.   Plaintiff and the Funds and purchasers were in an economic relationship that probably would have resulted in an economic benefit to Plaintiff.

577.   The Core Defendants knew of and, in many instances, formed or were a part of the economic relationship between Plaintiff and the Funds and purchasers.

578.   The Core Defendants' engaged in conduct that disrupted the economic relationship between Plaintiff and the Funds and purchasers.

579.   The Core Defendants intended to disrupt the economic relationship and/or knew that disruption of the economic relationship was certain or substantially certain to

Snell & Wilmer
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1   occur.

2        580.   As a result, the economic relationship was disrupted.

3        581.   As a result, Plaintiff was harmed.

4        582.   The Core Defendants' conduct was a substantial factor in causing Plaintiff's

5   harm.

6                              **Count XI**

7                   **(Professional Negligence – Lauer)**

8        583.   Plaintiff repeats, realleges, and incorporates each and every prior factual

9   allegation in the preceding paragraphs.

10       584.   Plaintiff retained Lauer to provide legal services and counsel to Plaintiff with

11  respect to the Funds, MSG purchases, and related matters.

12       585.   As legal counsel for Plaintiff, Lauer had a duty to exercise reasonable care,

13  skill, and diligence in performing legal services and providing legal advice to Plaintiff.

14       586.   Plaintiff reasonably relied on the skill and expertise of Lauer to provide legal

15  advice and counsel consistent with the standard other members of the legal profession

16  commonly possess and exercise.

17       587.   Lauer breached the duty of care owed to Plaintiff by failing to use the skill

18  and care that a reasonably careful attorney would have used in providing legal services and

19  advice in similar circumstances.  Lauer acted negligently.

20       588.   Plaintiff was harmed by Lauer's breach and negligence.

21       589.   Lauer's breach and negligence were a substantial factor in causing Plaintiff's

22  harm.

23                              **Count XII**

24                   **(Breach of Fiduciary Duty – Lauer)**

25       590.   Plaintiff repeats, realleges, and incorporates each and every prior factual

26  allegation in the preceding paragraphs.

27       591.   Lauer was Plaintiff's attorney and acted on behalf of Plaintiff with respect to

28  the Funds, MSG purchases, and related deals.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

592. As Plaintiff's attorney, Lauer owed a fiduciary duty to Plaintiff.

593. Lauer failed to act as a reasonably careful attorney would have acted under the same or similar circumstances. Lauer failed to act in good faith and with the best interests of Plaintiff in mind.

594. Lauer breached his fiduciary duty to Plaintiff.

595. Plaintiff was harmed by the breach.

596. Lauer's conduct proximately caused Plaintiff's harm.

### Count XIII

### (Professional Negligence – Roach)

597. Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

598. Plaintiff retained Roach to provide accounting services and counsel to Plaintiff with respect to the Funds, MSG purchases, and related deals.

599. As accountant for Plaintiff, Roach had a duty to exercise reasonable care, skill, and diligence in performing services and providing advice to Plaintiff.

600. Plaintiff reasonably relied on the skill and expertise of Roach to provide advice and counsel consistent with the standard other members of the accounting profession commonly possess and exercise.

601. Roach breached the duty of care owed to Plaintiff by failing to use the skill and care that a reasonably careful accountant would have used in providing services and advice in similar circumstances. Roach acted negligently.

602. Plaintiff was harmed by Roach's breach and negligence.

603. Roach's breach and negligence were a substantial factor in causing Plaintiff's harm.

### Count XIV

### (Breach of Fiduciary Duty – Roach)

604. Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

\4832-6691-7075

73           FIRST AMENDED COMPLAINT

605.   Roach was Plaintiff's accountant and acted on behalf of Plaintiff with respect to the Funds, MSG purchases, and related deals.

606.   As Plaintiff's accountant, Roach owed a fiduciary duty to Plaintiff.

607.   Roach failed to act as a reasonably careful accountant would have acted under the same or similar circumstances. Roach failed to act in good faith and with the best interests of Plaintiff in mind.

608.   Roach breached his fiduciary duty to Plaintiff.

609.   Plaintiff was harmed by the breach.

610.   Roach's conduct proximately caused Plaintiff's harm.

## Count XV

## (Negligence – Alvarez & Marsal)

611.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

612.   Alvarez & Marsal owed a duty to Plaintiff in preparing the appraisals of the MSGs.

613.   For the reasons set forth above, Alvarez & Marsal breached its duty and was negligent in preparing the appraisals.

614.   As a result, Plaintiff was harmed.

615.   Alvarez & Marsal's conduct was a substantial factor in causing Plaintiff's harm.

## Count XVI

## (Negligent Misrepresentation – Alvarez & Marsal)

616.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

617.   Alvarez & Marsal represented to Plaintiff that the appraisals of the MSGs were true and accurate representations of the value of the MSGs.

618.   Alvarez & Marsal's representations were not true.

619.   Alvarez & Marsal had no reasonable grounds for believing the representations

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

1    were true when it made them.

2        620.    Alvarez & Marsal intended that Plaintiff rely on these representations.

3        621.    Plaintiff reasonably relied on Alvarez & Marsal's representations.

4        622.    Plaintiff was harmed.

5        623.    Plaintiff's reliance on Alvarez & Marsal's representations were a substantial

6    factor in causing Plaintiff's harm.

7                                **Count XVII**

8        **(Professional Negligence – Wentz, Yee, Montage, and Radius/Vistra)**

9        624.    Plaintiff repeats, realleges, and incorporates each and every prior factual

10   allegation in the preceding paragraphs as if fully set forth here.

11       625.    Plaintiff retained Wentz, Yee, Montage, and Radius/Vistra to provide

12   accounting services and counsel to Plaintiff with respect to the Funds, MSG purchases, and

13   related deals.

14       626.    As accountants for Plaintiff, Wentz, Yee, Montage, and Radius/Vistra had a

15   duty to exercise reasonable care, skill, and diligence in performing services and providing

16   advice to Plaintiff.

17       627.    Plaintiff reasonably relied on the skill and expertise of Wentz, Yee, Montage,

18   and Radius/Vistra to provide advice and counsel consistent with the standard other members

19   of the accounting profession commonly possess and exercise.

20       628.    Wentz, Yee, Montage, and Radius/Vistra employees breached the duty of care

21   owed to Plaintiff by failing to use the skill and care that a reasonably careful accountant

22   would have used in providing services and advice in similar circumstances. Wentz, Yee,

23   Montage, and Radius/Vistra acted negligently.

24       629.    Plaintiff was harmed by Wentz, Yee, Montage, and Radius/Vistra's breach

25   and negligence.

26       630.    Wentz, Yee, Montage, and Radius/Vistra's breach and negligence were a

27   substantial factor in causing Plaintiff's harm.

28

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street
Suite 510
Reno, Nevada 89501

## Count XVIII

### (Breach of Fiduciary Duty – Wentz, Yee, Montage, and Radius/Vistra)

631.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

632.   Wentz, Yee, Montage, and Radius/Vistra were Plaintiff's accountants, and acted on behalf of Plaintiff with respect to the Funds, MSG purchases, and related deals.

633.   As Plaintiff's accountants, Wentz, Yee, Montage, and Radius/Vistra owed fiduciary duties to Plaintiff.

634.   Wentz, Yee, Montage, and Radius/Vistra failed to act as reasonably careful accountants would have acted under the same or similar circumstances. Wentz, Yee, Montage, and Radius/Vistra failed to act in good faith and with the best interests of Plaintiff in mind.

635.   Wentz, Yee, Montage, and Radius/Vistra breached their fiduciary duties to Plaintiff.

636.   Plaintiff was harmed by the breach.

637.   Wentz, Yee, Montage, and Radius/Vistra's conduct proximately caused Plaintiff's harm.

## Count XIX

### (Negligent Misrepresentation – All Defendants)

638.   Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

639.   All Defendants, as more fully explained above, represented to Plaintiff that certain information was true regarding the operations of the DC Solar Enterprises, the existence or value of MSGs, or certain financial information related to the DC Solar Enterprises.

640.   Defendants' representations were not true.

641.   Defendants had no reasonable grounds for believing the representations were true when they made them or within the time periods of their involvement.

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

642. Defendants intended that Plaintiff rely on these representations.

643. Plaintiff reasonably relied on Defendants' representations.

644. Defendants failed to disclose information about the operations of the DC Solar Enterprises, the existence or value of MSGs, or certain financial information related to the DC Solar Enterprises that was known, or should have been known, to be important to Plaintiff and purchasers in their transactions.

645. Plaintiff was harmed.

646. Plaintiff's reliance on all Defendants' representations and failure to disclose was a substantial factor in causing its harm.

## Count XX

### (Equitable Contribution/Indemnification – All Defendants)

647. Plaintiff repeats, realleges, and incorporates each and every prior factual allegation in the preceding paragraphs as if fully set forth here.

648. Plaintiff is at risk for claims or causes of action due to the Defendants' schemes, actions, or misrepresentations.

649. To the extent Plaintiff is found liable for damages with respect to such potential causes of action, it is entitled to equitable contribution and/or indemnification from the Defendants due to Defendants' fault.

## VII.   DEFENDANTS ARE EQUITABLY RESPONSIBLE FOR ANY DAMAGES SUFFERED BY PLAINTIFF AS A RESULT OF CLAIMS OR CAUSES OF ACTION AGAINST PLAINTIFF RELATED TO THE DEFENDANTS' SCHEMES. RESERVATION OF RIGHTS

650. Plaintiff hereby reserves and does not waive:

A.    Any and all rights, claims, or remedies against other individuals and/or entities currently the subject of tolling agreements with Plaintiff;

B.    To the extent applicable, any and all claims or remedies that are asserted through Plaintiff's instant suit, and which might benefit any other purchasers, the Funds, and/or other Court-appointed representatives for said purchasers, and/or the Funds; and/or

Snell & Wilmer
L.L.P.
Law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501

C.     The right to name additional individuals and/or entities and seek additional claims and/or further remedies based upon ongoing investigations.

## VIII.   PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendants as follows:

A.     For damages against all Defendants in an amount in an amount to be proven at trial, but in any event no less than $75,000.

B.     For treble damages under RICO against the Core Defendants.

C.     For an award of Plaintiff's reasonable attorneys' fees in an amount to be proven at trial.

D.     For such other relief as the Court may determine.

## IX.     DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues in this litigation that are triable to a jury.

DATED: December 18, 2020

SNELL & WILMER L.L.P.

By:  /s/ Nathan G. Kanute
Nathan G. Kanute
50 West Liberty Street, Suite 510
Reno, NV  89501

Don Bivens *(admitted pro hac vice)*
One Arizona Center, Suite 1900
400 East Van Buren Street
Phoenix, AZ 85004-2202
*Attorneys for Plaintiff*

*Snell & Wilmer*
L.L.P.
law offices
50 West Liberty Street
Suite 510
Reno, Nevada 89501